UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11
                                                Subchapter V
HARRY BECK GREENHOUSE,
                                                Case No. 21-12844-BKC-AJC
        Debtor.

_____/

**LEE GREENHOUSE'S RESPONSE IN
OPPOSITION TO POLYCHAIN'S MOTION TO COMPEL
AND REQUEST FOR SANCTIONS AGAINST POLYCHAIN**

Lee Greenhouse ("Lee"), by and through his undersigned attorneys, hereby objects and responds to the Motion to Compel Production of Documents Pursuant to Subpoena filed by Polychain Partners LLC and Polychain Fund I LP (collectively, "Polychain"). Lee also respectfully moves this Court to impose sanctions against Polychain for *knowingly* submitting a false, misleading and baseless Motion to this Court in its ongoing efforts to harass Lee Greenhouse, the father of Debtor Harry Beck Greenhouse. In support of this response and request for sanctions, Lee states as follows:

**INTRODUCTION**

Lee is not a party to any adversary proceeding nor a creditor in Debtor's bankruptcy proceedings. Lee's "crime" for which Polychain attempts to punish him is that he is the father of Debtor, Harry Beck Greenhouse ("Harry"), and as this Court is well aware, Polychain's disdain, albeit misplaced, for Harry, is never-ending. Indeed, the Bankruptcy Court's docket is replete with motions and objections filed by Polychain designed to prevent Debtor from obtaining the relief he seeks, as well as ongoing efforts by Polychain to conduct scorched earth discovery. *See* e.g., Dkt. Nos. 27, 37, 43-45, 78, 107, 158, 160, 171, 204, 226, 254, 260, 290 and 308. Polychain's tactics have necessarily resulted in an increased expenditure of time and resources

not only for the Debtor, but also for the various third-party targets of Polychain's continuing requests for the production of documents and Rule 2004 examinations.

Lee has clearly been Polychain's favorite target, as Polychain wrongly presumes that Lee must be hiding or falsifying information because he is Debtor's father. However, nothing could be further from the actual truth, and Polychain knows it. Despite Polychain's antics and tactics, Lee has been the consummate, cooperative third-party, and has responded to **all** of Polychain's requests, produced all of the responsive documents in his possession and cooperated fully in Polychain's Rule 2004 examination. Lee has had no choice but to retain counsel to represent him in these proceedings, and has already incurred more than $24,000 in attorneys' fees (not including the fees related to his response to this Motion) as a direct result of Polychain's relentless discovery requests and continued refusal to believe what they are being told by Lee and his counsel. Lee's good faith efforts to be thorough and responsive have not made a difference. Indeed, no good deed goes unpunished.

Polychain's latest Motion to Compel, when stripped to its core, tells a one-sided, disingenuous and misleading tale that should result in sanctions against Polychain. Falsely and repeatedly, Polychain fails to mention (much less attach copies of) the **eight (8)** separate letters, discovery responses and e-mails served upon Polychain's counsel – all of which either attach/include the production of responsive documents or fully explain that no responsive documents exist. Polychain does not like Lee's honest and candid answers, so it files a baseless Motion that does nothing more than accuse Lee and his counsel of lying. Such a bad faith Motion has no place in this or any other litigation proceeding, and Polychain's conduct should not be condoned. The imposition of sanctions against Polychain will serve to grant Lee some financial relief and perhaps curb Polychain's behavior going forward.

## LEE'S RESPONSES TO POLYCHAIN'S
## FALSE AND MISLEADING STATEMENTS

Throughout its Motion, Polychain tells less than half of the complete story, and what Polychain does assert is misleading, if not completely false. As a result, Lee will address and refute many of Polychain's misstatements *infra*, and will support his position with his prior deposition testimony and/or the correspondence previously served on Polychain.[1]

**Polychain's Allegation** – On February 3, 2021, Harry executed a Power of Attorney Agreement in favor of Lee, and terminated that POA on March 26, 2021. *See* Motion at ¶¶ 6-7.

**Lee's Response** – This allegation is true, but misleading. Polychain fails to tell the Court that Lee took no actions whatsoever as Debtor's POA, and there were also no written communications regarding the POA. *See* L. Greenhouse Dep. Transcript at pp. 96, 103. A complete copy of the transcript from Lee's Rule 2004 Examination is attached hereto as Exhibit A; *see also* Richard Saldinger's May 25, 2021, e-mail to Polychain's counsel, a copy of which is attached as Exhibit B.

**Polychain's Allegation** – "[Lee] manages a number of Debtor's investments, special purpose vehicles or joint ventures which invest in various investment funds managed by Union Square Ventures. As the Nominee of the Greenhouse USV Joint Ventures, he almost certainly has unique documents reflecting the value of the joint ventures' interests in the USV funds." *See* Motion at ¶ 8.

**Lee's Response** – This allegation is misleading. At his deposition, Lee explained that the only investments of Debtor that he has any interactions with are the five Greenhouse Union Square Joint Ventures. Lee explained in great detail that each joint venture has an identical structure, and follows the same transparent operating process. All capital contributed by the Greenhouse family investors is deposited into a brokerage account (there is a separate brokerage account dedicated to each Greenhouse Joint Venture), from which funds are paid to Union Square Ventures and distributions are made out of that brokerage account (when distributions are made to the Joint Venture from Union Square) to each investor of the Greenhouse Joint Venture according to their percentage ownership share. All of the funds flowing in and out of the brokerage accounts are a matter of record, and are also mirrored and confirmed by the Union Square capital calls and distribution notices. <u>All of the documents reflecting the same have been produced to Polychain</u>. *See* Ex. A at pp. 15-16, 45-56, 61-66, 125-135, 138-140, 143-145; *see also* Richard Saldinger's May 12, 2021, letter to Polychain's counsel (Exhibit C); Mr. Saldinger's June 14, 2021, letter to Polychain's counsel (Exhibit D) and Lee's *Objections and Responses* to Polychain's *Second Subpoena to Produce Documents* (Exhibit E), all of which evidence the extensive financial information and correspondence produced by Lee to Polychain.

---

[1] In this response, Lee will not address ALL of Polychain's misstatements. Lee's decision not to refute certain statements in the Motion should not be deemed to be a concession or an admission that the statement is accurate.

**Polychain's Allegation** – In response to Polychain's *First* Subpoena seeking documents, Lee made a "limited production of 59 documents responsive to Polychain's Rule 2004 Requests consisting of unsigned copies of agreements underlying the [Greenhouse Ventures] and Form K-1 tax documents for each entity." *See* Motion at ¶¶ 13-14.

**Lee's Response** – This allegation is false and misleading. Lee produced much more than the K-1 statements and certain unsigned Greenhouse Joint Venture Agreements. In response to Polychain's *First* Subpoena, Lee produced ***all*** of the responsive documents including, but not limited to, monthly Morgan Stanley account statements for each Greenhouse Joint Venture, capital account statements for each Greenhouse Joint Venture, Merrill Lynch brokerage statements and all of the fully executed Joint Venture agreements in his possession. *See* Ex. B. Lee explained that he produced certain unsigned Joint Venture Agreements, as he did not readily possess the fully executed version of such agreements due to his ongoing move across the country resulting in such paper files being inaccessible. *Id.*

**Polychain's Allegations** – "Lee admits he failed to conduct a reasonable search." *See* Motion at 5. "[Lee] testified that he conducted the document collection entirely by himself without utilizing keyword search terms and made his own determinations about whether documents were responsive. He further testified that he did not search his hard drive on his personal computer for responsive documents using any keyword search terms. He conducted a manual review of a subset of his e-mails and paper files and did not search any cloud-based platforms that he uses, nor any prior electronic devices that may still be in his possession." *Id.* at ¶ 16.

**Lee's Response** – These allegations are also false and misleading, and Polychain again knows that is the case. As explained by Lee during his deposition and as further explained in his counsel's June 9, 2021, letter (*see* Exhibit F), Lee's search for relevant documents was thorough and exhaustive, as he searched both of his Gmail accounts and all of his text messages. *See* Ex. A at 10-13, 83-84. There was no need for Lee to conduct a "key word search" because Lee literally looked through and examined ***every*** single e-mail between himself and Debtor searching for any responsive communications. *Id.* He also did not have to search the hard drive of his computer because Gmail (which Lee uses for e-mail) is a cloud-based service. Thus, Lee did search through the only cloud-based platform that he uses. *See* Ex. F. Still further, Lee explained that he did not possess any "prior electronic devices," so there was nothing for him to search in that regard. At bottom, Lee's search and subsequent document production was entirely consistent with the agreements reached between counsel limiting the scope of certain requests in the Subpoena. *See* Exhs. C-F. It is both incredible and disingenuous that Polychain attached its June 4, 2021, letter to the Motion, but failed to attach, or even mention, the lengthy June 9, 2021, written response to the June 4 letter sent to Polychain's counsel. *Id.*

**Polychain's Allegations** – "Lee admitted to the existence of a number of responsive documents that he did not produce." *See* Motion at ¶ 17. "Polychain was unable to question [Lee] regarding the details of Debtor's investments, including their value, expected future distributions, liquidity and transferability." *Id.*

**Lee's Response** – These allegations are also false and misleading. During the deposition, there were a small number of documents – ***not previously requested by Polychain*** –

4

that were topics of discussion.  In Mr. Saldinger's June 9, 2021, letter (Ex. F), he addressed those specific categories of ***newly requested*** documents, and, on June 14, 2021, Lee's counsel ***produced those documents to Polychain***.  *See* <u>Exhibit D</u>.  Polychain again fails to tell the Court about this supplemental production; rather, Polychain would have the Court believe that Lee failed to make any supplemental production.  Still further, the 150-page transcript from Lee's deposition demonstrates that Polychain thoroughly examined Lee regarding all topics of which he might have personal knowledge including the interplay between the Union Square Ventures and the Greenhouse Joint Ventures.  *See* Ex. A at 43-56, 61-66, 70-71, 125-135, 138-145, 148-149.

<u>**Polychain's Allegations**</u> – "[Lee] produced only 17 documents in response to Polychain's [*Second*] Subpoena, including the Q4 2021 capital account statements for the Greenhouse USV Joint Ventures, capital call letters from [Lee] to the members of the joint ventures, and two heavily redacted letters from Union Square Ventures.  [Lee's] production included a lone transaction confirmation for the $100,000 retainer he paid to Debtor's bankruptcy counsel with no related communications regarding the payment of that retainer."  *See* Motion at ¶ 21.

<u>**Lee's Response**</u> – Again, Polychain's allegations are demonstrably misleading.  Lee produced ***all*** documents in his possession responsive to the Second Subpoena.  *See* <u>Exhibit E</u>.  Consistent with its ongoing pattern, in its November 23, 2021, letter, Polychain again falsely accused Lee of withholding responsive documents.  In response, Lee's counsel scheduled a "meet and confer" conference with Polychain's counsel in still another attempt to assure Polychain that Lee's document production was complete.  Polychain, however, refused to believe Lee's counsel and made additional false accusations in a December 10, 2021, e-mail.  Polychain attaches its December 10 e-mail to its Motion, but ***does not attach Lee's December 14, 2021, response***.  In this December 14, 2021, e-mail, Lee candidly and thoroughly refutes Polychain's false claims including the allegation that Lee withheld responsive e-mails.  *See* <u>Exhibit G</u>.[2]  The minimal information redacted reflects confidential information belonging to ***Union Square Ventures***.  It is not Lee's information to share with Polychain.  *Id.*

## <u>POLYCHAIN SHOULD BE SANCTIONED AND ITS MOTION SHOULD BE DENIED</u>

Apparently, this is not the first time that Polychain has used such bad faith tactics to attack a party or a third-party who failed to provide the documents Polychain wanted, ***even when such documents did not exist***.  Indeed, according to Debtor, the arbitrator in the Arbitration between Polychain and Debtor sanctioned Polychain for "falsely accusing the Debtor of hiding discovery and committing discovery violations of its own."  *See* Dkt. No. 56 at p. 4, ¶ 5.

---

[2] Notably, Polychain does ***not*** attach to the Motion the two e-mails that Lee allegedly withheld.  However, to prove that these e-mails were both non-responsive and irrelevant, Lee's counsel attached them to his December 14 e-mail. *See* Ex. G.

Polychain has clearly not been deterred by the sanctions imposed against it in the Arbitration.  In its latest Motion, Polychain again seeks to use its "deep pockets" to force Lee to incur unnecessary attorneys' fees and costs simply because Polychain refuses to accept that Lee and his counsel are telling the truth when they tell Polychain that Lee has produced all responsive documents in his possession.  Respectfully, Polychain's continued specious conduct cannot be condoned or rewarded.  The Motion should be denied, and Polychain should be sanctioned.

After providing a series of false and misleading statements to this Court, Polychain falsely and baldly complains that Lee has yet to produce:

a. Documents or communications regarding any transfer or sale of any interest to any of the Greenhouse USV Joint Ventures;
b. Documents or communications regarding any proposed or requested transfer of any interest in any of the Greenhouse USV Joint Ventures;
c. Communications between Lee and any member of any Greenhouse USV Joint Venture regarding the transferability of the interests in the joint venture entities; and
d. Documents and communications regarding the $100,000 retainer he paid to Debtor's current bankruptcy counsel.

*See* Motion at ¶ 25.  However, as Lee has repeatedly told Polychain, ***there are no documents responsive*** to those document requests with the exception of a single document (previously produced) reflecting the wire transfer of the $100,000 retainer.  *See* Ex. E.  Frustrated by the truth, Polychain cries that Lee failed to "conduct a reasonable search" for responsive documents. *See* Motion at ¶25.  Lee is familiar with all of the correspondence regarding the Greenhouse Joint Ventures, he reviewed literally ***all*** of his e-mails with Debtor and produced ***all*** of the responsive documents.  He also reviewed all of his communications with Union Square Ventures for the relevant time period, and produced any responsive documents.  *See* Exhs. D, F.  The fact that Lee has not produced documents responsive to certain requests does not mean that Lee failed to do a thorough search or that such documents otherwise exist.  Polychain's argument is a classic *non-*

*sequitur*, and it is clearly being made in bad faith and for the sole purpose of harassing Lee and causing him to incur unnecessary fees and costs.

Lastly, Polychain claims that Lee has refused to complete his deposition. That is also false and misleading. First and foremost, Polychain and Lee **agreed in advance of the deposition** that Lee would only be deposed for four hours on June 2, 2021. Although the deposition did not last seven (7) hours, Polychain still exhausted Lee's knowledge on all relevant topics relating to Debtor and the Greenhouse Joint Ventures during the four-hour deposition. *See* Ex. A. The documents that Lee has produced following his deposition were either not requested in the original Subpoena or are simply updated financial information that Polychain also could have obtained directly from Debtor.

Second, and in any and all events, those additional documents speak for themselves and do not require any explanation. Accordingly, on multiple occasions, Lee's counsel has asked Polychain's counsel to explain why they need to depose Lee further based on his prior testimony and the documents produced. **Polychain has refused to provide any explanation whatsoever for the need to depose Lee further**. Again, if Polychain was acting in good faith, they would be able to articulate the topics, if any existed, which are relevant and were not yet explored during Lee's prior deposition. Polychain's silence in this regard is both telling and deafening.

At bottom, the exhibits attached to this response demonstrate Lee's full cooperation and production of all responsive documents in his possession. These same exhibits should also serve to demonstrate that Polychain has been dishonest with this Court. Incredibly, Polychain did not attach any of these exhibits to its Motion or even provide the Court with some, limited (or any) detail of Lee's position. In so doing, Polychain necessarily forced Lee to incur additional fees providing this written response and attaching the multiple exhibits necessary to provide this

Court with a complete, full and accurate picture of what Lee and his counsel have done to date in response to Polychain's continuing document requests.

Lee's request for sanctions against Polychain is not made casually or cavalierly. Prior to being served with the pending Motion, Lee has been forced to incur more than $24,000 in attorneys' fees in connection with his production of documents, his deposition and the need for his counsel to correspond in writing continuously with Polychain. Even before responding to this Motion, Lee has incurred attorneys' fees solely based on Polychain's false belief that Lee is hiding responsive documents and information. Polychain's ongoing disdain for Debtor, its baseless theory that a conspiracy exists between Lee and Debtor and overall bad faith conduct should not result in Lee incurring more attorneys' fees simply to prove that he and his counsel are telling the truth.

Indeed, if the Federal Rules and the Bankruptcy Rules allowed for such conduct, discovery would never end, and the Courts would be flooded with Motions to Compel whenever one party simply chooses not to believe the responding party or his/her/its counsel. Fortunately, Polychain's improper conduct remains the exception rather than the rule. However, and in any and all events, sanctions should be imposed against Polychain. At a minimum, Lee respectfully requests that the Motion be denied, and Polychain be ordered to reimburse Lee for all of the attorneys' fees and costs he has incurred to date and will continue to incur in connection with responding to Polychain's Motion and appearing at the upcoming hearing on this Motion.

Dated: February 14, 2022

**LEE GREENHOUSE**

/s/ *Richard A. Saldinger*

Richard A. Saldinger
Latimer LeVay Fyock LLC
55 W. Monroe Street, Ste. 1100
Chicago, IL 60603
Phone: (312) 667-1359
rsaldinger@llflegal.com
*Counsel for Respondent, Lee Greenhouse*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served on February 14, 2022 upon the following:

James C. Moon
Meland Budwick, P.A.
200 S. Biscayne Blvd., Suite 3200
Miami, Florida 33131
jmoon@melandbudwick.com
Counsel for Polychain Partners LLC

J. Noah Hagey
Andrew Levine
Braun Hagey & Borden LLP
315 California Street, 10th Floor
San Francisco, California 94104
hagey@braunhagey.com
levine@braunhagey.com
Counsel for Polychain Partners LLC

Pratik Ghosh
Braun Hagey & Borden LLP
7 Times Square, 27th Floor
New York, New York 10036-6524
ghosh@braunhagey.com
Counsel for Polychain Partners LLC

Linda Marie Leali
2525 Ponce De Leon Blvd., Suite 300
Coral Gambles, Florida 33134
lleali@lealilaw.com; trustee@lealilaw.com
Subchapter V Trustee

Steven D. Schneiderman
Office of the US Trustee
51 SW 1 Ave #1204
Miami, Florida 33130
steven.d.schneiderman@usdoj.gov
United States Trustee

Nicole Grimal Helmstetter
Buchanan Ingersoll & Rooney PC
One Biscayne Tower
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
nicole.helmstetter@bipc.com
Counsel for Debtor in Possession

                             _/s/ Richard A. Saldinger_____
                                Richard A. Saldinger, Esq.

# EXHIBIT A

# PART I

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  21-12844-AJC

IN RE.:

HARRY BECK GREENHOUSE,

        Debtor.

_____/


VIDEOCONFERENCE
VIDEOTAPED REALTIME
DEPOSITION OF:    LEE GREENHOUSE

DATE:             WEDNESDAY, JUNE 2, 2021

TIME:             9:10 A.M. - 1:03 P.M.

PLACE:            VIA VIDEOCONFERENCING TECHNOLOGY


STENOGRAPHICALLY
REPORTED BY:      JAZZMIN A. MUSRATI, RPR, CRR
                  Registered Professional Reporter
                  Certified Realtime Reporter



Page 2

```
 1   A P P E A R A N C E S:   (VIA ZOOM VIDEOCONFERENCE)
 2   PRATIK GHOSH, ESQUIRE
     DOUGLAS CURRAN, ESQUIRE
 3   OF: BraunHagey & Borden, LLP
        7 Times Square
 4      27th Floor
        New York, New York 10036
 5      646.829.9403
        ghosh@braunhagey.com
 6      curran@braunhagey.com
        APPEARING ON BEHALF OF POLYCHAIN FUND 1, LP
 7
     RICHARD A. SALDINGER, ESQUIRE
 8   OF: Latimer LeVay Fyock
        55 West Monroe Street
 9      Suite 1100
        Chicago, Illinois 60603
10      312.667.1359
        rsaldinger@llflegal.com
11      APPEARING ON BEHALF OF LEE GREENHOUSE
12   LINDA M. LEALI, ESQUIRE
     OF: Linda Leali, P.A.
13      1600 South Federal Highway
        Suite 317
14      Pompano Beach, Florida 33062
        305.341.0671
15      lleali@lealilaw.com
        APPEARING ON BEHALF OF POLYCHAIN
16
     NICOLE G. HELMSTETTER, ESQUIRE
17   OF: Agentis, PLLC
        55 Alhambra Plaza
18      Suite 800
        Coral Gables, Florida 33134
19      305.722.2002
        ngh@agentislaw.com
20      APPEARING ON BEHALF OF GREENHOUSE
21   JAMES C. MOON, ESQUIRE
     OF: Meland Budwick, P.A.
22      200 South Biscayne Boulevard
        Suite 3200
23      Miami, Florida 33131
        jmoon@melandbudwick.com
24      APPEARING ON BEHALF OF POLYCHAIN
25
```



Page 3

```
 1                    C O N T E N T S
 2   TESTIMONY OF LEE GREENHOUSE                       PAGE
 3           DIRECT EXAMINATION                          4
     BY MR. GHOSH
 4           CERTIFICATE OF OATH                       151
             CERTIFICATE OF REPORTER                   152
 5           ERRATA SHEET                              153
             READ AND SIGN LETTER                      154
 6
                        PLAINTIFF EXHIBITS
 7
     EXHIBIT                                           PAGE
 8
         Exhibit 1....................................   7
 9           Amended Third Re-Notice of Rule 2004
             Examination Duces Tecum
10       Exhibit 2....................................  30
             Voluntary Petition for Individuals
11           Filing for Bankruptcy
         Exhibit 3....................................  39
12           Summary of Debtor's Assets
         Exhibit 4....................................  44
13           Greenhouse USV 2019 Joint Venture
             Agreement
14       Exhibit 5....................................  62
             Wealth Management Report
15       Exhibit 6....................................  86
             Power of Attorney
16       Exhibit 7.................................... 104
             3/26/2021 Agentis Termination of
17           Attorney-Client Relationship with Lee
             Greenhouse
18       Exhibit 8.................................... 107
             8/9/2020 Email String From Harry
19           Greenhouse To Lee Greenhouse
         Exhibit 9.................................... 120
20           12/17/2018 Email String From Harry
             Greenhouse To Lee Greenhouse
21       Exhibit 10................................... 125
             USV 2012 Investors Fund, LP
22       Exhibit 11................................... 127
             USV 2014 Investors Fund, LP
23       Exhibit 12................................... 129
             USV 2016 Investors Fund, LP
24       Exhibit 13................................... 131
             USV 2019 Investors Fund, LP
25       Exhibit 14................................... 132
```



Page 4

P R O C E E D I N G S

1

* * * * * * * *

2

3        (Whereupon, the proceedings began at 9:10 a.m.)

4        THE STENOGRAPHER:  If I could have you raise

5    your right hand, please.

6        Do you swear or affirm that the testimony you

7    are about to give will be the truth, the whole truth

8    and nothing but the truth?

9        THE WITNESS:  Yes.

10        THE STENOGRAPHER:  Thank you.

11    Thereupon,

12                    LEE GREENHOUSE,

13    having been first duly sworn or affirmed, was examined

14    and testified as follows:

15                    DIRECT EXAMINATION

16    BY MR. GHOSH:

17    Q.  Good morning.  Mr. Greenhouse, my name is Pratik

18    Ghosh with BraunHagey & Borden.  I represent Polychain

19    Fund 1, LP, and Polychain Partners, LLC, in this matter.

20        Before starting, I just want to state on the

21    record that we've agreed with your counsel,

22    Mr. Saldinger, to accommodate for your schedule to

23    adjourn this deposition at 1:00 p.m. Eastern Time today.

24        Although it's possible we won't conclude the

25    deposition at that time, we reserve the right to keep,



1   you know, the deposition open until we've completed the

2   seven hours of examination, to which we're entitled.

3   That being said, we will do our very best to -- to get

4   all of our questions asked today.

5          Does that make sense to you?

6   A.   That's fine.

7   Q.   Perfect.

8          Can you please state your name for the record.

9   A.   Lee R. Greenhouse.

10  Q.   Have you ever had your deposition taken before?

11  A.   Yes.  A long time ago I was an expert witness in

12  a trial.

13  Q.   And can you describe that -- the nature of that

14  case, briefly.

15  A.   A long time ago, it's probably 25 years ago.  It

16  involved an information company that had a contract with

17  another company that they felt had been breached.  And

18  that was basically the -- the essence of the matter.  I

19  don't recall it, it was a long time ago.

20  Q.   Do you know the caption of that case.  So the

21  parties v. parties?

22  A.   I don't even remember the -- I think -- I think

23  the -- I don't even remember the name of the company.  I

24  believe it -- I believe they were suing Citibank, that's

25  all I...



Page 6

1    Q.  Got it.

2         And did you give testimony at trial in that case?

3    A.  No, I did not.

4    Q.  Okay.  Have you, yourself, ever been party to any

5    sort of lawsuit or litigation?

6    A.  No.

7    Q.  Okay.  And just to briefly go over some of the

8    rules of the road, when I ask a question, you'll be sure

9    to give a verbal response for the court reporter to

10   hear.  Is that okay?

11   A.  Yes.

12   Q.  We'll try not to talk over each other for a clean

13   record.  Please let me complete my question.  Is that

14   okay?

15   A.  Yes.

16   Q.  Great.

17        If due, you know, to any reason, given the nature

18   of Zoom depositions, whether it's internet connection or

19   otherwise, if you don't hear my whole question, you'll

20   let me know and I will re-ask it.  Is that okay?

21   A.  That's fine.  Thanks.

22   Q.  Your counsel will object from time to time.

23   You'll give him time to complete his objection.  Does

24   that make sense?

25   A.  Yes.



Page 7

1    Q.  While you're welcome to take breaks, you may not

2    take breaks pending -- when there's a question pending.

3    Does that make sense?

4    A.  Okay.

5    Q.  If you don't ask for clarification, I will assume

6    you understood the question.  Does that make sense?

7    A.  Yes.

8    Q.  Do you understand you're under oath today?

9    A.  Yes.

10   Q.  Are you currently on any medications that would

11   prevent you from giving complete and truthful answers?

12   A.  No.

13   Q.  Is there any other reason why you would be unable

14   to give complete and truthful answers today?

15   A.  No.

16   Q.  I want to instruct you now:  Are you looking at

17   anything to help guide or, you know, assist you to

18   answer questions during this deposition?

19   A.  No.

20       MR. GHOSH:  Okay.  If we could please get Tab 1

21   pulled up on the screen.

22       I want to introduce this as Exhibit 1.

23       (Whereupon, Claimant Exhibit 1 was marked for

24   identification.)

25



Page 8

1    BY MR. GHOSH:

2        Q.   Mr. Greenhouse, do you recognize this document?

3        A.   I mean, I don't actually recognize it.

4        Q.   Okay.  And so let me ask that another way:

5    You're here today because your counsel received this

6    document -- received a subpoena in this case; is that

7    correct?

8        A.   Yes.

9        Q.   Okay.  Did you do anything to prepare for this --

10   this deposition?

11       A.   By the way, I received the subpoena directly.

12       Q.   Understood.

13       A.   This may have been the document that I was

14   served.  I glanced at it, but I can't say it's the same

15   document.

16       Q.   Got it.  Understood.

17            So did you do anything to prepare for this

18   examination?

19       A.   Yes.

20       Q.   Can you describe what you did, without getting

21   into any conversations that you had with your attorney?

22       A.   I -- well, obviously I had furnished the

23   documents that were requested.  I went over, reviewed

24   those, reviewed the -- the request for the documents.

25       Q.   Got it.



Page 9

1        Mr. Saldinger is your attorney in this case; is

2    that correct?

3        A.  Yes.

4        Q.  Have you had any other counsel besides from

5    Mr. Saldinger in this bankruptcy?

6        A.  No.

7        Q.  What is your relationship with Harry Beck

8    Greenhouse?

9        A.  Harry's my son.

10        Q.  He's the debtor in these Chapter 11 cases; is

11    that correct?

12        A.  Yes.

13        Q.  When I refer to Mr. Harry Greenhouse as "Debtor,"

14    will that be clear to you?

15        A.  Yes.

16        Q.  If you have any questions about who I'm referring

17    to, please ask.

18        I want to briefly talk about, you know, your

19    document collection process, we do appreciate that --

20    the documents that you were able to provide to us.  You

21    understand that once you were served with that subpoena,

22    you had an obligation to preserve all relevant

23    documents, right?

24        A.  Yes.

25        Q.  Did you take any steps in order to meet that



Page 10

```
 1    preservation obligation?
 2       A.  Well, it's what I, I guess, I didn't do.  I
 3    didn't delete any documents or anything else.  So I did
 4    nothing specific.
 5       Q.  Great.
 6           Did you speak with anybody regarding how to
 7    fulfill your preservation -- document preservation
 8    obligations?
 9       A.  No.
10       Q.  Okay.  Did you, yourself, collect documents that
11    were responsive to Polychain's Rule 2004 request?
12       A.  Do you mean in response to your request?
13       Q.  That's right.
14       A.  Did -- I'm sorry.
15           Would you restate the question?
16       Q.  Sure.
17           Who was responsible for collecting the documents
18    responsive to the -- the request?
19       A.  Oh, I was.
20       Q.  Okay.  Can you briefly describe the process for
21    that collection.
22       A.  Well, depends on the type of document.  For bank
23    statements, I went online and got the bank statements.
24    Brokerage statements, I did the same.  For emails, I
25    went through emails.  And that was about it.
```



Page 11

1     Q.  Okay.  When you say that you went through emails,
2  are you referring to your Gmail account?
3     A.  Yes.
4     Q.  How did you locate responsive emails on that
5  account?
6     A.  I went through every email between me and Harry
7  for the dates that were requested.
8     Q.  Got it.
9        Did you apply any -- any search terms to capture
10  any communications between that with Debtor?
11     A.  No.
12     Q.  Okay.  You didn't apply any terms into the -- the
13  Gmail search bar up top to make sure you were capturing
14  all communications?
15     A.  No.  Because I went through every one.
16     Q.  Okay.  So when you say you went through every
17  one, you mean every one between yourself and Debtor; is
18  that correct?
19     A.  Yes.
20     Q.  Got it.
21        You didn't go through any emails between yourself
22  and any other individual?
23     A.  I don't think so.
24     Q.  Okay.  Did you search any other electronic
25  devices you may have, other than your Gmail account, for



Page 12

1    any other responsive documents or communications?

2        A.   No.   Just the -- you know, just the Gmail

3    account.

4        Q.   Do you have a cell phone with text messaging

5    features?

6        A.   Yes, I do.   Actually, I did look at the text

7    messages too.

8        Q.   Okay.   And did you -- did you have any responsive

9    text messages...

10       A.   No.

11       Q.   Okay.   Do you have an iCloud account or some

12   other sort of cloud-based platform that you use?

13       A.   Yes.

14       Q.   Did you search those cloud-based platforms for

15   any responsive documents?

16       A.   No.

17            Well, wait.   Did I?

18            I guess not, no.

19       Q.   Okay.   Do you have any email accounts, besides

20   that greenhousegrows Gmail accounts that you stated you

21   searched?

22       A.   I have two email accounts.   One is the

23   greenhousegrows and the other is lrgreenhouse@gmail.

24       Q.   All right.   Did you search that lrgreenhouse

25   account for responsive documents and communications?



Page 13

1    A.  I did, yes.

2    Q.  Okay.  And were there any?

3    A.  I think there were just two which had to do

4    with -- yes, I think there were just two, and I provided

5    those.

6    Q.  Okay.  Have you withheld any documents or

7    communications that were responsive to Polychain's

8    request?

9    A.  No.

10    Q.  Okay.  I want to briefly get into your

11    background.

12        Can you briefly describe your educational

13    background?

14    A.  I have a -- a bachelor's degree from Harvard

15    University.  No other further formal education.

16    Q.  Can you briefly describe your professional

17    experiences.

18    A.  Most recently, say from about 1992 until I

19    retired about a year and a half ago, I was a consultant

20    doing strategy consulting or, you know, business

21    consulting for companies whose businesses involved

22    information, online databases, and things like that.

23    You can think of them as publishers, database

24    publishers.

25    Q.  Can you just describe some of the various



Page 14

1   entities that you had, perhaps, significant contracts

2   with?

3       A.   Let's see over the years who I have worked for.

4   I did some work for Thomson Reuters.   I did some work

5   for Elsevier.   I did some work for the American Chemical

6   Society, which is a big publisher.   I did some work

7   for a company called Reis, R-E-I-S, which is in the real

8   estate information area.

9           I did some work for a company, ShopperTrak, who

10  does business -- I guess still is tracking foot traffic

11  in and out of stores and retail malls.   So those kind of

12  companies.

13      Q.   Okay.   Do you have any sort of professional

14  licenses?

15      A.   No.

16      Q.   You're not a licensed securities broker or

17  trader; is that correct?

18      A.   No.

19      Q.   You're not a licensed investment advisor; is that

20  correct?

21      A.   Correct.

22      Q.   Got it.

23           What is Greenhouse Associates?

24      A.   That was the name of my consulting firm.

25  Technically, it still exists.   And that was basically



Page 15

1    me; I was solely practitioner.  And I had some people

2    who were sort of freelancers or stringers who worked for

3    me.

4        Q.  Got it.

5        A.  If you went to the website, you'll see their bios

6    as well as mine.

7        Q.  Got it.

8            Has Debtor ever worked for Greenhouse Associates?

9        A.  No.

10       Q.  Okay.  Did you employ or retain any investment

11   advisors or professionals at Greenhouse Associates?

12       A.  No.

13       Q.  What is your experience with financial

14   investments, such as mutual funds, stocks, bonds,

15   options, and futures?

16       A.  I have investments in, you know, stocks, bonds,

17   mutual funds -- I guess I have mutual funds.  You know,

18   I have a range of investments.

19       Q.  Would you describe yourself as somebody who is

20   very familiar with them or not familiar with them?

21       A.  I don't know.  Somewhat familiar.

22       Q.  Got it.

23           Have you ever managed any investments for Debtor

24   or on Debtor's behalf?

25       A.  Can you explain what you mean "managed"?



Page 16

1      As you know, there were some investments that --
2   that we are in together.  And I don't know if you'd
3   consider them, that I manage those or not, in the sense
4   of I don't really make investment decisions.  I
5   administer.
6      Q.  Okay.  So when you say you administer, what do
7   you take that to mean?  Can you expand on that a little
8   bit?
9      A.  Yeah.  I mean -- you know, I set up in the case
10  of some investments that we have joint interest in --
11  which also includes other family members -- I did
12  paperwork to set up the appropriate accounts.  I collect
13  the money from the various investors.  I, you know,
14  write checks to the various members of -- of the joint
15  venture entity that we formed when there is a liquidity
16  event.  And that's it.
17      I'm kind of a -- you know, I'm kind of a traffic
18  cop.  But I don't make any investment decision, per se.
19      Q.  Okay.  When you say you "write checks," you're
20  describing distributions where there is investors,
21  including Debtor; is that correct?
22      A.  That's right.
23      Q.  Have you had any experience with investment
24  vehicles such as cryptocurrencies or non-fungible
25  tokens?



Page 17

```
 1      A.   Not direct experience, if that's what you mean.

 2   I've never bought any of those directly myself, if

 3   that's what you're asking.

 4      Q.   Do you have any experience with bankruptcy or

 5   structuring transactions?

 6      A.   No.

 7      Q.   Have you, yourself, ever filed for bankruptcy?

 8      A.   No.

 9      Q.   Do you have any experience with digital marketing

10   or advertising?

11      A.   You know, a little bit.  I mean...

12      Q.   What is that little bit?

13      A.   Well, you know, I have clients whose, you know --

14   and I was involved somewhat in looking at their

15   marketing program as part of my consulting.  And all of

16   the marketing, pretty much, included some element of

17   digital marketing, but it's not an area that I consider

18   myself to have particular expertise.

19      Q.   Can you briefly describe Debtor's educational

20   background.

21      A.   Harry has a bachelor's degree from the University

22   of Michigan.

23      Q.   What was his area of study?

24      A.   I think it was political science.

25      Q.   Would you say Debtor is proficient in handling
```



Page 18

1   and understanding financial -- complex financial

2   instruments?

3       A.  You know, I don't know.  He's a smart guy.  I

4   don't know what more to say about that.

5       Q.  Has Debtor ever received a graduate degree?

6       A.  I'm sorry.  What was the question?

7       Q.  Has Debtor ever pursued a graduate degree?

8       A.  No.

9       Q.  Okay.  What would you say is Debtor's primary

10  occupation?

11      A.  You know, he's a, I guess, investor/entrepreneur.

12      Q.  Has Debtor ever held a salaried job?

13      A.  Not to my knowledge.

14      Q.  How long was Debtor involved in playing poker at

15  a professional level?

16      A.  Oh, many years.  I don't know the exact number.

17      Q.  Would you say it's longer than ten years?

18      A.  I don't know.  I would have really to do math on

19  that.

20      Q.  Let me ask it another way:  When did Debtor first

21  get started in playing poker at a professional level?

22      A.  I don't know what "a professional level" means.

23  You know, he was -- he started playing poker online in

24  high school.

25      Q.  When was the first time he won money at a



Page 19

1  significant poker tournament?

2          MR. SALDINGER:  I will object as to foundation,

3      Pratik.  But if he knows, he knows.

4          MR. GHOSH:  Okay.

5      A.  I'm sorry?

6  BY MR. GHOSH:

7      Q.  Yeah.  What was the -- what was the year or date

8  that Debtor first won any significant winnings at a

9  poker tournament?

10     A.  I have no idea.

11     Q.  Understood.

12     A.  I have no idea.  I mean, he wasn't -- he was

13  making money without going to tournaments.

14     Q.  To your knowledge, does Debtor have any

15  professional licenses?

16     A.  I have no idea if he has any.

17     Q.  Would you say you're familiar with Debtor's

18  business and financial affairs?

19     A.  Somewhat.

20     Q.  Do you discuss Debtor's business and financial

21  affairs with him?

22     A.  Occasionally.

23     Q.  Do you provide him with advice on his business

24  and financial affairs?

25     A.  Occasionally.



1    Q.   And when you provide this advice, what format

2    does it take?  Is it usually verbal or is it written

3    communication?

4    A.   It's usually conversations.

5    Q.   Conversations.

6         Just to be clear:  You're talking about, like,

7    verbal, face to face, or phone conversations; is that

8    correct?

9    A.   Yes.

10   Q.   Okay.  What would you say is Debtor's primary

11   business?

12   A.   Right now?

13   Q.   That's correct.

14   A.   Nothing except whatever, you know, remains in his

15   investments.

16   Q.   Okay.  To your knowledge, does Debtor have a

17   digital marketing business?

18   A.   Right now?  I don't know.

19   Q.   Has Debtor ever had a digital marketing business?

20   A.   I don't know.  Because I don't know how you would

21   characterize some of his businesses.

22   Q.   Okay.  Let me ask that another way:  Can you list

23   the types of businesses that you're aware that Debtor

24   has had in the last ten years?

25   A.   Well, online poker is a business.  He -- he had



Page 21

1   a -- and then he had a business basically selling

2   event -- event tickets, you know, sort of speculating on

3   event tickets.

4          And he also had the -- a business where he was,

5   you know -- how do I describe it -- getting --

6   bringing -- bringing members to a bank -- an e-bank

7   that, you know -- and he got paid money for bringing

8   customers to that e-bank, I guess I would call it.

9      Q.   Okay.  When you say event ticket specialization

10  [sic], can you expand on what you mean a little bit?

11     A.   It was event ticket speculation.

12     Q.   Speculation.

13          So same question, then:  When you say event

14  ticket speculation, can you clarify what kind of events

15  was he speculating on?

16     A.   My understanding, it was anything, you know, from

17  sporting events to rock concerts.

18     Q.   Do you know approximately how much he made

19  annually from this kind of speculation?

20     A.   I don't know.

21     Q.   Okay.  So I just want to get back to this

22  question of bringing members to an e-bank.

23          Can you describe what that consisted of?

24     A.   I don't really know.

25     Q.   Do you know the name of the e-bank?



Page 22

```
1      A.   I forgot it.  I don't know.
2      Q.   Okay.  Do you know if Debtor's ticket --
3  ticketing business was -- does it have a name?
4      A.   I don't know what name he used.
5      Q.   Okay.  Debtor's e-bank business, did that have
6  any sort of name?  Any independent entity name?
7      A.   Not to my knowledge.
8      Q.   Debtor's ticketing business --
9      A.   I don't know the name used for that.
10     Q.   Got it.  Got it.
11          Debtor's ticketing business, was that registered
12  in any state to do business?
13     A.   I don't know.
14     Q.   Okay.  So you described that Debtor also has an
15  investing business.  Would you say this -- is this a
16  distinct entity that you're thinking of?
17     A.   I'm sorry.  Just repeat that for me.
18     Q.   Sure.
19          You mentioned that Debtor has an investing
20  business.  Has he performed investing to a distinct
21  entity?
22     A.   I don't know how he went about making the
23  individual investments.
24     Q.   To your knowledge, does he have any employees to
25  refer him or assist him in these various enterprise s?
```



Page 23

1    A.   I don't know.

2    Q.   Okay.  Debtor's businesses, as you just

3    described, the online poker, the ticket speculation, and

4    the e-bank, do they serve as his primary forms of

5    income, to your knowledge?

6    A.   I really don't know.

7    Q.   Do you know anything about Debtor's income in the

8    last -- in the last 10 years?

9    A.   Nothing specific.

10    Q.   Okay.  You and Debtor have never talked about

11    his -- his income level?

12    A.   No.

13    Q.   Okay.  You haven't talked to him about his future

14    income?

15    A.   No.

16    Q.   Okay.  If we could get back to the debtor's

17    ticket selling business.

18         Are there any sort of organizing documents for

19    that business, like an FP agreement, or an LLP

20    agreement, or something like that?

21    A.   I have no idea.

22    Q.   Okay.  For Debtor's investment business, are

23    there any sort of organizing documents for that

24    business?

25    A.   Again, I don't know.



Page 24

1    Q.  Got it.

2         Do you know if Debtor has any other formal

3    entities which he owns and does business through,

4    besides the ones we talked about?

5    A.  I don't know.

6    Q.  Okay.  To your knowledge, other than the

7    Polychain dispute, is Debtor engaged in any other sorts

8    of litigations?

9    A.  I don't know.

10   Q.  Okay.  So before I asked you if you ever talked

11   with Debtor about his business and financial affairs,

12   and you -- you answered that you do sometimes.

13        When you do discuss Debtor's business and

14   financial affairs with him, what, principally, do you

15   discuss?

16   A.  I don't know.  If I could characterize it any

17   particular way.

18   Q.  Do you discuss his -- his investments?

19   A.  Generally ones we discussed were ones where we

20   were both involved, yeah.

21   Q.  Got it.

22        And you're referring to the USV joint ventures

23   that you both have a stake in; is that right?

24   A.  Right.

25   Q.  Would you say that's your primary connection with



Page 25

1    Debtor, with his business and financial affairs?

2        A.   There were a couple of others that we

3    independently had investments, but that's not together.

4        Q.   Could you list those ventures where you and

5    Debtor both independently have investments?

6        A.   One is called ChargePoint.  One is called

7    MetaStable.  I think those are it.  I think there's

8    another one, Thrive -- Thrive Market is another one.

9        Q.   Got it.

10            Let's start with ChargePoint.  How did you come

11   to invest in ChargePoint?

12       A.   Through a mutual contact that we have.

13       Q.   What is the nature of -- of the ChargePoint

14   business?

15       A.   They build charging stations for electric

16   vehicles.

17       Q.   And both you and Debtor currently have

18   investments with them?

19       A.   I don't know what the disposition of Harry's is,

20   but I do.

21       Q.   Okay.  Have you realized any income from the

22   ChargePoint investment?

23       A.   No.

24       Q.   Have you realized any gains from the ChargePoint

25   investment?



Page 26

1    A.   No.

2    Q.   Do you know if Debtor has realized any income or

3    gains from the ChargePoint investment?

4    A.   His would be the same as mine.

5    Q.   Understood.

6         Could you describe the nature of the MetaStable

7    investment?

8    A.   I guess it's basically a hedge fund that invests

9    in cryptocurrencies.  And we're both -- I don't know

10   what his position is these days, I don't know if he

11   still has his, to be honest.  But it's -- you know, we

12   are -- I am, anyway, an investor in that.  I have some

13   money -- money in that, and...

14   Q.   Have you realized any income or gain from your

15   MetaStable investment?

16   A.   I personally have.  I have redeemed some of my

17   interest in that.

18   Q.   Have Debtor realized any income or gain from the

19   MetaStable investment?

20   A.   I don't know.

21   Q.   Do you have any reason to believe that his income

22   or gain would be different than yours?

23   A.   Possibly, yeah.

24   Q.   Why would that be?

25   A.   I'm not sure I can explain it.  But there's some



1  way that they do their accounting that results in

2  different gains, depending on when your money went in or

3  was taken out.  And I can't begin to explain why that

4  is.

5     Q.  Got it.

6        Do you have any documents or communications

7  relating to your or Debtor's MetaStable investment?

8     A.  Only -- only my own.

9     Q.  And do those documents cover the -- the income

10 that you derive from that investment?

11    A.  My -- mine do.

12    Q.  Understood.

13       MR. GHOSH:  We'd like to -- Mr. Saldinger, we

14    would like to make a document request for documents

15    responsive to -- to Mr. Greenhouse's MetaStable

16    investment.

17 BY MR. GHOSH:

18    Q.  I just want to move on to Thrive Market, briefly.

19       MR. SALDINGER:  Pratik, for the record, I'm not

20    necessarily agreeing to that.  That wasn't requested

21    in your 2004 subpoena.  In fact, we --

22       MR. GHOSH:  Understood.  Mr. Saldinger, just to

23    say this for the record, I will be making a number of

24    document requests throughout this, just for the

25    purpose of making a record.



Page 28

1       We'll follow up with formal supplemental

2   discovery requests, and we can meet and confer about

3   that off the record, if that makes sense.

4       MR. SALDINGER:  That's fine.

5       And I will just state that by the fact that

6   you're making requests, I am not agreeing that those

7   documents exist, or we're going to produce them, or I

8   will allow Mr. Greenhouse to be subject to any

9   further examination about those documents, just so

10  we're clear on the record.  But you can make your

11  requests.

12      MR. GHOSH:  Understood.

13  BY MR. GHOSH:

14      Q.  Briefly talking about that, the Thrive Market

15  investment, can you describe the nature of that

16  business?

17      A.  Can I?

18      They invest in cryptocurrencies.  That's all I

19  know.

20      Q.  Have you made any income or gain from that

21  investment?

22      A.  I have taken some distributions from there.

23      Q.  Do you know if Debtor has also taken

24  distributions?

25      A.  I don't know.



Page 29

1      Q.   You, yourself, you're not familiar with
2   cryptocurrencies; is that correct?
3      A.   Only a cursory level.
4      Q.   How did you come to be an investor in these
5   various cryptocurrency vehicles?
6      A.   Harry probably identified that, or we had a
7   personal connection to somebody that said, Do this.  And
8   this goes back a few years ago.  And I thought, okay.
9      Q.   Did you understand the risk involved in these
10  cryptocurrency investments?
11     A.   Yes.
12     Q.   Okay.  And what do you understand about that
13  risk?
14     A.   This was extremely speculative.  A very new area,
15  you know.  That's all -- that's what I understood.
16     Q.   Understood.
17          When did you first learn that Debtor was going to
18  file for bankruptcy protection?
19          MR. SALDINGER:  I don't know the exact date.
20  BY MR. GHOSH:
21     Q.   Can you provide an approximate date when Debtor
22  was going to apply for bankruptcy?
23     A.   Early 2020.
24     Q.   And how did you find that out?  Did Debtor tell
25  you verbally that he was going to be filing?



Page 30

1    A.  I'm sorry, did I say 2020?  We're in 2021?

2    Q.  That's right.

3    A.  It was during 2021.  It was this year.

4    Q.  Understood.

5         So you learned in early 2021 that Debtor was

6    going to be filing for bankruptcy; is that correct?

7    A.  Yes.

8    Q.  And how did you learn that Debtor was going to be

9    filing for bankruptcy?  Did he tell you verbally, via

10   email, or some other written communication?

11   A.  I'm trying to think.  So I guess I had learned

12   that he had lost in the Polychain suit, then he was

13   trying to figure out what to do at that point.

14        And some point after that he, you know -- he

15   determined that bankruptcy would probably be the --

16   the -- the best course for him.

17   Q.  Got it.

18        Can we please bring up Tab 2.

19        (Whereupon, Claimant Exhibit 2 was marked for

20   identification.)

21        MR. GHOSH:  Let's introduce this as Exhibit 2.

22   BY MR. GHOSH:

23   Q.  Have you reviewed Debtor's bankruptcy petition

24   which was filed on March 26th, 2021?

25   A.  No.



MAGNA
LEGAL SERVICES

Page 31

1    Q.  You haven't gone through any of the disclosures
2    made here?
3    A.  I have never seen this document, as far as I
4    know.
5    Q.  Understood.
6        Do you understand -- can we go to Page 13 of this
7    document, please.
8        Do you understand that Debtor was involved in an
9    arbitration with Polychain?
10   A.  Yes.
11   Q.  Do you understand that this arose from Debtor's
12   investment with Polychain?
13   A.  Yes.
14   Q.  Did you, yourself, have any investments with
15   Polychain?
16   A.  Yes.
17   Q.  Did you ever discuss those investments with
18   Debtor?
19   A.  Sure.  Yes.
20   Q.  Did that communication take place via email or
21   written correspondence?
22   A.  It was primarily verbal.  I don't recall that it
23   was much in terms of emails.
24   Q.  What was the approximate cost basis of your
25   Polychain investment?



1          MR. SALDINGER:  Objection.

2          Excuse me.

3          Objection; relevance.  You're talking about his

4     cost basis?

5          MR. GHOSH:  Yeah.

6          MR. SALDINGER:  What is the relevance of that?

7          MR. GHOSH:  I understand you have an objection.

8     The question still stands.

9  BY MR. GHOSH:

10    Q.  What was the approximate cost basis in your

11  Polychain investment?

12         MR. SALDINGER:  Pratik, I understand it's based

13    on my objection.  My client's personal finances are

14    personal and confidential.  And there -- and unless

15    you can explain the relevance to me of his personal

16    financial investment --

17         MR. GHOSH:  I understand the objection --

18         MR. SALDINGER:  Pratik, don't interrupt me.

19         MR. GHOSH:  Okay.

20         MR. SALDINGER:  I'm -- I understand the rules

21    very clearly, and I understand Rule 2004 is fairly

22    open.  But unless you can explain to me how my

23    client's personal finances are all relevant, I will

24    instruct him not to answer.  If you need to go to

25    court, go to court.  I'm happy to defend that



Page 33

1    position.

2           MR. GHOSH:  Are you --

3           MR. SALDINGER:  I would like you to explain the

4    relevance, why his personal finances and personal

5    cost basis in the Polychain investment has anything

6    to do with the debtor or the bankruptcy.  Because I

7    don't think his personal finance -- there's no

8    protective order in place.  This is completely off

9    base.  So please explain the relevance.

10          MR. GHOSH:  We do believe it's relevant.

11   That's why I'm asking the question.  If you're

12   instructing the witness not to answer, you're free to

13   do so.  Otherwise, the question stands.

14          MR. SALDINGER:  I instruct the witness not to

15   answer.

16          MR. GHOSH:  Okay.  And the basis for that is

17   based on relevance?

18          MR. SALDINGER:  The basis for that is you have

19   not explained to me -- and I have given you now three

20   opportunities to explain how my client's personal

21   cost basis and his personal investment in Polychain

22   has anything to do with -- with these proceedings.

23          And that's personal financial information.  I

24   don't think -- I don't think you would be telling me

25   what -- what your cost basis is on any of your



Page 34

1    investments, nor would I be telling you mine.

2         MR. GHOSH:  Understood.  Debtor's largest, you

3    know, liability is with Polychain.  The witness has

4    admitted that he has a similar investment.  I think

5    it's relevant to the estate.

6         If you're instructing the witness not to

7    answer, I understand that.

8         Are you changing that instruction at this time?

9         MR. SALDINGER:  No, I am not.  You have not

10   explained why Mr. Greenhouse's personal cost basis is

11   relevant.

12        MR. GHOSH:  Okay.  Understood.

13   BY MR. GHOSH:

14   Q.  Mr. Greenhouse, do you know what Debtor's cost

15   basis was in Polychain?

16   A.  No.

17   Q.  Do you understand that the arbitration award

18   entered against him was approximately $4,173,141?

19   A.  Yes.

20   Q.  Do you understand the nature of the dispute that

21   he had with Polychain?

22   A.  In general terms, yes.

23   Q.  Can you explain what you mean by those general

24   terms?

25   A.  I mean, it -- at a conceptual level, I think I



1    understood the basis of his -- of his claim.

2       Q.   So if you could just provide to me your

3    understanding.

4       A.   Yeah.  It had to do with how -- how the

5    accounting was done when Harry cashed out of the fund.

6       Q.   Understood.

7            And did you -- so is there any reason you didn't

8    join him in that arbitration or litigation with

9    Polychain?

10      A.   Does it really matter?

11      Q.   Is there any reason you didn't join him in that

12   arbitration or litigation with Polychain?

13      A.   I guess, yeah.  I'm -- you know, I didn't -- I

14   didn't have a stomach for litigation, frankly.

15      Q.   Okay.  And so what was the reason why you're

16   saying that you didn't have a stomach for litigation?

17           MR. SALDINGER:  I'm going to object again on

18      relevance.  I will let him answer this question, but

19      I think this whole line of questioning about

20      Mr. Greenhouse's involvement or lack thereof, or

21      willingness to get involved in litigation with

22      Polychain is irrelevant.

23           But I will let him answer this question.

24      A.   You're asking me why -- I'm sorry, would you

25   restate the question.



Page 36

1    BY MR. GHOSH:

2        Q.  Sure.

3            I just want you -- I want to get some more detail

4    on why you didn't join Debtor in his arbitration with

5    Polychain, given that you both had investments with the

6    same entity.

7            MR. SALDINGER:  Same objection on relevance.

8        A.  Yeah.

9    BY MR. GHOSH:

10       Q.  You can answer the question.

11       A.  I'm sorry, may I --

12       Q.  I can give it to you one more time.

13           Can you provide to me some detail on the reason

14   why you did not get involved in Debtor's arbitration

15   litigation with Polychain, given that you're both

16   invested in that same fund?

17       A.  I think I already answered your question.

18           MR. SALDINGER:  I agree.  He did.  He did

19   answer the question.

20   BY MR. GHOSH:

21       Q.  Okay.  You understand that Debtor initiated these

22   bankruptcy proceedings shortly after the Polychain

23   arbitration was awarded?

24       A.  I don't know if it was shortly after, but it was

25   after.



Page 37

1    Q.  In your understanding, did Debtor file for

2    bankruptcy protection because of the Polychain

3    arbitration award?

4    A.  Primarily, I guess, yeah.

5    Q.  Did you have any communications with him after

6    the Polychain arbitration award was entered, regarding

7    his options?

8    A.  Just that he should check out his options.

9    Q.  And what options about paying that arbitration

10   award did you discuss, specifically?

11   A.  Well, I mean, I really didn't -- I mean, I just

12   said go -- you know, you need to find out what options

13   you have.

14   Q.  Did Debtor ever ask you for any money to pay the

15   Polychain arbitration award?

16   A.  No.

17   Q.  To your knowledge, did Debtor ask anybody else,

18   any other individual or entity, for any money to pay the

19   Polychain arbitration award?

20   A.  I don't know.

21   Q.  Did Debtor make any transfers, that you're aware

22   of, of his funds after the Polychain award was entered?

23   A.  Not to my knowledge.

24   Q.  Did you discuss Debtor making any sort of

25   transfers, or considering making any sort of transfers,



Page 38

1    either in the months leading up to the Polychain award

2    or shortly after he filed for bankruptcy?

3        A.  Well, everybody we -- we talked to basically, you

4    know, said don't -- don't make transfers after the

5    award.

6        Q.  So when you say everybody he talked to, can you

7    provide me with more details on who he talked to?

8        A.  Just, you know, friends and everybody else we

9    talked to.  But it was very -- you know, it was sort of

10   very clear from anything you could read anywhere that --

11   you know, don't make transfers.  So -- but I -- you

12   know, I just sort of like -- so, anyway, yeah.

13       Q.  Did he consult with any financial advisors?

14           MR. SALDINGER:  Objection; foundation.

15   BY MR. GHOSH:

16       Q.  Let me ask that one more time:  Did Debtor

17   consult with any financial advisors regarding the

18   repayment of the Polychain arbitration award?

19           MR. SALDINGER:  Same objection; foundation.

20           You can answer, Mr. Greenhouse, if you know.

21       A.  Talk to any financial advisors about it?  Not to

22   my knowledge.

23   BY MR. GHOSH:

24       Q.  Do you know if Debtor retains any sort of

25   accountants?



1    A.   I'm sure, yeah, he has an accountant.

2    Q.   Is that accountant Russell Fox?

3    A.   That's the name I know.

4    Q.   Do you know if Debtor consulted Mr. Russell Fox

5    regarding the repayment of the Polychain arbitration

6    award?

7    A.   I don't know.

8         MR. GHOSH:   Okay.   Can we bring up Tab 3?

9         (Whereupon, Claimant Exhibit 3 was marked for

10   identification.)

11   BY MR. GHOSH:

12   Q.   Have you had a chance to review the summary of

13   Debtor's assets that was filed in the bankruptcy case on

14   April 9th, 2021?

15   A.   No.

16   Q.   Okay.   Can we go to Page 6 of this document,

17   please.

18        So Debtor disclosed that -- do you have this

19   document in front of you?   Are you able to review this

20   exhibit?

21   A.   I can see it.   It's a little small on the screen.

22   I don't know if you can make it a little bigger.

23        Thank you.

24   Q.   Yep.

25        MR. SALDINGER:   I'm sorry.   What was the



Page 40

1    question, Pratik?

2         MR. GHOSH:  I just want to make sure he can

3    review the document.

4         MR. SALDINGER:  Okay.

5         MR. GHOSH:  There's no question right now.

6         Let's just go off record for like two minutes.

7    I just want to fix one thing on my computer.  Is that

8    okay?

9         MR. SALDINGER:  No problem.

10        THE VIDEOGRAPHER:  The time is 9:56 a.m.

11        We're going off the video record.

12        (Whereupon, a break was taken from 9:56 a.m.

13   to 9:59 a.m.)

14        THE VIDEOGRAPHER:  Time is now 9:59 a.m.

15        We're back on the video record.

16   BY MR. GHOSH:

17        Q.  Could we just scroll down a little bit towards

18   the -- Schedule F, right there.  Yeah.

19        So, Mr. Greenhouse, do you see on this disclosure

20   statement that it says that Debtor has listed Greenhouse

21   USV Joint Venture 2019 as a claimant in a contingent and

22   un- -- in a contingent and unliquidated amount?

23        A.  Yes.

24        Q.  Greenhouse USV Joint Venture 2019 is an entity

25   that you and Debtor are jointly invested in; is that



Page 41

1    correct?

2        A.   Yes.  As well as some other family members.

3        Q.   Okay.  Do you believe that Greenhouse USV Joint

4    Venture 2019 is a claimant in this proceeding?

5        A.   I don't know technically what that means,

6    honestly.

7        Q.   Do you claim that they have any -- any right to

8    any portion of the bankruptcy estate?

9        A.   You know, I suppose so.  Harry, you know, his

10   capital -- it was a capital call, you know, that's been

11   unfunded.  Harry's capital call is unfunded.

12       Q.   Okay.  So has Debtor had any communications with

13   you about why he believes that that obligation is -- is

14   not an actual claim?

15       A.   Why it's not an actual claim?  I don't understand

16   that.

17       Q.   Okay.  Has -- has Debtor had any sort of

18   conversations with you regarding his obligations to

19   fulfill that capital call with USV Joint Venture 2019?

20       A.   Only that that exists.

21       Q.   Okay.  Got it.

22            Both you and Debtor jointly participate in a

23   number of USV Joint Venture funds; is that correct?

24       A.   Yes.

25       Q.   Are you a participant in 1313 Ventures?



Page 42

1    A.  No.

2    Q.  Okay.  Are you a participant in 1confirmation

3  Fund, LP?

4    A.  You're talking about the fund -- the fund one,

5  no.

6    Q.  The entity name is 1confirmation Fund, LP?

7    A.  No.

8    Q.  Okay.  Are you a participant in Greenhouse USV

9  2012 Joint Venture?

10    A.  Yes.

11    Q.  Are you a participant in Greenhouse USV 2014

12  Joint Venture?

13    A.  Yes.

14    Q.  Are you a participant in USV 2014 Opportunity

15  Joint Venture?

16    A.  Yes.

17    Q.  Are you a participant in Greenhouse USV 2016

18  Joint Venture?

19    A.  Yes.

20    Q.  Are you a participant in Greenhouse USV 2019

21  Joint Venture?

22    A.  Yes.

23    Q.  Okay.  What is the difference between the

24  Greenhouse USV 2014 Joint Venture and the USV 2014

25  Opportunity Joint Venture?



Page 43

```
 1        A.  All of these Greenhouse USV Joint Venture
 2   entities invest in a specific fund of a venture capital
 3   firm called Union Square Ventures.
 4        So in 2014 they had two funds that started up.
 5   One -- one was, I guess I'd call it, more or less a
 6   conventional venture fund, where they invest in
 7   early-stage companies.
 8        And they also had, at the same time, they created
 9   sort of side by side another fund, which is -- they sort
10   of call these opportunity funds, which generally are
11   doing somewhat later-stage investing, when one of their
12   existing companies that they've invested is, you know,
13   raising more capital in a later round.  And so the
14   opportunity fund will make investments opportunistically
15   at that point.
16        Q.  How did you come -- who came up with the idea of
17   having the Greenhouse family invest in Union Square
18   Ventures?
19        A.  I did.
20        Q.  And how did that idea come to you?
21        A.  Well, I had a personal connection to one of the
22   founding partners of Union Square Ventures.  And that
23   gave us the opportunity to invest, and was more money
24   than I wanted to invest personally.  And I thought it
25   might be interesting for my other family members to
```



Page 44

1    participate.  So I asked them and we formed a little

2    entity to do that.

3        Q.  The founding member of Union Square Ventures with

4    whom you have a personal connection, who is that

5    individual?

6        A.  Fred Wilson.

7        Q.  And is Mr. Wilson still at USV?

8        A.  Yes.

9        Q.  What is his role there?

10       A.  He's a -- he's one of the partners.

11       Q.  Understood.

12           Did Mr. Wilson or anyone else at USV make any

13   sort of special accommodations so that the Greenhouse

14   entities could participate in the USV funds?

15       A.  No.

16       Q.  Okay.  They didn't lower the investment minimum

17   so that you could participate?

18       A.  Not to my knowledge, no.

19           MR. GHOSH:  Okay.  Can we please pull up Tab 4

20       as Exhibit 4.

21           (Whereupon, Claimant Exhibit 4 was marked for

22       identification.)

23   BY MR. GHOSH:

24       Q.  Do you recognize this document?

25       A.  Yes.



Page 45

```
 1      Q.  Can you briefly describe what this is.

 2      A.  Yes.  This is just the document that I use for

 3   forming these joint ventures with my family members.  It

 4   just -- yeah, it spells out who is participating, how

 5   much they're investing, what their investment percentage

 6   is, and a few other things like that.

 7      Q.  Got it.

 8          Do you have any sort of communication with either

 9   Mr. Wilson or anybody else at Union Square Ventures

10   regarding your investments there?

11      A.  Not -- not personally.  I mean, I -- you know, I

12   have very -- I -- nothing direct.  I mean, I get, you

13   know -- you know, periodically the fund communicates

14   with us.

15      Q.  And how -- how does the fund communicate with

16   you?

17      A.  They issue capital calls.  They send out a memo

18   saying there's going to be a distribution of either cash

19   or stock.  They send us a capital call that -- capital

20   account statement, like, I guess once a quarter.

21      Q.  Understood.

22          Let me be a little more clear:  Does Union Square

23   Ventures communicate with you via email, U.S. Mail, or

24   some other means?

25      A.  Email.
```



Page 46

1    Q. And which email account does the Union Square

2    Ventures send you emails about your investments there?

3    A. I believe it's the -- it's the greenhousegrows

4    account. But I should tell you, all the -- all of

5    the -- because I am trying to switch over -- all of

6    greenhousegrows emails are automatically forwarded to my

7    other account, which is really the one I use.

8    Q. And that's the @lgreenhouse.com Gmail account,

9    correct?

10   A. Lrgreenhouse.

11        MR. GHOSH:  Okay.  At this point we'd like to

12   make a document request for those USV capital call

13   communications.  And, you know, as we stated on the

14   record, all rights are reserved, and we'll be

15   following up with formal requests.

16        MR. SALDINGER:  May I just point out one thing

17   here:  I believe that you have the capital account

18   statements, which are cumulative.  And all of those

19   list all of the capital calls on them, I believe.

20        MR. GHOSH:  Understood.  We will get to those

21   in a second.

22   BY MR. GHOSH:

23   Q.  If I can just draw your attention -- if we can go

24   to the next page of this document, to the paragraph

25   titled "Second."



Page 47

1          Contributions to this 2019 USV JV -- and by "JV,"

2    I mean joint venture -- these contributions were made

3    between yourself, Lee R. Greenhouse, Debtor, and Harry

4    Greenhouse, as well as three other individuals,

5    Charles R. Greenhouse, Nancy Greenhouse, and Wendy

6    Greenhouse; is that correct?

7        A.   Yes.

8        Q.   Are these all of the individuals that invested in

9    the USV 2019 Joint Venture?

10       A.   Yes.

11       Q.   Can you please explain your relationship between

12   each of these investors, between yourself and each of

13   the investors.

14       A.   Charles is my father, Nancy's my sister, and

15   Wendy's my sister.

16       Q.   Understood.

17           Currently, if we could just scroll down to the

18   next paragraph.  Currently Debtor has a 29.38 percent

19   interest in the USV 2019 Joint Venture; is that correct?

20       A.   If that's what it says here, then that's correct.

21       Q.   That amounts to approximately $99,000 in

22   interest; is that correct?

23       A.   Yes.

24       Q.   Has Debtor actually paid that $99,000?

25       A.   No.



Page 48

1    Q.    And I just want to back up a little bit.  Is that

2    how it works when -- when one of these investors wants

3    to invest in, you know, the underlying USV fund, they

4    transfer you the money?

5    A.    Well, they transfer -- typically they write me a

6    check and I deposit into an account that's been set up

7    specifically for this entity.

8    Q.    And that account, which bank is it with?

9    A.    Morgan Stanley Smith Barney.

10   Q.    Got it.

11        And what happens to those joint funds between you

12   five?  Is that -- are those funds, then, transferred to

13   Union Square Ventures?

14   A.    Yes.

15   Q.    And who makes that transfer?

16   A.    I do.

17   Q.    Who has control, other than yourself, of the

18   funds in the Morgan Stanley account?

19   A.    Just me.

20   Q.    Just you.  No one else has access to the log-in

21   credentials or the funds in that account?

22   A.    No.  Just me.

23   Q.    Okay.  Okay.  So any income that the USV 2019

24   Joint Venture generates is distributed pursuant to this

25   third paragraph; is that correct?



Page 49

1      A.  That's right.

2      Q.  Are you aware that Debtor retained a valuation

3  expert to determine the value of his stake in this joint

4  venture?

5      A.  I -- I assumed he had to for the -- the

6  bankruptcy.

7      Q.  Did he make any communications with you regarding

8  that valuation analysis?

9      A.  No.

10      Q.  Have you ever conducted any independent valuation

11  analysis of any of the Greenhouse USV Joint Venture

12  entities?

13      A.  No.

14      Q.  Have you ever discussed with Debtor, or with any

15  other investor, the fair market value of the stakes of

16  any individual Greenhouse USV fund?

17      A.  No.

18      Q.  Have you taken any steps to determine Debtor's

19  stake in any of the Greenhouse Joint Venture entities?

20      A.  Can you restate the question?

21      Q.  Have you taken any steps to determine Debtor's

22  stake in the Greenhouse USV Joint Venture entities?

23      A.  Well, I know his stake is whatever his percentage

24  is, his percentage of ownership, but otherwise, no.

25      Q.  Okay.  Do you receive communications from Union



MAGNA
LEGAL SERVICES

Page 50

1    Square Ventures regarding the makeup of the portfolio

2    for any of their funds?

3        A.  Yes.

4        Q.  Okay.  How do you receive those communications?

5        A.  Usually, sometimes they have a core meeting

6    report where they list the components of the funds.

7        Q.  Okay.  What are the sort of assets that are in

8    the USV Joint Venture 2019, or the -- or the USV 2019

9    Fund?

10       A.  I can't tell you specifically.  But I can say

11   they are generally early-stage companies in, you know,

12   technology.  Well, they're not all technology.  But

13   they're, you know -- they're early-stage companies,

14   basically.

15           MR. GHOSH:  Okay.  At this time, understanding

16       that all rights have been reserved, we would like to

17       make a document request for documents and

18       communications concerning the portfolio makeup of the

19       USV funds in which Debtor has a stake.

20   BY MR. GHOSH:

21       Q.  What were your responsibilities with respect to

22   the management of the USV Joint Venture entities?

23       A.  As earlier, after the entity had been set up, I

24   would collect money periodically from each member,

25   deposit in the bank, and then either write a check or



**MAGNA** ◉
LEGAL SERVICES

Page 51

1    wire the money to Union Square when they called capital.

2    And then if there was a liquidity event, I would

3    distribute out to everybody.

4        Q.   I'm just trying to understand the nature of the

5    capital call for Greenhouse USV 2019.

6            Is that capital call coming from United -- or

7    Union Square Ventures to your fund, or is it coming from

8    your fund to the investors?

9        A.   Well, first it comes from Union Square to us, and

10   they call capital periodically.  And then if -- if

11   necessary, then I ask my relatives to send me a check

12   for some amount.  So -- but it starts with the request

13   from Union Square.

14       Q.   And how do you ask your relatives to send you a

15   check?  What is the form of that communication?

16       A.   Typically I'll just send an email.

17           MR. GHOSH:  Okay.  At this time, understanding

18       all rights are reserved, we would like to make a

19       request for communications regarding any capital

20       calls on behalf of the USV Greenhouse 2019 Venture.

21           MR. SALDINGER:  Any request by whom?

22           MR. GHOSH:  Any requests by Mr. Greenhouse to

23       Debtor.

24           But, again, we'll clarify that via a follow-up

25       off the record.


MAGNA
LEGAL SERVICES

Page 52

```
1    BY MR. GHOSH:
2        Q.  Do you -- have you had any communications with
3    Debtor regarding his ability or inability to make the
4    capital call for the 2019 Joint Venture entity?
5        A.  May I also explain that first?  It's not -- it's
6    not always an entirely formal thing, that sometimes it's
7    verbal as well.  Because in different -- different
8    people have had different abilities to pay more, you
9    know, faster than others.
10           So for some of it, it's like some people pay more
11   sooner, just to have it paid in.  And other people do it
12   slower.  And sometimes it's just been verbal.  I don't
13   know that it's always -- it's not like it's a formal
14   thing for me.  Because, you know, these are my close
15   relatives.  A lot of times it's just a phone call.
16       Q.  Okay.  Understood.
17           But some of the time these capital calls are made
18   via email; is that correct?
19       A.  Right.  Sometimes.  But I -- I'm not going to --
20   I just want you to know, there's not necessarily an
21   email every time.  And also I have tended to
22   generally -- the capital that I request from my
23   relatives does not necessarily map one to one at all, or
24   even map to the capital requested by the fund.
25           A lot of times it's, you know -- I'm going to get
```



MAGNA ●
LEGAL SERVICES

Page 53

1   much more money from everybody up front just so that I

2   don't have to continuously go back and ask them to keep

3   writing me checks.

4       Q.  Okay.  So how much do you determine how much to

5   ask the various investors?

6       A.  It's -- it's somewhat arbitrary.  I am not very

7   formal about it, to be honest.  I mean, it -- usually, I

8   mean -- there's no usually, actually.  It's just sort

9   of -- it's kind of like what I think we need at the

10  moment.

11      Q.  Okay.  So by way of example, Harry's stake in

12  this entity -- I'm sorry -- Debtor's stake in this

13  entity is approximately $99,000.

14          What, then, would you ask him for on an informal

15  basis to deposit into the fund?

16      A.  I don't know.  I might have -- I think I might

17  have asked -- I don't even know what I would have asked.

18  There's so many of these, and so --

19      Q.  Do you remember how you -- how you made that ask?

20  Was it on the phone?  Was it an email communication?

21      A.  It was probably on the phone when we set this

22  thing up.  We did all of the paperwork.  Signed their

23  forms, got them in.

24          I said, by the way, would you please all send

25  me -- would you send me X percent.  I don't even know



Page 54

1    what the percent was.

2    Q.  Okay.  And then how do you -- how do you make

3    sure -- since it's such an informal communication, how

4    do you make sure that every one is sending the amount

5    that you agreed to, you know, informally on the phone?

6    A.  I just keep kind of a, you know -- a little

7    spreadsheet I keep it in.

8    Q.  Okay.

9    A.  And not everybody sends the same amount either.

10   That's the other thing.

11   Q.  Okay.  So, again, just -- just drawing your

12   attention back to this percentage schedule here, you,

13   Charles R. Greenhouse, your father, and your son, Harry

14   Greenhouse, all have the same stake.

15       Would you say sometimes the three of you will

16   deposit different amounts into this joint account?

17   A.  Yes.

18   Q.  Okay.  And how do you reconcile that going

19   forward to make sure that the -- the amount of money

20   from each investor that's put into the USV fund is

21   consistent with your -- with your agreement laid out in

22   Exhibit 3?

23   A.  I just -- I track it on a spreadsheet.

24       MR. GHOSH:  Okay.  At this time, understanding

25       all rights are reserved, we would like to request the



Page 55

1      spreadsheet that the witness is referring to where he

2      keeps track of these deposits to the Morgan Stanley

3      account.

4   BY MR. GHOSH:

5      Q.  Previously you said when you asked in this

6   informal manner about funds to be deposited into this

7   Morgan Stanley account, you do so, so you don't have to

8   keep asking for more money.  You're referring to more

9   money that would be required to fund future Greenhouse

10  USV Ventures; is that correct?

11     A.  No.  To fund the existing commitments.

12     Q.  What happens to that surplus before USV make its

13  formal capital call of the Greenhouse USV entity?

14     A.  It sits in the Morgan Stanley bank account.

15     Q.  Does it accrue any interest?

16     A.  Very little.

17     Q.  Understood.

18     A.  That's not invested, it's basically sitting in

19  the bank account doing nothing.

20     Q.  What do you do to ensure there's no surplus past

21  what USV is going to require of you in that Morgan

22  Stanley account?

23     A.  Well, I only request the money that they've asked

24  for.  So I wouldn't have more.

25     Q.  Okay.  I understand that.



Page 56

1          But you did just say that you don't request exact

2     figures, according to the operating agreement.  Rather,

3     you sometimes request slightly more; isn't that correct?

4          A.  No.  No.  No.  No.  I -- in other words, if

5     somebody ultimately has a commitment.  I will make up a

6     number of $50,000.  That would be $50,000 over the life

7     of that fund, which means $50,000 over the life of the

8     entity that we formed.

9          So I would ask for some percentage of that up

10    front when we form the entity, so I can put money in the

11    bank, so I can have funds there to respond to the

12    capital calls for Union Square.

13         And then, you know, periodically I would ask

14    people for more.  And I would tell them how much more

15    they owe, and ask them to, you know, either pay the

16    remaining amount or pay the portion of the remaining

17    amount.

18         Q.  I understand.

19         Okay.  If we could just go to the paragraph on

20    this document titled "Fifth," it should be on the next

21    page.

22         A.  Uh-huh.

23         Q.  Are you familiar with this provision of the

24    operating agreement?

25         A.  Yes.



Page 57

1    Q.  Do you understand what an unincorporated

2  association is?

3    A.  I understand that our joint venture fits into

4  that.  I don't know more than that.

5    Q.  Did you -- did you consult with any sort of legal

6  or financial advisors when making the determination that

7  your entity is an unincorporated association?

8    A.  Yeah.  Initially, when we set up the first of

9  these entities, I consulted a lawyer who came up with

10  the initial agreement which was since copied.  And so

11  we've used that approach the whole time.  And his

12  suggestion at the time was that we --

13         MR. SALDINGER:  Lee.  Lee.  Hold on.  Not

14      appropriate for you to reveal legal advice from your

15      attorney.  So I will instruct you not to answer a

16      question that seeks the legal advice that you got

17      from your counsel regarding Mr. Greenhouse.

18         THE WITNESS:  Okay.  Fine.  And, by the way, in

19      this view, I don't see you, just so you know that.

20         MR. SALDINGER:  I'm still here, Lee.  Don't

21      worry.

22         THE WITNESS:  I don't see a picture of you

23      raising your hand.

24         MR. SALDINGER:  That's okay.  If I -- if I

25      interrupt, I apologize, but I will do so.  If there's



Page 58

1    another view, I think maybe Jim can guide us again.

2         MR. MOON:  Let me step in in the drag part of

3    your screen.  It's a little bit bigger, now we're

4    looking at a document.  It might have scrunched up

5    your screen a little bit.  If you pull it out with

6    your cursor, you may be able to see more of the

7    boxes, the gallery.

8         THE WITNESS:  I can see most of the gallery,

9    perfect.

10   BY MR. GHOSH:

11   Q.  Without getting into any of the conversations

12   with your attorneys, why was this decision made to form

13   this entity as an unincorporated association?

14        MR. SALDINGER:  Just to instruct the witness:

15   If by answering the question you're revealing any

16   advice from your legal counsel, I would instruct you

17   not to answer.

18        THE WITNESS:  Okay.

19   BY MR. GHOSH:

20   Q.  Okay.  So I just to want make sure:  The

21   reasoning for why this was formed as an unincorporated

22   association is entirely based on legal advice; is that

23   correct?

24   A.  Yeah.

25   Q.  Is that why you're not answering the question?



Page 59

1    A.   Yeah.  It was legal advice.

2    Q.   That's totally fine.  Understand.

3    A.   I mean, this --

4    Q.   Would you say the purpose of the Greenhouse USV

5    Joint Venture entities was noncommercial in nature?

6    A.   Yeah.  These were just to create a vehicle for

7    several individuals to invest as a single entity.

8    Q.   Would it be fair to describe these entities as

9    personal, family investments?

10   A.   I guess.  I don't really know.  Yeah.

11   Q.   Well, I really don't want to put words into your

12   mouth.  How would you describe the nature of these

13   investments, if not personal or family?

14        MR. SALDINGER:  Pratik, if I may, from whose

15        perspective?

16   BY MR. GHOSH:

17   Q.   From your perspective, Mr. Greenhouse.

18   A.   I just know they were created so that members of

19   our family could invest.

20   Q.   Okay.  Again, I don't want to put words into your

21   mouth.  If you disagree with what I'm saying, I don't

22   want you to say I guess.  I want you to say yes or no.

23        Would you say this is a -- a family investment,

24   or is it a business investment, or in between one of the

25   two?



Page 60

1          MR. SALDINGER:  My point of clarification is:

2     From whose perspective?  Like from his individual

3     investment?  What -- do you understand, Pratik, the

4     difference?  I'm -- I think you're trying to get at.

5  BY MR. GHOSH:

6     Q.  Let it me ask the question one more time:  From

7  the perspective of Debtor, Mr. Greenhouse, as far as you

8  know, was this investment a business investment or a

9  personal investment?

10         MR. SALDINGER:  Objection; lack of foundation.

11 BY MR. GHOSH:

12    Q.  You can still answer.

13         MR. SALDINGER:  You can answer.

14    A.  I don't know.

15 BY MR. GHOSH:

16    Q.  Okay.  Let's just slightly alter that question.

17 From your perspective, Mr. Greenhouse, were these

18 personal investments or were they business/commercial

19 investments?

20    A.  For me, personally, these were personal

21 investments.

22    Q.  Got it.

23         Would you have any reason to believe that that

24 would be different for Debtor?

25    A.  I don't know.



Page 61

1    Q.  Okay.  I just want to ask that question one more

2    time:  You have no reason to believe that that would be

3    different for your -- for Debtor?

4              MR. SALDINGER:  No.  That's the same question

5         asked in a different way.  So he said he doesn't --

6         he doesn't know.  Now I think you are trying to put

7         words in his mouth.

8              MR. GHOSH:  Understood.

9    BY MR. GHOSH:

10   Q.  Would you consider the USV Joint Ventures to be

11   you running a business?  Or is this just you helping out

12   family?

13   A.  I'm helping my family.  But it's, you know --

14   there's an entity here.  It's a -- it's a -- there's an

15   entity here to do that.

16   Q.  Are these entities registered to do business in

17   any state?

18   A.  No.

19   Q.  Okay.  Do these entities have any employees?

20   A.  No.

21   Q.  I want to just briefly get back to some of the

22   testimony you gave me a little bit ago now.

23         I asked you, "Some of these capital calls are

24   made via email; is that correct?"

25   A.  Which capital calls?



Page 62

1    Q.   From the USV Joint Venture entities.

2         And you responded that, "A lot of times, you

3    know, I'm going to get much more money from everybody up

4    front just so I don't have to continuously go back and

5    ask them to continually write checks."

6         I just want -- I would like you to expand on that

7    just a little bit, on specifically the methodology you

8    used for the upfront request.

9         Is there any sort of analysis that you do or --

10   basically, any sort of analytical process that you may

11   go through to make that initial capital call request?

12   A.   Well, I do look, you know, at the fund.

13   Sometimes they -- the fund will say they're going to be

14   calling at a certain rate, X percent per quarter.   I

15   would use that a little too.   I know because I have been

16   investing for a while, you know, that they take a --

17   they take several years to invest the money.   And they

18   don't tend to call the money -- you know, a lot of money

19   quickly.   So I have used that as sort of a guide.

20   Q.   I understand.

21        MR. GHOSH:   Can we please get Tab 5 pulled up.

22        (Whereupon, Claimant Exhibit 5 was marked for

23   identification.)

24   BY MR. GHOSH:

25   Q.   Do you recognize this document, Mr. Greenhouse?



Page 63

1    A.  Yes.

2    Q.  Can you please describe what this is.

3    A.  This is the monthly statement from the Merrill

4    Lynch bank account that is associated with the

5    Greenhouse USV 2012 Joint Venture.

6    Q.  So I want to get a sense of how this plays into

7    the joint venture.  Do the investors deposit their funds

8    into this account?

9    A.  No.

10    Q.  How does that work?  Can you explain how this

11    relates to the USV 2012 Joint Venture?

12    A.  Right.  So this account -- and it's the same for

13    all of the other Greenhouse USV Joint Ventures, which

14    is -- also have Merrill Lynch accounts associated with

15    them -- are used solely for the purpose of receiving

16    stock when it's distributed by Union Square Ventures.

17    Sometimes they've sold something, there's cash,

18    and they send us cash.  And that would go to the Morgan

19    Stanley account.  If they have stock that they're

20    distributing in kind, they give us the stock and they

21    deposit it into an account at Merrill Lynch.  And so we

22    have set up accounts for each of the Greenhouse USV

23    joint ventures at Merrill Lynch for the sole purpose of

24    receiving that stock and then subsequently selling it.

25    Q.  Understood.



MAGNA
LEGAL SERVICES

Page 64

```
 1        So am I right in saying that each of the
 2   Greenhouse USV joint ventures has a separate Merrill
 3   Lynch brokerage account set up with it?
 4      A.   That's correct.
 5      Q.   And the purpose of these Merrill Lynch accounts
 6   is to hold stock that you receive from Union Square
 7   Ventures; is that correct?
 8      A.   Yes.
 9      Q.   How soon after receiving these -- the stock from
10   USV do you sell it, typically?
11      A.   It depends on the situation.
12      Q.   Okay.  Let's talk about a specific instance,
13   then.
14           When is the last time you received stock from
15   USV?
16      A.   In April we received stock.
17      Q.   April of 2021?
18      A.   Yes.
19      Q.   Have you sold that stock yet?
20      A.   We did.  We sold it.  It was Coinbase stock, and
21   we did sell it.
22      Q.   Understand.
23           If you would just scroll down to Page 4 -- I'm
24   sorry, I meant Page 5.
25           In the middle of this document it says, Coinbase
```



Page 65

```
 1    Global Inc. Reg.  Is that the Coinbase stock you're
 2    referring to?
 3        A.  Yes.
 4        Q.  And that sale, was it approximately 2- --
 5    $2.293 million?
 6        A.  Whatever it says on here is what it was.
 7        Q.  Understood.
 8            Do you know anything about Coinbase Global Inc.
 9    Reg?
10        A.  The company?
11        Q.  Correct?
12        A.  Yes.
13        Q.  What is the nature of that company?
14        A.  They are a company that can we used to hold
15    cryptocurrencies in a secure way.
16        Q.  Okay.  So approximately $2.293 million of the
17    Greenhouse USV assets were invested in Coinbase Global,
18    Inc. Reg, as of March 2021; is that correct?
19        A.  I didn't -- I can't say that.  Because at that
20    point there was no -- I don't know what it was as of
21    March 2021.  I mean, there was a number of shares.  I
22    actually didn't know the number of shares until they
23    were distributed to us.
24        Q.  Okay.  Understood.
25        A.  Also, the price -- Coinbase was not a public
```



Page 66

1    company, so the price was not evident either.

2        Q.  Okay.  What was the vehicle in which you were

3    permitted to invest in a private company?

4        A.  This is -- Union Square did the investing.

5        Q.  To your knowledge, Union Square is permitted to

6    invest in nonpublic entities; is that correct?

7        A.  That's basically their business.

8        Q.  Understood.

9            And do you have any say in what kind of nonpublic

10   entities they invest in?

11       A.  No.

12       Q.  You understand that Coinbase's primary business

13   is brokering cryptocurrency transactions?

14       A.  It brokers' transactions.  It's also like a bank

15   with a secure holding service.

16       Q.  A secure holder of cryptocurrency; is that right?

17       A.  Yeah.  Sort of a combination of a stock exchange,

18   I guess, in a bank.  That's as I understand it.

19       Q.  Is your understanding of cryptocurrencies' value,

20   in general, would it be fair to characterize that as

21   volatile?

22       A.  Cryptocurrencies' value as volatile?

23       Q.  Yeah.  Would that be a correct characterization?

24       A.  I think so.

25       Q.  Okay.  Do you know how much of USV assets are



Page 67

1    involved in Coinbase or other crypto-based businesses?

2        A.  I don't know.

3        Q.  Is that information located on the portfolio

4    reports that you get from USV?

5        A.  They list companies.  And to the extent you can

6    tell from the name of the company they own, I suppose

7    so.

8        Q.  You're administrator of the Greenhouse USV Joint

9    Venture; is that correct?

10       A.  Yeah.  That's my informal role.  It's not my job

11   title.

12       Q.  Right.  And it's not your job title because this

13   is all sort of an informal family investment vehicle; is

14   that right?

15           MR. SALDINGER:  Objection; mischaracterizes

16       prior testimony.

17           You're putting words in his mouth, Pratik.

18           MR. GHOSH:  The question stands.

19   BY MR. GHOSH:

20       Q.  Is the reason why that's not your job title, is

21   it because this is an informal family investment

22   vehicle?

23       A.  Right.  The -- the agreements, when they're set

24   up, names me as something called a nominee, which is

25   sort of the manager.



Page 68

1    Q.  Right.

2    A.  That's it.  There's no job called administrator.

3    I may have used that term earlier just to explain the

4    nature of the role.

5    Q.  Understood.  Of course.

6        Do you do any sort of diligence in this sort of

7    informal role to vet the investments that were carried

8    by USV?

9    A.  None.

10   Q.  Did you even review any of the portfolio emails

11   you get to sort of like sift through, like, Hey, they're

12   holding this much of Coinbase, they're holding this

13   much, you know, whatever other company?

14   A.  I glance at them.

15   Q.  Okay.  Did the investors at the USV entities

16   have -- the Greenhouse USV entities, to be clear, do you

17   have any formal or informal meetings to talk about your

18   investments, however briefly?

19   A.  No.

20   Q.  Do you have any sort of communications, such as

21   an email or text thread, where you might, you know,

22   briefly talk about these communications?

23   A.  No.

24   Q.  Okay.  Again, I don't want to be putting words in

25   your mouth.  If you disagree with the statement, please



Page 69

1    tell me so.

2         But is it fair to say that there is no formal or

3    informal communication regarding the investments made by

4    the Greenhouse USV vehicles?

5    A.   I guess that's probably -- that would be fair, I

6    guess.

7    Q.   When is the first time you told Debtor that he

8    had a capital call obligation with respect to USV 2019?

9    A.   Well, it was formed in 2019.

10   Q.   Do you remember what date the entity was formed?

11   A.   I don't know exactly.

12   Q.   At the time of formation, you told Debtor that he

13   had a capital call obligation?

14   A.   Yeah.  Yeah.  The date, by the way, would be on

15   the document you have.  I just don't know.

16   Q.   Did you reduce -- did you give any sort of formal

17   communication about like, Hey, you have this obligation,

18   you are required to pay X amount of money by X date?

19   A.   No.

20   Q.   Understood.

21   A.   Let me say this:  I don't remember it.  I don't

22   remember it.

23   Q.   Understood.

24         Has any Greenhouse USV investor ever failed to

25   fulfill their capital call obligations?



Page 70

```
 1    A.  No.
 2    Q.  Okay.  So every investor has satisfied their
 3  capital call obligations per their pro rata share at all
 4  times for all of the USV -- the Greenhouse USV Joint
 5  Ventures?
 6    A.  Yes.
 7    Q.  Understood.
 8        Do you know what the consequence would be if an
 9  investor would fail to satisfy the capital call
10  requirements?
11    A.  I don't really know.
12    Q.  Have you done any diligence to find out what your
13  remedies would be if an investor failed to satisfy the
14  capital call?
15    A.  No.
16    Q.  Do you believe that USV would penalize you or
17  bring any action against you, either personally or your
18  joint venture entity, if you failed to satisfy the
19  capital call?
20    A.  Yes.
21    Q.  And what -- do you know what kind of action that
22  would be?
23    A.  I don't know.
24    Q.  Do you have a contract between either yourself or
25  a Greenhouse USV entity and Union Square Ventures?
```



Page 71

1       A.  We have a subscription agreement.

2       Q.  And do you current -- are you currently in

3   possession of your subscription agreement with Union

4   Square Ventures?

5       A.  No, I don't think I am.

6       Q.  Who is in possession of these subscription

7   agreements with Union Square Ventures?

8       A.  Union Square Ventures would be.  I just don't

9   think I have a copy at the ready.  Maybe they sent me

10  one and it's packed up in a file cabinet.

11      Q.  I'm sorry.  You cut out for a little bit there on

12  my speaker.  You're saying that you -- well, let me just

13  ask the question one more time.

14          Do you have the subscription agreements with

15  Union Square Ventures?

16      A.  I probably do somewhere.

17          MR. GHOSH:  Okay.  Understanding that all

18      rights are reserved at this time, we would like to

19      make a document request for the subscription

20      agreements for Union Square Ventures.

21  BY MR. GHOSH:

22      Q.  Have you reviewed those agreements?

23      A.  No.

24      Q.  To date, have you or any of the other

25  investors -- actually, scratch that.



Page 72

```
1          Are you concerned that Debtor won't be able to
2    meet his capital call obligation, in light of his
3    bankruptcy?
4               MR. SALDINGER:  Objection as to relevance.
5               You can answer the question.
6               THE WITNESS:  I'm sorry.  Should I answer?
7               MR. SALDINGER:  And objection as to relevance,
8          whether or not my client is concerned.
9       A.   I'm concerned -- you know, moderately concerned.
10   I mean, I'm not worried about, you know -- about our
11   obligations to Union Square, if that's what you're
12   worried about.
13   BY MR. GHOSH:
14      Q.   Understood.
15          If Debtor fails to meet his capital call
16   obligation for the 2019 Joint Venture, what steps would
17   you take to make sure that Greenhouse USV still makes
18   its contributions to Union Square?
19              MR. SALDINGER:  Objection; calls for
20         speculation; also irrelevant.
21   BY MR. GHOSH:
22      Q.   You can still answer.
23      A.   I would go seek some legal advice on what to do.
24      Q.   Would you consider initiating litigation against
25   Debtor?
```



Page 73

1          MR. SALDINGER:  Objection; asked and answered.

2          He said he would seek legal advice on what to

3     do.

4          MR. GHOSH:  I'm asking a slightly different

5     question.

6     BY MR. GHOSH:

7     Q.  Would you consider initiating litigation if

8     Debtor fails to meet its capital call?

9     A.  It would depend on what legal advice I got.

10    Q.  Understood.

11         Would the other investors, subject -- yourself

12    included -- consider diluting or otherwise eliminating

13    Debtor's share in the USV entity so that the rest of the

14    investors could make up for his stake and still meet the

15    capital call requirements?

16         MR. SALDINGER:  Same objection; calls for

17    speculation as to what other investors would do.

18         And he already answered the question about what

19    he would do, he said he would seek legal advice.

20    BY MR. GHOSH:

21    Q.  You can still answer the question.

22    A.  I don't know.

23    Q.  Okay.  What happens to the USV venture -- the

24    Greenhouse venture entities if Debtor fails to make the

25    capital call?



Page 74

1    A.  I don't know yet.

2    Q.  Okay.  You've taken no steps to -- to get legal

3  or financial advice on this topic?

4    A.  No.

5    Q.  Okay.  Is there any reason for that?

6    A.  I guess I would ask why would I do that now?  I

7  mean, I...

8    Q.  Okay.  Are you aware that Debtor's current

9  liabilities exceed his assets, as laid out in his

10  bankruptcy filings?

11    A.  I haven't seen the filings, so I don't know.

12    Q.  Are you generally aware of that principle, that

13  Debtor's current liabilities exceed his assets?

14    A.  Yeah, I guess I am.

15       MR. SALDINGER:  Are you aware of what

16    principle?  A principle of bankruptcy?  Or a

17    principle of what?

18       Can you maybe restate the question, Pratik?

19  BY MR. GHOSH:

20    Q.  Sure.

21       Are you aware that Debtor's current liabilities

22  exceed his assets?

23       MR. SALDINGER:  Objection; foundation.

24  BY MR. GHOSH:

25    Q.  You can answer.



1    A.  I guess that's the purpose of the -- of being in

2    bankruptcy, isn't it?

3    Q.  Right.  I -- I do apologize.  It -- I asked a

4    yes-or-no question.

5        Are you aware that Debtor's current liabilities

6    exceed his assets?

7    A.  I assume that they do.

8    Q.  Okay.

9    A.  Yeah.

10   Q.  And that -- does that cause you any concern,

11   then, that he is not going to be able to meet the

12   capital call requirements of the USV 2019 Joint Venture?

13       MR. SALDINGER:  Objection; asked and answered.

14   BY MR. GHOSH:

15   Q.  You can answer.

16   A.  It causes concern, but I'm not worried about what

17   we, as an entity, might need to do.

18   Q.  Okay.  Understood.

19       Why are you not concerned about what you, as an

20   entity, would need to do, given that Union Square

21   Ventures could potentially bring litigation against you

22   if you failed to meet that obligation?

23   A.  Because between, you know, members of our joint

24   venture, we would have enough cash to cover, you know,

25   Harry's position and make good on our commitment to



Page 76

1    Union Square Ventures.

2    Q.  Understood.

3        Do you know a Raymond Cahnman?

4    A.  Yes.

5    Q.  Who is Raymond Cahnman?

6    A.  He's a gentleman who lives in Chicago.

7    Q.  Is he related to Debtor?

8    A.  He's related by marriage, I guess.

9    Q.  What is his relationship?

10   A.  He's married to my former sister-in-law.

11   Q.  Understood.

12       To your knowledge, did -- have you ever had any

13   communications directly with Mr. Cahnman regarding

14   Debtor's finances?

15   A.  No.

16   Q.  Okay.  Do you know whether or not Debtor has

17   asked Mr. Cahnman to lend him money?

18   A.  I don't know.

19   Q.  Okay.  Has Debtor ever asked you to lend him

20   money in connection with any tax liability to the IRS?

21   A.  No.

22   Q.  Okay.  You're aware that Debtor carried a

23   significant tax liability in 2019?

24   A.  I don't know the status of that.  I know it's a

25   complicated thing.

Page 77

1    Q.  But he did talk to you about his tax liabilities

2    in 2019?

3    A.  I actually don't know if he talked to me about

4    that specifically.

5    Q.  Okay.  Did he talk to you generally about his tax

6    liabilities?

7    A.  He's talked generally about the complexity of his

8    taxes.

9    Q.  And did he ever ask you to help him pay any sort

10   of tax liabilities to the IRS --

11   A.  No.

12   Q.  -- at any point?

13   A.  No.

14   Q.  Understood.

15       MR. GHOSH:  Can we please pull up Tab 6.  I

16   believe this is Exhibit 6.

17       MR. SALDINGER:  Pratik, can we take a short

18   break, we've been going about an hour and 50 minutes,

19   and then jump back on and continue with the next

20   exhibit?

21       MR. GHOSH:  Definitely.

22       How long do you want to take, so I know when to

23   come back?

24       MR. SALDINGER:  Ten minutes at most.

25       MR. GHOSH:  Let's reconvene in ten.



# EXHIBIT A

# PART II

Page 78

1          THE VIDEOGRAPHER:  The time is 10:49 a.m.

2     We're going off the video record.

3          (Whereupon, a break was taken from 10:49 a.m.

4     to 11:04 a.m.)

5          THE VIDEOGRAPHER:  Time is now 11:04 a.m.

6          We're back on the video record.

7     BY MR. GHOSH:

8     Q.  Mr. Greenhouse, I might have to go to a couple

9     prior points of your testimony.

10          First, are you aware of any litigation between

11     Debtor and Paysafe Financial Services Limited?

12     A.  No.

13     Q.  And then before we go on, I just want to ask you,

14     during this past break, did you speak with your counsel?

15     A.  I'm sorry.  During the break?

16     Q.  Yeah.

17     A.  Yeah.  I just -- yeah, very briefly.

18     Q.  What did you discuss?

19          MR. SALDINGER:  I will instruct the witness not

20     to answer.

21          MR. GHOSH:  That information is, in fact,

22     discoverable.  You can go ahead and answer any

23     conversations you had over the break.

24          MR. SALDINGER:  I instruct him not to answer.

25          MR. GHOSH:  Okay.  And what is that instruction



Page 77

1      Q.  But he did talk to you about his tax liabilities

2  in 2019?

3      A.  I actually don't know if he talked to me about

4  that specifically.

5      Q.  Okay.  Did he talk to you generally about his tax

6  liabilities?

7      A.  He's talked generally about the complexity of his

8  taxes.

9      Q.  And did he ever ask you to help him pay any sort

10  of tax liabilities to the IRS --

11     A.  No.

12     Q.  -- at any point?

13     A.  No.

14     Q.  Understood.

15         MR. GHOSH:  Can we please pull up Tab 6.  I

16  believe this is Exhibit 6.

17         MR. SALDINGER:  Pratik, can we take a short

18     break, we've been going about an hour and 50 minutes,

19     and then jump back on and continue with the next

20     exhibit?

21         MR. GHOSH:  Definitely.

22         How long do you want to take, so I know when to

23  come back?

24         MR. SALDINGER:  Ten minutes at most.

25         MR. GHOSH:  Let's reconvene in ten.



Page 79

1    based on?

2         MR. SALDINGER:  The fact that we had a

3    conversation.  And for the record, Counsel, I did not

4    give any guidance.  There was no pending question.  I

5    did not give any guidance to my client on -- on the

6    pending question or what to answer or not to answer.

7         But I'm still instructing him not to answer.

8    Move on.

9         MR. GHOSH:  Yeah, I -- I just need to know what

10   the instruction not to answer is based on.  Is it

11   based on privilege or something else?

12        MR. SALDINGER:  Based on privilege, yeah.

13        MR. GHOSH:  Got it.

14   BY MR. GHOSH:

15   Q.  Okay.  So you're not aware of any litigation

16   between Debtor and Paysafe Financial Services Limited.

17   Is that what you testified to?

18   A.  Are you saying currently?

19   Q.  Yeah.  In the past or currently, yeah.

20   A.  I don't know about that particular litigation.

21   Q.  Okay.  Are you aware of what Debtor's business

22   dealings with Paysafe Financial Services Limited?

23   A.  I don't know.

24   Q.  Okay.  Are you aware of any of Debtor's business

25   affairs in the United Kingdom?



Page 80

1    A.  Yes.

2    Q.  And can you describe some of those business

3    affairs that he has in the United Kingdom?

4    A.  I mentioned earlier he had a relationship with an

5    e-bank that he brought, you know, customers to.

6    Q.  Is that e-bank Paysafe Financial Services, or is

7    it some other entity?

8    A.  I don't know the name, actually.

9    Q.  Okay.  Understood.

10        I just wanted to get back to the document

11   collection effort.  You mentioned you had email

12   accounts.  One of the email accounts, the

13   @greenhousegrows email account, forwards to the

14   @lrgreenhouse.com Gmail account; is that correct?

15   A.  Right.

16   Q.  Do all of the emails from the -- from the

17   @greenhousegrows email account transfer?

18   A.  As far as I know, they do.

19   Q.  So is there any reason why -- why you searched

20   both email accounts?

21   A.  Well, yes.  Because the -- the transfer was

22   something that I started -- I'm not sure exactly when I

23   started it.  But I wanted to make sure that there

24   weren't emails in one account and not -- that didn't

25   show up in the other account.



Page 81

1    Q.   Understood.

2         You mentioned that you had copies of the

3    subscription agreement with USV.

4         Is there any reason you didn't produce those

5    agreements to us?

6              MR. SALDINGER:  I would instruct the witness --

7         to the extent that his answer would reveal any

8         attorney-client communications, I would instruct him

9         not to answer the question.

10             MR. GHOSH:  Let me re-ask.

11   BY MR. GHOSH:

12   Q.   To the extent that your answer doesn't talk about

13   the privileged communications, is there any reason why

14   you've determined not to produce the subscription

15   agreements with USV?

16   A.   No.  I thought that we -- we responded to the

17   request.

18   Q.   Okay.

19   A.   What we provided was -- was, you know, responsive

20   to what you asked for.

21   Q.   Okay.  So you -- did you make a determination

22   that the subscription agreements were not responsive?

23   A.   I guess I probably did.

24   Q.   Okay.  And what was that determination based on?

25   A.   Reading the request for documents and saying is



Page 82

1    this relevant or not.

2        Q.  And you interpreted those requests; is that

3    right?  Or did your counsel request -- interpret those

4    requests, and then tell you what was responsive and not?

5            MR. SALDINGER:  Again, I would instruct the

6        witness not to reveal any attorney-client

7        communication.

8            Pratik, you need to move on.  If you want to

9        make a subsequent document request --

10           MR. GHOSH:  I'm going to --

11           MR. SALDINGER:  Pratik, I'm going to talk now.

12           MR. GHOSH:  This is not the first time you've

13       made a speaking objection.

14           If you're instructing him not to respond,

15       that's fine, but you're going to have to stop with

16       the speaking objections.  I'm --

17           MR. SALDINGER:  Actually, I'm not going to --

18       actually, Pratik, I'm not going to -- Pratik, I'm not

19       going to have to stop to do anything.  What you're

20       going to need to do --

21           MR. GHOSH:  I'm going to re-ask --

22           MR. SALDINGER:  -- is move on with your

23       deposition.  Most of your questions --

24           MR. GHOSH:  This is my deposition -- I'm sorry,

25       you're going to --



Page 83

```
 1              MR. SALDINGER:  It absolutely is.

 2              MR. GHOSH:  -- have to stop with the speaking

 3      objections.

 4              MR. SALDINGER:  Pratik --

 5              MR. GHOSH:  If you're instructing him not to

 6      respond, that's one thing --

 7              MR. SALDINGER:  Fine.  I'm instructing him not

 8      to respond.  I'm asking you to move on to relevant

 9      inquiries.

10              MR. GHOSH:  All of these inquiries are

11      relevant.

12              MR. SALDINGER:  I disagree strongly.

13              MR. GHOSH:  Understood.

14      BY MR. GHOSH:

15         Q.  So did you search your hard drive on any of the

16      devices, electronic devices that you have, for

17      responsive documents?

18         A.  Did I search them?

19         Q.  Sure.

20              So let's --

21         A.  Of course, I had to find the documents.  I had to

22      search them.

23         Q.  Do you have an iPad or any sort of tablet?

24         A.  No.

25         Q.  Okay.  When we're talking about electronic
```



Page 84

1   devices, what are those electronic devices?

2       A.  I have a -- I have a laptop.  And I have a -- a

3   phone, an iPhone.

4       Q.  So on that laptop, did you perform a hard drive

5   search?

6       A.  I probably did, looking for -- yeah, I mean, at

7   some point I probably did.

8       Q.  And how did you go about doing that?

9       A.  Well, depends on what document you're talking

10  about.

11      Q.  Just in a general matter, to produce any of the

12  documents, how did you go about locating the responsive

13  documents?

14      A.  I looked through emails.  I literally went back,

15  you know, looked under all of the emails and did -- that

16  had occurred between me and Harry.  I literally went

17  back through every single email.

18      Q.  So what about the non-email documents?  Just the

19  regular PDF or bank statements?

20      A.  You know, some of them I had on my hard drive,

21  and I knew where they were because they were file

22  folders.  I went to do a search, I went to the --

23      Q.  Did you conduct any sort of keyword searches?

24      A.  I -- I don't think I -- I didn't need to.

25      Q.  Okay.



Page 85

1    A.  I didn't -- didn't do that.  I mean, the other

2    documents are, like, bank statements and brokerage

3    statements and things like that.  So I knew.  I went

4    online and pulled those off of the -- the sites where

5    they sat.

6    Q.  Okay.  If there was an email between, let's say,

7    Fred Wilson, for instance, and you regarding the USV

8    Joint Venture, that email wouldn't be pulled into your

9    searching; is that correct?

10   A.  Well, again, I didn't search.  The request was

11   for -- as I recall, was for docu- -- was for

12   communication between me and Harry.

13   Q.  Okay.

14   A.  So that's why I...

15   Q.  And pursuant to that, you only searched

16   communications that took place between you and Debtor;

17   is that right?

18   A.  I believe that was the request.

19   Q.  Okay.  So before when I asked you why you didn't

20   join with Debtor in the Polychain litigation and in the

21   Polychain arbitration, you mentioned you didn't have a

22   stomach for litigation.

23       Other than the reason you provided, is there any

24   other reason why you didn't join Debtor in the Polychain

25   arbitration?



Page 86

1          MR. SALDINGER:  Objection; relevance.

2    BY MR. GHOSH:

3      Q.  You can answer.

4      A.  I don't recall.  I mean, I don't really recall

5    much else about it.

6          MR. GHOSH:  Okay.  Can we get Tab 6 pulled?

7          I believe this is Exhibit 6.

8          (Whereupon, Claimant Exhibit 6 was marked for

9    identification.)

10         MS. HELMSTETTER:  Pratik, excuse me.  Before we

11   get into this line of questioning, I would just like

12   to make a global statement on the record.

13         And I am referring to Tab 6, the power of

14   attorney that I believe you're about to introduce as

15   an exhibit.

16         And I'm sure everyone is aware that

17   Mr. Greenhouse engaged in a brief attorney-client

18   relationship in connection with the bankruptcy case

19   and this power of attorney.

20         And so I would like to make a global objection

21   on the record, to the extent that any of your

22   questions relate to communications surrounding this

23   power of attorney and communications between my firm

24   and Mr. Greenhouse during the scope and the time this

25   power of attorney was in existence or -- or, you



Page 87

1    know, during the time that Mr. Greenhouse was acting

2    as a power of attorney, pursuant to this agreement.

3         And that is an attorney-client privilege, for

4    the record.

5         MR. GHOSH:  Okay.  Understood.

6         So with that objection as a layer, if you have

7    any instructions to this witness specifically not to

8    answer, I will just ask you to just limit it to that

9    instruction going forward.

10        MR. SALDINGER:  And for the record, I join and

11   concur with the statement of Debtor's counsel.

12        MR. GHOSH:  Understood.

13   BY MR. GHOSH:

14   Q.   And before we go on to this, I just want to

15   quickly ask you about the approximately $2 million in

16   Coinbase stock that was in the Merrill Lynch account.

17        When was that stock liquidated into cash?

18   A.   I don't know the exact date, but it was probably

19   around April 20th or so.

20   Q.   Okay.  So -- so --

21   A.   You have the record.  I don't know.

22   Q.   Okay.  So that -- the Coinbase stock in that

23   Merrill Lynch account, approximately $2 million of it,

24   was liquidated after Debtor filed for bankruptcy,

25   correct?



Page 88

1    A.  Correct.

2    Q.  Did you work with Debtor to make sure that he

3  received his portion of those proceeds as soon as

4  possible?

5    A.  I didn't do anything extraordinary with Harry.  I

6  did what I would normally do.

7    Q.  What would you normally do?

8    A.  I would sell the stock and distribute it out to

9  everybody.

10    Q.  Did Harry receive the funds in his personal

11  account of his share of the proceeds from that

12  $2 million Coinbase sale?

13    A.  They went into the account that he instructed me

14  to wire it to.  I don't actually know what that account

15  was.

16    Q.  Okay.  Do you have any communications where he

17  gave you that instruction?

18    A.  I don't know how he conveyed that to me, how he

19  conveyed the wire instructions.

20    Q.  Okay.  Do you have a record of that transaction?

21    A.  Of the wire?

22    Q.  That's right.

23    A.  Yeah, I do.

24        Again, it would be that money went out of the

25  Morgan Stanley -- wait, is that right?  Yeah, I mean,



Page 89

1    whatever account it went out of, it would have been --

2    it went out of the Morgan Stanley account, and there

3    would have been a record of every wire sent.  Yes.

4            MR. GHOSH:  At this time, understanding that

5        all rights are reserved, we are going to make a

6        document request for the transfers out of the Morgan

7        Stanley account, including the one originating from

8        the sale of approximately $2 million of Coinbase

9        stock.

10   BY MR. GHOSH:

11       Q.  Mr. Greenhouse, you understand that Debtor is not

12   to reinvest any of those proceeds without prior approval

13   from the Court; is that correct?

14       A.  I think I understand that.  Yeah.

15       Q.  Okay.  You also understand that you cannot

16   reinvest any portion of Debtor's proceeds without prior

17   approval from this bankruptcy court; is that right?

18           MR. SALDINGER:  Object to the form of the

19       question.

20   BY MR. GHOSH:

21       Q.  You can still answer.

22       A.  Yes, I understand that.

23       Q.  Okay.  Great.

24           So we'll head back into this power of attorney

25   document labeled as Exhibit 6.



Page 90

1          Do you recognize this document?

2     A.   Yes.  I mean, I don't know -- I don't know it in

3   detail, but it looks -- if it's -- if it's the power of

4   attorney that I think it is, yes.

5     Q.   Okay.  This power of attorney naming you as

6   attorney in fact for Debtor was executed by Debtor on

7   February 3rd, 2021.  Is that consistent with your

8   understanding?

9          MR. SALDINGER:  Can you show the witness all

10       the pages of this document?

11          MR. GHOSH:  Can we please scroll through the

12       two-page or three-page document.

13          MR. SALDINGER:  Thank you.

14          MR. GHOSH:  If possible, can we have both of

15       the pages up at once?

16   BY MR. GHOSH:

17     Q.   So, you know, if you need a second to read this

18   through, because we're going to walk through this

19   document briefly.

20          Have you ever reviewed this document?

21     A.   Really, no.

22     Q.   Okay.

23     A.   I have seen it, but I never really reviewed it.

24     Q.   Understand.  Understand.

25          Did you retain any counsel in connection with the



Page 91

1    power of attorney agreement?

2        A.   No.

3        Q.   Did you speak with any lawyer regarding the power

4    of attorney agreement?

5            MS. HELMSTETTER:   Objection; attorney-client

6        privilege.

7            I will instruct the witness not to answer.

8            MR. GHOSH:   You're instructing him not to

9        answer whether or not he spoke with a lawyer?

10           MS. HELMSTETTER:   Okay.   You can answer whether

11       or not you spoke.   Fine.   And do not go into further

12       detail, please.

13       A.   I guess the answer would be yes.

14   BY MR. GHOSH:

15       Q.   Okay.   And who was that attorney?

16       A.   Bob Charbonneau.

17       Q.   Okay.   When did you speak with Bob Charbonneau?

18       A.   You know, I don't know.   Because I -- there were

19   different conversations going on.   I don't know.

20       Q.   Okay.   When is the first time you spoke with

21   Bob Charbonneau about the power of attorney agreement,

22   specifically?

23       A.   You know, I don't know.   I mean, it was just -- I

24   don't know what that date would have been.

25       Q.   Okay.   I understand.



Page 92

1          So do you see on the second page at the bottom,

2    it says that the "foregoing instrument was acknowledged

3    before me on the 3rd day of February, 2021"?  Do you see

4    that?

5       A.   Yes.

6       Q.   Do you understand that to mean that this

7    agreement was executed on February 3rd, 2021?

8       A.   I suppose so.  Sure.

9       Q.   To your knowledge, was this approximately one

10   month after the entry of the Polychain arbitration award

11   against Debtor?

12      A.   I don't know.  I don't know what that date was.

13      Q.   Okay.  Are you aware that the Polychain

14   arbitration award against Debtor was entered on

15   January 8, 2021?

16      A.   I don't understand the dates, because it was my

17   understanding that there was some kind of a judgment

18   before then.

19      Q.   Understand.

20          To your knowledge, was the decision to enter into

21   this power of attorney agreement related in any way to

22   the Polychain arbitration award against Debtor?

23          MS. HELMSTETTER:  Objection; attorney-client

24      privilege.

25



Page 93

1    BY MR. GHOSH:

2        Q.  Let me rephrase.

3            Aside from what you were told by Bob Charbonneau

4    or any other attorney -- aside from what you were told

5    by any other attorney, including Bob Charbonneau, was

6    the decision to enter into the power of attorney

7    agreement related in any way to the Polychain

8    arbitration award?

9            MR. SALDINGER:  Go ahead, Nicole.

10           MS. HELMSTETTER:  I don't see how you can

11       separate the two.

12           MR. GHOSH:  That's up to the witness.  He's

13       been given the instruction and the question.

14   BY MR. GHOSH:

15       Q.  Please don't tell me anything -- any information

16   that you derived from either Bob Charbonneau or any

17   other attorney that -- to your knowledge, was this

18   declaration -- or was this power of attorney entered

19   into because of or related in any way to the Polychain

20   arbitration agreement?

21           MR. SALDINGER:  I have an objection on whose

22       standpoint are you talking about?

23           I think --

24           MR. GHOSH:  Again, that's a speaking objection.

25           MR. SALDINGER:  Pratik, I want to make sure



Page 94

1    that I understand the question.  So I don't

2    understand the question.  And if I don't understand

3    it, I don't -- I don't think the witness understands

4    it.

5         The decision by whom?

6         MR. GHOSH:  Again, this is a repeated speaking

7    objection.  I will ask the question one more time.  I

8    will try to be as clear as I can.

9         MR. SALDINGER:  Thank you.

10   BY MR. GHOSH:

11   Q.  Without divulging any attorney-client

12   communications that you've had, can you please tell me,

13   from your perspective, the reason why this power of

14   attorney was entered?

15        MS. HELMSTETTER:  I will instruct the witness

16   not to answer the question.

17        I don't see how you can separate his opinion as

18   to why this was entered from any attorney-client

19   communications.  If it's a bigger issue, we can

20   discuss offline.

21        MR. GHOSH:  Okay.

22   BY MR. GHOSH:

23   Q.  Mr. Greenhouse, who is your attorney in this

24   case?

25   A.  Mr. Saldinger.



Page 95

1    Q.  Is Ms. Helmstetter currently your attorney?

2    A.  No.

3    Q.  I will re-ask the question.

4         Without divulging attorney-client information,

5    can you please tell me why the power of attorney

6    agreement was entered.

7              MS. HELMSTETTER:  I will object again.

8         Attorney-client privilege.  You are asking

9         Mr. Greenhouse about a period of time during which

10        Agentis and --

11             MR. GHOSH:  I will object to any further

12        speaking objections.

13             Mr. Greenhouse, I'm going to tell you that you

14        have an attorney here, it's Mr. Saldinger --

15             MR. SALDINGER:  Mr. Ghosh, let me help you out

16        here.  I join in the objection, and instruct him not

17        to answer.

18             MR. GHOSH:  On what basis?

19             MR. SALDINGER:  On the basis that the question

20        would reveal attorney-client communications.

21   BY MR. GHOSH:

22        Q.  Are you following that instruction,

23   Mr. Greenhouse?

24        A.  I am.

25        Q.  Okay.  In your view, did you make any -- strike



Page 96

```
 1    that.
 2         Did you take any actions pursuant to the
 3    authority vested in you by this power of attorney
 4    agreement?
 5      A.  Such as what?
 6      Q.  Okay.  Did you make any transfers of funds
 7    related to the power of attorney agreement?
 8      A.  No.
 9      Q.  Okay.  Did you take any other actions with
10    regards to Debtor's assets?
11      A.  No.
12         MR. GHOSH:  Can we zoom into Parts 1, 2, and 3
13    to this agreement?
14    BY MR. GHOSH:
15      Q.  And if you could just briefly take some time to
16    review these three provisions.
17         MR. SALDINGER:  What goes above it?  What are
18    these referring to?
19         MR. GHOSH:  I'm sorry?  What do you want
20    clarification on?
21         MR. SALDINGER:  I see these phrases.  I don't
22    know what they are referring to, "consulting with,"
23    what --
24         MR. MOON:  Could you show him the beginning of
25    the document, Mr. Ghosh.
```



MAGNA
LEGAL SERVICES

Page 97

1          MR. GHOSH:  Sure.  If you could zoom out to the

2      whole section.

3          MR. SALDINGER:  Okay.

4          MR. GHOSH:  There we go.

5      A.  Okay.

6  BY MR. GHOSH:

7      Q.  Do you understand these provisions that they gave

8  you the authority to make transactions related to

9  Debtor's bankruptcy case?

10     A.  Actually, I didn't know I could make transactions

11  on his behalf.  So I -- I, generally -- yeah, I guess

12  I -- I guess I could understand that it could have,

13  yeah.

14     Q.  Did Debtor have any conversations with you

15  regarding this power of attorney agreement?

16     A.  About it?

17     Q.  Yeah.

18     A.  No.  I mean...

19     Q.  Okay.  And I just want to make sure I have this

20  right.  A power of attorney agreement was entered naming

21  you as Debtor's attorney-in-fact, and Debtor never once

22  spoke to you about that agreement?

23     A.  Other than the fact that he was doing it and, I

24  guess, there had been something advised by, you know --

25  by his attorneys.



Page 98

1    Q.  So he -- he did communicate with you about the

2  power of attorney agreement?

3    A.  I don't recall that we really had a conversation,

4  honestly.

5    Q.  Okay.  So -- so this is a document that is

6  entered, you know, if you can read the very first

7  sentence, "Know all men by these presents," right?

8        It's entered -- it's directed at, you know,

9  everyone, written in large.  It directs you to act on

10 Debtor's behalf related to his bankruptcy case, his

11 adversary proceeding, or dissolution or divorce

12 proceeding.

13       You have no -- do you know why you were given

14 this authority?

15       MR. SALDINGER:  Again, Mr. Greenhouse, if your

16    answer would divulge your attorney-client

17    communications with Mr. Charbonneau, I will instruct

18    you not to answer.

19    A.  I will pass on the answer.

20 BY MR. GHOSH:

21    Q.  Okay.  Is it fair to say that your only

22 understanding of the rights and responsibilities granted

23 to you by this power of attorney agreement stemmed from

24 your conversations with Bob Charbonneau?

25    A.  Yes.



Page 99

1    Q.  Okay.  Meaning that you -- you don't understand
2   anything about this power of attorney agreement or any
3   of its consequences aside from what Mr. Bob Charbonneau
4   told you?
5    A.  Yes, I think that's correct.
6    Q.  Okay.  You, yourself, sought no independent legal
7   advice to understand the authorities vested in you by
8   this power of attorney agreement?
9    A.  That's correct.
10   Q.  Did you make any decisions for Harry related to
11   his divorce or dissolution proceedings in Miami-Dade
12   County, Florida?
13   A.  No.
14   Q.  Did you make any decisions for Harry related to
15   any disposition of assets involved in his bankruptcy
16   case, or bankruptcy estate?
17   A.  No.
18   Q.  Okay.  Have you talked about this power of
19   attorney agreement to anybody else other than Mr. Bob
20   Charbonneau?
21   A.  No.
22   Q.  You haven't spoken to any family members about
23   this power of attorney agreement?
24   A.  No.
25   Q.  Did you receive a copy of this power of attorney



Page 100

1    agreement?

2           MR. SALDINGER:  Are you talking about the

3    executed one, Mr. Ghosh?

4        A.  I don't believe I have the executed copy,

5    honestly.

6    BY MR. GHOSH:

7        Q.  I'm sorry.  Can you repeat that one more time?

8        A.  I don't think I have an executed copy of it.

9        Q.  So what did you receive?

10           You only received the unexecuted copy of this

11   power of attorney agreement?

12       A.  I believe so.  Because I don't have a copy of it.

13   And I -- you know, and I -- you know, I didn't -- I did

14   look for it, and I don't have it.

15       Q.  Did you ever ask for a copy of it?

16       A.  No.

17       Q.  Okay.  Independent of any conversations,

18   specifically with Bob Charbonneau, what is your

19   understanding, at a general level, of what a power of

20   attorney agreement does?

21       A.  It gives someone the right to carry out certain

22   activities on behalf of an individual.

23       Q.  Okay.  Debtor is younger than you; is that

24   correct?

25       A.  Yes.



Page 101

1    Q.   To your knowledge, is Debtor in a fit mental

2    state?

3    A.   Is he in a fit mental state?

4    Q.   That's right.

5    A.   Yes.

6    Q.   Okay.  Do you know why someone would direct a

7    third party to act on their behalf?

8         Did any of those thoughts enter into your mind

9    when you received an unexecuted copy of this power of

10   attorney agreement?

11        MR. SALDINGER:  Objection to form; calls for

12      speculation.

13   BY MR. GHOSH:

14   Q.   Okay.  Withdrawn.  Let me ask that a different

15   way.

16        What thoughts entered into your mind when you

17   received a copy of this unexecuted power of attorney

18   agreement?

19   A.   So -- so my -- my understanding was that --

20        MR. SALDINGER:  Wait.  I'll instruct the

21      witness, again, not to answer it if your

22      understanding is based on your conversations with

23      Mr. Charbonneau.

24        THE WITNESS:  Right.

25        MR. SALDINGER:  I just want to caution the



Page 102

1    witness in answering the question as phrased.

2         THE WITNESS:  Okay.

3    A.  Yeah.  I mean, my -- it's correct my

4    understanding of the purpose of this was, you know,

5    derived from communications with Mr. Charbonneau.

6    BY MR. GHOSH:

7    Q.  Okay.  You had no thoughts, independent of what

8    you derived from Mr. Charbonneau, when you received a

9    copy of this power of attorney agreement?

10        That's just a yes-or-no question.

11   A.  No.

12   Q.  Okay.  Were you concerned for Debtor when you

13   received a copy of this power of attorney agreement?

14   A.  When I received this?

15   Q.  Yeah.

16   A.  No.

17   Q.  Did you communicate --

18   A.  Are you saying was I concerned because I received

19   this?

20   Q.  Yes.  Yes, that is my question.

21        Were you concerned because you received this?

22   A.  No.  No.  No.

23   Q.  So in your opinion, then, this is sort of a usual

24   or ordinary agreement to receive?

25   A.  You know --



Page 103

```
 1              MR. SALDINGER:  Objection to the form of the
 2      question.
 3      BY MR. GHOSH:
 4          Q.  You can answer.
 5          A.  I don't know what's usual in a situation like
 6      a --
 7          Q.  Okay.
 8          A.  -- bankruptcy.
 9          Q.  Did you take any act, whatsoever, on Harry's
10      behalf from February 3rd, 2021, until March 26th, 2021?
11          A.  No.
12          Q.  Okay.  So you did nothing in connection with this
13      power of attorney agreement?  You have made no acts,
14      you've made no transfers?
15              I'm sorry.  Just -- I'm going to ask those two
16      questions again.  And this is my fault, I went a little
17      fast.  But I'm just going to need a yes or no on those,
18      just for the purpose of the record.  I do appreciate
19      that.  That was my fault.
20              From February 3rd, 2021, to March 26th, 2021, did
21      you take any acts on behalf of Debtor?
22          A.  No.
23          Q.  During that time period, did you enter into any
24      transactions on behalf of Debtor?
25          A.  No.
```



Page 104

1    Q.  Understood.

2         MR. GHOSH:  Can you pull up Tab 7, please.

3         (Whereupon, Claimant Exhibit 7 was marked for

4    identification.)

5         MR. GHOSH:  Okay.  And before we head into

6    Tab 7, I just want to state on the record that we're

7    reserving all rights with respect to what we regard

8    as the improper privilege objection between -- on

9    behalf of Debtor's counsel.  That's all I will say on

10   the record on that.  We just reserve all rights.

11   BY MR. GHOSH:

12   Q.  Do you recognize this email that you got from

13   Debtor's counsel?

14   A.  Yes.

15   Q.  Okay.  Okay.  I guess I just want to start out by

16   asking, why was this email not produced to Polychain?

17   A.  First of all, I don't know that it was

18   specifically asked for.  And I think I -- I -- if I --

19   if it was, I think the conversation might have been a

20   question as of what was, you know -- falls under

21   attorney-client privilege.

22   Q.  What do you understand this letter to be

23   conveying to you?  Can you read the subject line to me?

24   A.  Sure.  "Termination of the attorney-client

25   relationship."



Page 105

1    Q.  Are you saying you didn't produce this because
2    you are claiming privilege over the attorney-client --
3    A.  I don't --
4         MR. SALDINGER:  Objection -- sorry.
5         Objection; mischaracterizes his testimony.
6    A.  First of all, I don't -- I don't -- doesn't seem
7    like this is one of the things that was requested, that
8    would fall into what was requested.
9    BY MR. GHOSH:
10   Q.  Understood.
11        This is a communication between yourself and
12   Debtor's counselor; is that correct?
13   A.  Yes.
14   Q.  Do you understand that Debtor's counsel act on
15   Debtor's behalf and make communications on his behalf?
16   A.  Yes.  But I also had a relationship with counsel.
17   Q.  Understood.  Understood.
18   A.  That would be my attorney-client privilege.  I
19   don't know.  I'm not a lawyer, but that's how I would
20   read this.
21   Q.  Okay.  Did you make any payment to
22   Mr. Charbonneau for legal services rendered from
23   February 3rd to March 26th, 2021?
24   A.  Did I?  No.
25   Q.  Did you sign a retention agreement with



1  Mr. Charbonneau or his law firm?

2    A.  Yes, I believe I did.

3    Q.  Okay.  Understood.

4       MR. GHOSH:  At this time, understanding all

5    rights are reserved, that we will make a document

6    request for the aforementioned retention agreement.

7  BY MR. GHOSH:

8    Q.  Without divulging any attorney-client

9  communications, do you know whether or not this power of

10  attorney agreement was entered into in connection with

11  Debtor's mental or emotional state?

12       MR. SALDINGER:  Go ahead.  Go ahead, Nicole.

13       MS. HELMSTETTER:  Hold on.

14       MR. SALDINGER:  I think he has answered that --

15    I think he's answered that same question about the

16    reasons for entering the power of attorney, that all

17    of that is based on communications with

18    Mr. Charbonneau.

19       So the way you have phrased the question is the

20    same question I think you've asked multiple times

21    and --

22       MS. HELMSTETTER:  And I'm trying to think

23    through the phrasing of the question.  You caveat it

24    with don't disclose your attorney-client

25    relationship, but it's very difficult to separate



Page 107

1    attorney-client -- you know, this was all a part
2    of --
3         MR. GHOSH:  I understand all of that.  Is there
4    an instruction for him not to answer?
5         MS. HELMSTETTER:  Yeah.
6         MR. SALDINGER:  Yes, there is, based on how you
7    phrased your question.
8         MR. GHOSH:  Is that instruction based on
9    privilege?
10        MS. HELMSTETTER:  Yes.
11        MR. SALDINGER:  Yes.
12        MR. GHOSH:  Understood.
13        Again, we'll be reserving all rights with
14   regard to what we regard as improper privilege
15   objections before the bankruptcy court.
16        Can we please pull up Tab Number 8?
17        And, actually, before we do that, can we please
18   take a five-minute break?  Is that okay with
19   everyone?
20        (Whereupon, Claimant Exhibit 8 was marked for
21   identification.)
22        MR. SALDINGER:  Sure.
23        MR. GHOSH:  We'll reconvene in five minutes.
24   Thanks, all.
25        THE VIDEOGRAPHER:  The time is 11:39 a.m.



Page 108

1          We're going off the video record.

2          (Whereupon, a break was taken from 11:39 a.m.

3     to 11:45 a.m.)

4          THE VIDEOGRAPHER:   The time is 11:45 a.m.,

5     we're back on the video record.

6          It looks like Nicole wants to wait for a

7     second.

8          Time is 11:45 a.m., going off the video record.

9          (Whereupon, a break was taken from 11:45 a.m.

10    to 11:55 a.m.)

11         THE VIDEOGRAPHER:   The time is now 11:55 a.m.

12         We're back on the video record.

13         MR. GHOSH:   So just before we move on, I just

14    want to ask a question Ms. Helmstetter, actually.

15         Nicole, is there any category of information

16    that you would permit Mr. Greenhouse, Mr. Lee

17    Greenhouse, to divulge regarding the power of

18    attorney?

19         MS. HELMSTETTER:   Sure.   It depends on how you

20    ask the question.   If you ask the question in a way

21    that does not force Mr. Greenhouse to divulge

22    attorney-client privilege information, or privileged

23    information, then he can answer the question.   I

24    think Mr. Saldinger would agree.

25         MR. GHOSH:   What category or detail of the



Page 109

1    power of attorney will you allow the witness to

2    respond to?

3        MS. HELMSTETTER:  I can't tell you how to take

4    your deposition, Pratik, or what question to ask the

5    deponent; however, if you do so in a way that does

6    not invade the attorney-client privilege, I -- I will

7    not object.

8        MR. GHOSH:  Okay.  You understand that every

9    question I have asked has been prefaced with the

10   instruction that he should not divulge any

11   attorney-client information, yet every time you have

12   instructed the witness not to answer.

13       So my question, then, is:  Are you saying that

14   the categorical objection is based on privilege here?

15       MS. HELMSTETTER:  There is a categorical

16   objection to any information that you're seeking to

17   obtain from the deponent that is subject to the

18   attorney-client privilege; however, if you ask a

19   question that is crafted in a way that doesn't ask

20   for privileged information, I will allow it.

21       MR. GHOSH:  Okay.

22   BY MR. GHOSH:

23   Q.  Mr. Greenhouse, do you know who Flora Lazar is?

24   A.  She's my wife.

25   Q.  Understood.



Page 110

1          Have you had any communications with Ms. Lazar

2     regarding the power of attorney agreement?

3          A.   No.

4          Q.   Okay.  Has Debtor had -- either during the power

5     of attorney agreement or any time prior, had any

6     physical or mental disabilities?

7               MS. HELMSTETTER:  You know -- okay.

8          A.   Has he had any physical or mental disabilities?

9     BY MR. GHOSH:

10         Q.   That's right.

11              MS. HELMSTETTER:  I'm going to object to any

12         questions -- I guess I understand this is a speaking

13         objection -- that require Mr. Greenhouse to make any

14         kind of speculations about the Debtor's health or any

15         information that may be covered by HIPAA.

16    BY MR. GHOSH:

17         Q.   Mr. Greenhouse, are you a healthcare provider?

18         A.   I'm not.

19         Q.   You're not a medical doctor; is that correct?

20         A.   I'm not a medical doctor.  Is that the question?

21         Q.   That's the question.

22         A.   I'm not a medical doctor, if that was your

23    question.

24         Q.   Are you a psychologist?

25         A.   No.



Page 111

1    Q.  I'm going to ask the question again.

2         During the time of the power of attorney, from

3    February to March 26th, 2021, did Debtor have any

4    physical disabilities?

5         MR. SALDINGER:  Form of the question.

6    BY MR. GHOSH:

7    Q.  You can answer.

8    A.  Did he have any physical disabilities?  No.

9    Q.  Okay.  Did he have any mental disabilities during

10   the --

11        MR. SALDINGER:  Objection to the form of the

12   question.

13        You can answer.

14   BY MR. GHOSH:

15   Q.  I apologize there was a little bit of crosstalk.

16   Let me ask that question -- if you could just let your

17   counsel make the objection and then respond.

18        During the time, the period in which the power of

19   attorney was active -- so from February 3rd, 2021, to

20   March 26th, 2021, did Debtor have any mental

21   disabilities or incapacitations?

22   A.  No.

23   Q.  Okay.  In front of you, you have on the screen --

24   you can see an email with the subject line "Top Shot

25   Dapper Labs."



Page 112

1    A.   Uh-huh.

2    Q.   Do you recognize this email?

3    A.   Yes.

4    Q.   Do you know what Dapper Labs is?

5    A.   In vague terms, yeah.

6    Q.   Can you describe to me what your understanding of

7    that entity is?

8    A.   Well, they have created, I guess -- they're

9    involved in the development of, I guess, the technology

10   for certain types of what are called non-fungible

11   tokens, such as video -- well, pieces of art that can be

12   kind of secured by the blockchain or -- or video -- this

13   is referring to video basketball cards that become

14   collectibles.  That's the term I'm looking for.

15   "Collectibles" is really the word.

16   Q.   Understood.

17        So here Debtor tells you, and I am quoting, "I

18   can let you log on to my account if you want to see how

19   it works tomorrow."

20   A.   Uh-huh.

21   Q.   Do you see that?

22   A.   I do.

23   Q.   Did you take Debtor up on this offer to log into

24   his Dapper Labs account?

25   A.   No.



Page 113

1    Q.  Did you otherwise ask him any questions about his
2    Dapper Labs account?
3    A.  His account, no.
4    Q.  Did you ask him any questions about NFTs in
5    general?
6    A.  We probably chatted offline about what was going
7    on, but I don't really recall any particular
8    conversations about it.
9    Q.  Do you recall Debtor ever telling you that he had
10   invested approximately $395,000 in these non-fungible
11   tokens?
12   A.  At some point he clearly has mentioned it here,
13   right?  I don't know he ever mentioned about amount,
14   though, as far as I --
15   Q.  Did he ever tell you that he had a significant
16   investment in NFTs?
17   A.  No.
18   Q.  Did you jointly invest in any NFTs?
19   A.  I'm sorry.  Turns out -- just give me that
20   question again.  I want to make sure I'm answering it
21   correctly, or I could...
22   Q.  Did Debtor ever tell you that he had a
23   significant investment in NFTs?
24   A.  In those?  Well, I mean, he's -- he's sort of
25   saying that here, isn't he?



Page 114

1      Q.   Okay.  Aside from this email communication on

2  August 9th, 2020, did Debtor ever communicated with you

3  regarding his investment in NFTs?

4      A.   I don't really remember any other communication.

5      Q.   Understood.

6           Have you and Debtor jointly purchased any

7  non-fungible tokens?

8      A.   No.

9      Q.   And what is the reason for that?

10     A.   I -- I don't -- I don't know.  I just -- I just

11 haven't.  And most of my investing tends to be through

12 third parties anyway.

13     Q.   Understood.

14          In referring to these non-fungible tokens as a

15 quote/unquote big winner, do you know what he meant by

16 that?

17     A.   I think it's talking about the space that -- just

18 thinks the space is going to be big, you know, over some

19 period of time, a big winner.

20     Q.   And did you respond to this August 9th, 2020,

21 email from Debtor?

22     A.   You know, I'm not sure if I did.  I -- I probably

23 did not, but I don't know.  Maybe I did.

24     Q.   Okay.  Did you do any additional searching to try

25 to -- to try to find any responsive -- any responses to



Page 115

1    either this or any other communication you received from

2    Debtor?

3          MR. SALDINGER:   Objection to the form of the

4      question.

5    BY MR. GHOSH:

6      Q.   You can answer.

7      A.   Are you talking about in response to your request

8    for documents, did I --

9      Q.   That's correct.

10      A.   Well, again, I looked through all of the emails

11    from -- between Harry and me to find any -- any emails

12    that would have been relevant or responsive to your

13    request.

14      Q.   Okay.  So also in this document Debtor says that

15    he "Wouldn't be surprised if some end up going for crazy

16    amounts."

17          Do you see where it says that?

18      A.   I do.

19      Q.   Was it your understanding that there was a market

20    in which Debtor could sell these NFTs?

21      A.   I don't know.  I mean, like, I don't know if

22    there was a market.  I --

23      Q.   Okay.

24      A.   Eventually, like everything, there probably was a

25    market at some point in time.



Page 116

1    Q.  Did Debtor ever tell you there was a market?

2    A.  Well, I don't know.  Because, I mean, he was --

3  he was talking about the price, the price of them, I

4  think.  I don't know if he is saying that.

5    Q.  Understand.

6    A.  We didn't talk that much about it.

7    Q.  Okay.  To your knowledge, other than this

8  investment with Dapper Labs, does Debtor own any other

9  sort of non-fungible tokens?

10    A.  I don't know.

11    Q.  To your knowledge, does Debtor currently own any

12  cryptocurrencies?

13    A.  Can I clarify one thing?

14    Q.  Sure.

15    A.  I believe from this, Harry does not have any --

16  or did not have any investment in Dapper Labs itself.

17  He bought some of the product that they produce, which

18  is an NBA video card.

19    Q.  I understand.

20    A.  I just want to make sure we're clear on that.

21    Q.  To your knowledge, does Debtor have any

22  cryptocurrency?

23    A.  No.  To my knowledge, he does not.  But I don't

24  necessarily know.  I probably would know if he did, and

25  he doesn't.



Page 117

1    Q.  Okay.  Well, we can pull that document down now.

2        Have you ever set up a trust with Debtor listed

3   as a beneficiary?

4    A.  Yes.

5    Q.  Does that trust have a name?

6    A.  Well, it doesn't exist anymore.  It was a -- it

7   was a life insurance trust when my kids were little.

8    Q.  Understand.

9    A.  And there was -- it's since liquidated.  It was

10  for when my kids were little, for protection -- their

11  protection.

12   Q.  I understand.

13       When was that liquidated?

14   A.  I don't even know.

15   Q.  Let me ask it a different way:  Was that life

16  insurance trust liquidated prior to ten years ago?

17   A.  Probably.

18   Q.  Okay.  Do you have -- have you set up any other

19  sorts of trusts that are currently still active that

20  list Debtor as a beneficiary?

21   A.  No.

22   Q.  Do you share any bank accounts with Debtor?

23   A.  No.

24   Q.  Does Debtor have access to any of your

25  personal --



Page 118

1    A.  Let me just say, I'm assuming we're not talking

2    about the ones we already talked about, in terms of the

3    joint ventures.

4    Q.  Let me ask that one more time.

5         Other than the Greenhouse USV Joint Venture

6    checking accounts with Morgan Stanley, do you share any

7    bank accounts with Debtor?

8    A.  No.

9         And I assume you're also talking about the

10   Merrill Lynch brokerage accounts, just to be clear here.

11   Q.  Yeah.

12        So to follow up there, does the Merrill Lynch

13   bank account, does that work as both a stock brokerage

14   account as well as a checking account?

15   A.  It's just a brokerage account.

16   Q.  Understood.  Understood.

17   A.  I probably expanded the question.

18   Q.  That's always okay.

19        Does Debtor have access to any of your personal

20   funds?

21   A.  No.

22   Q.  Okay.  You were the only individual of the

23   investors in the Greenhouse USV funds who has control of

24   or access to those funds within the Merrill Lynch and

25   Morgan Stanley accounts; is that correct?



Page 119

1    A.  Yes.

2    Q.  Do you monitor those accounts regularly to ensure

3    that no funds have been improperly withdrawn?

4    A.  I look at the monthly statements.

5    Q.  Okay.  Do you monitor those monthly statements to

6    also ensure that no funds have been improperly -- and by

7    that I mean without your authorization or request --

8    deposited?

9    A.  I get notification -- I think I get notifications

10   when there's a deposit.  So, yeah.  But also I wouldn't

11   notice it.  But, yeah.

12   Q.  Understood.

13       After the Polychain arbitration award was

14   entered, did you discuss transferring Debtor any funds

15   with your personal accountant?

16   A.  I'm sorry?  Did -- can you do that one more time?

17   Q.  After the Polychain arbitration award was

18   entered, did you have any conversations or

19   communications with your personal accountant about

20   transferring funds to Debtor?

21   A.  No.

22   Q.  Okay.  Do you know of any trusts that Debtor is a

23   beneficiary of, regardless of who established that

24   trust?

25   A.  Am I aware of any trusts?  Other trusts?



Page 120

1          No.  No.  From my knowledge, no.

2      Q.  Okay.  Do you know anything about the -- the Ray

3   Cahnman Family Trust Limited Partnership entity?

4      A.  No.

5          MR. GHOSH:  Okay.  Can we pull up Tab 9,

6      please.

7          (Whereupon, Claimant Exhibit 9 was marked for

8      identification.)

9   BY MR. GHOSH:

10     Q.  This is an email dated December 17th, 2018, from

11  Debtor to you.

12         Do you recognize this email?

13     A.  Yes.

14     Q.  Okay.  He says there is an approximately $5,000

15  transfer and an approximately $20,000 transfer.  One is

16  it -- as he describes it, a business one and a personal

17  one.

18         Do you see that?

19     A.  I do --

20         MR. SALDINGER:  Object to the form question.

21         Hang on, Lee.

22         Object to the form of the question.

23  BY MR. GHOSH:

24     Q.  Okay.  Do you know what Debtor is referring to

25  when he says a 5- -- "the business one should be



Page 121

1    $5,000"?

2        A.   Yes.

3            Okay.  So the background here is, I got two

4    credit cards for the -- basically for the purpose of

5    getting a lot of airline miles.  I forget what card it

6    was.  It had a very lucrative -- I guess it was a Chase

7    card for one of the airlines.  They had a very lucrative

8    sign-up deal, so -- which is important to us, because

9    our kids live places we have to take planes to -- for to

10   see them.

11           Anyway, so Harry -- Harry said, when I was

12   getting the card, he said, Look, let me -- I will -- you

13   had to -- you had to hit a certain threshold of spending

14   within a relatively short period of time, which I was

15   not going to be able to do on my own, but Harry said he

16   could do it.

17           He would use the card, put some charges on

18   both -- either, both cards, and he would reimburse me

19   for the amounts he put on them.  And so this refers to a

20   personal card.

21           And the other card was a business card, taken out

22   in, you know, my business name.  And one of them, I

23   guess he had racked up $5,000 in charges on it, and the

24   other one 20,000.

25           And he's asking me, you know, get him the amounts



Page 122

1    so he can then wire me the money and reimburse me.

2        Q.  Understood.

3            Do you know what sort of business expenses these

4    were?

5        A.  I don't know.

6        Q.  Do you know what sort of personal expenses these

7    were?

8        A.  I don't know.

9        Q.  Other than these two credit cards you're

10   describing, were there any other credit cards in your

11   name that Debtor was an authorized user for?

12       A.  No.

13       Q.  Okay.  Are these credit cards still active?

14       A.  You know, I would have to look.  Because I have

15   had a bunch of cards over the years, playing the airline

16   miles game.  So I really don't know if we still have

17   these cards.

18       Q.  Understood.

19           MR. GHOSH:  At this time, understanding all

20       rights are reserved, we'd like to make a document

21       request for any communications or documents related

22       to credit card accounts for which Debtor is an

23       authorized user --

24           MR. SALDINGER:  I'm just going to object to the

25       form.  When you say "an authorized user," I think



Page 123

1    you're using that out of context.  But you can make

2    your request and we'll respond.

3        A.  We've never used an authorized user the way, you

4    know, I'm an authorized user of my wife's credit card,

5    and she may be on mine.  I just gave him the number and

6    just said, Go use it.

7    BY MR. GHOSH:

8        Q.  All right.  Before I asked if Debtor had any

9    access to your funds, your personal funds.  And you said

10   no.

11        Debtor does, however, have access to these two

12   credit lines, correct?  And these are your personal

13   credit lines?

14        A.  These are credit cards.

15        Q.  Right.  So Debtor does have access to these two

16   personal credit cards, which are yours; is that correct?

17        A.  If they even still exist.  I may have closed the

18   accounts.  I have no idea.  I'd honestly have to go back

19   and figure out which cards these were.

20        MR. GHOSH:  Okay.  Can we pull up Exhibit 5 one

21    more time.

22        Can we go to Page 1?  Is this Page 1?

23        THE WITNESS:  This is Page 1.

24        MS. HELMSTETTER:  This is Page 1.

25



Page 124

1   BY MR. GHOSH:

2       Q.   All right.   One second.

3            Are you familiar with the Deatherage Group?

4       A.   Yes.

5       Q.   And what is the Deatherage Group?

6       A.   It's just the -- sort of a group ideal inside of

7   Morgan Stanley.

8       Q.   Okay.   Do you pay them any fee?

9       A.   You know, not directly.   I think they're making

10  money off deposits that we have there.

11      Q.   Okay.   Do you understand the -- how that works?

12      A.   Do I understand how their fees work?

13      Q.   Yeah.

14      A.   Not directly.   I mean, no.   I assume they're

15  making money in some fashion.   Because they have our

16  money and, you know, they get a little bit of something

17  from the assets that are there.

18      Q.   Have you notified either -- have you notified

19  Morgan Stanley that Debtor is currently in bankruptcy

20  proceedings?

21      A.   No.

22      Q.   Have you notified Merrill Lynch that Debtor is

23  currently in bankruptcy proceedings?

24      A.   No.

25      Q.   Have you notified the Deatherage Group that



Page 125

1    Merrill Lynch -- that Debtor is currently in bankruptcy

2    proceedings?

3        A.  No.

4        Q.  Okay.  Has Union Square Ventures, have they been

5    notified that Debtor is currently in bankruptcy

6    proceedings?

7        A.  No.

8        Q.  Okay.  Are there any operating costs that you

9    incur and then charge the investors for the management

10   and administration of the Greenhouse USV entities?

11       A.  There are really no administrative costs.

12       Q.  Understand.

13           MR. GHOSH:  Can we please pull up Tab 11.  I

14       think this is Exhibit 11.  If it's not, correct me.

15           (Whereupon, Claimant Exhibit 10 was marked for

16       identification.)

17           THE EXHIBIT PRESENTER:  This is Exhibit 10, by

18       the way.

19   BY MR. GHOSH:

20       Q.  And what is this document?

21       A.  This is the capital -- capital statement from

22   Union Square Ventures for the -- the Greenhouse USV 2012

23   Joint Venture with Union Square 2012 fund.

24       Q.  Who prepared this document?

25       A.  Union Square.



MAGNA
LEGAL SERVICES

Page 126

```
 1     Q.   Okay.  And they sent that to you?

 2     A.   Uh-huh.  Yes.

 3     Q.   Did this -- did anything else accompany this

 4   statement?

 5     A.   I'm -- not to my knowledge.  I mean, unless --

 6   no, I don't think there was anything else with this.

 7   This was the statement.

 8     Q.   Was this emailed to you?

 9     A.   Yes, they sent an email.  They actually use a

10   platform that they deliver it through.  They will say

11   this is now available, but essentially it's an email.

12     Q.   Okay.  Got it.

13          Okay.  Did you do anything to verify the figures

14   on this statement?

15     A.   Yeah.  I look at it.  And I look at the

16   contributions and see if it -- if they've got the right

17   contributions amount, and that they've got the -- yeah.

18   I mean, I look at it, generally.  I, you know -- so,

19   yeah, I look at it.

20     Q.   Okay.  You'll see that it lists unrealized

21   gain/loss from the inception to date as 8,600 [sic] --

22   868,625.

23          Were the remainder of those gains ever realized,

24   that approximately $868,000?

25     A.   I don't know how they're calculating that.  I
```



Page 127

1    just trusted they knew what they were doing.

2      Q.  Okay.  Do you have any reason to believe that the

3    remainder of those gains were not subsequently realized

4    and liquidated?

5         MR. SALDINGER:  Object to the form of the

6      question.

7    BY MR. GHOSH:

8      Q.  You can answer.

9      A.  Do I have reason to believe?  Let's put it this

10   way:  I believe what's on here is accurate.

11     Q.  Okay.  The statement notes that these figures are

12   unaudited.  Have you ever worked with an auditor to --

13   with respect to the veracity of these figures?

14     A.  No.

15        MR. GHOSH:  Okay.  Can we please pull up tab --

16     I'm sorry.  One second.

17        Can we please pull up Tab 12.

18   BY MR. GHOSH:

19     Q.  Do you recognize this document?

20     A.  Yes.

21        (Whereupon, Claimant Exhibit 11 was marked for

22     identification.)

23   BY MR. GHOSH:

24     Q.  Okay.  Can you briefly describe what this is?

25     A.  That is the capital statement for the Greenhouse



Page 128

1    USV 2014 Joint Venture.

2        Q.  You'll note that for this year, for this entity,

3    the -- the fund posted from your investment a net

4    operating loss of over $26,000.

5            Do you see that?

6        A.  Yes.

7        Q.  Do you know what those losses stemmed from?

8        A.  I don't.

9        Q.  Did you do anything to try to find out what those

10   losses stemmed from?

11       A.  No.

12       Q.  Okay.  How frequently did these distributions

13   from the various USV funds occur out to the individual

14   investors?

15       A.  Oh, it varies.  There's no set rule for that.

16       Q.  Okay.  Are investors free to make distributions

17   at any time --

18       A.  No.

19       Q.  -- to themselves?

20       A.  No.  This isn't like a -- it's not like a mutual

21   fund where you can redeem funds or something, no.

22       Q.  So USV has to release funds to you, correct?

23       A.  Right.  And it depends on when they have had one

24   of the -- one of -- one of their portfolio companies

25   have a liquidity event, like go public or get bought by



Page 129

1    another company.  So it just depends.

2        Q.  Okay.

3        A.  And -- and -- and don't always release the money

4    then either.  Because sometimes they recycle funds,

5    so...

6            MR. GHOSH:  Can we please pull up Tab 13.

7            (Whereupon, Claimant Exhibit 12 was marked for

8        identification.)

9    BY MR. GHOSH:

10       Q.  So you'll note, you recognize this as a USV

11   investors 2016 statement.

12           We've gone over a number of these prior

13   statements.  Do you recognize what this document is?

14       A.  Yes.

15       Q.  Okay.  Great.

16           If you can just scroll down to the bottom of

17   this, the section titled "Capital Call Summary."

18           Do you understand what this schedule is?

19       A.  Yes.

20       Q.  Can you describe it to me?

21       A.  This lists all of the times they have called

22   capital, and the amount they've called, and the summary.

23       Q.  Okay.  So do they -- is this schedule

24   published to you in --

25       A.  I'm sorry?  The question, I didn't hear this.


MAGNA
LEGAL SERVICES

Page 130

```
 1      Q.  Is this capital call schedule published to you in
 2   advance?
 3      A.  No.
 4      Q.  So how much notice do you get before USV makes a
 5   capital call to you?
 6      A.  Oh, a couple of weeks.
 7      Q.  Okay.  Is that, like, two or three weeks or
 8   longer?
 9      A.  It may be -- it's probably two to three weeks,
10   something like that.
11      Q.  Okay.  And after USV makes a capital call to you,
12   you then have two to three weeks to gather those funds
13   from the individual USV entities; is that correct?
14      A.  Yes.  But as indicated before, I usually have
15   more money in the pot than I need for a given capital
16   call.  It's just a matter of convenience.  You know, I
17   don't want to have to go to my -- you know, my family
18   members and keep asking them to write a bunch of small
19   checks.  So I usually collect a larger chunk of money,
20   you know, fewer times.
21      Q.  You do that practice primarily for the sake of
22   convenience for the investors; is that right?
23      A.  Yes.  For everybody's convenience, so nobody --
24   yes.
25      Q.  Understand.
```



Page 131

```
 1              MR. GHOSH:  Can we please pull up Tab 14.
 2              (Whereupon, Claimant Exhibit 13 was marked for
 3         identification.)
 4    BY MR. GHOSH:
 5         Q.  This is just the next iteration of the statements
 6    that we've been reviewing.
 7              Do you recognize this document?
 8         A.  Yes.
 9         Q.  You'll note that this document doesn't have a
10    capital call summary located at the very bottom.  Can
11    you just tell me the reason why that's not there?
12         A.  I don't know.
13         Q.  Okay.
14         A.  Wait a minute.  Remaining capital.  Let's see.
15    Remaining balance, capital contributions.  I -- I don't
16    know why they don't show that.
17         Q.  So for the USV investors 2019 entity, right now,
18    how much does the Greenhouse Joint Venture entity owe
19    them?
20         A.  I don't know, because I just don't know the
21    numbers.  I mean, according to this -- right, according
22    to this, we were committed to $150,000.  And we
23    contributed 75,000 to date, and we have a 75,000
24    remaining.  That's what this says.
25         Q.  Okay.  The -- the spreadsheet you mentioned, the
```



Page 132

1    sort of informal ledger you operate, would that document

2    contain the current outstanding balance for USV

3    investors 2019?

4         A.   Does that -- let me think.  That would have --

5    no, that does not.  No.  That just -- that just has an

6    accounting of everybody's individual commitment and how

7    much they have paid toward that commitment.

8              MR. GHOSH:  Okay.  Let's take a -- a

9         five-minute break.  I just need to talk to the court

10        reporter offline for a little bit.

11             Is that okay with everyone?

12             THE VIDEOGRAPHER:  Time is 12:27 p.m.

13             Going off the video record.

14             (Whereupon, a break was taken from 12:27 p.m.

15        to 12:32 p.m.)

16             THE VIDEOGRAPHER:  The time is now 12:32 p.m.

17             MR. GHOSH:  I would like to introduce as

18        exhibit into evidence Tab 10.  I think we can pull

19        that up.

20             (Whereupon, Claimant Exhibit 14 was marked for

21        identification.)

22             MR. MOON:  Just as a point of clarification,

23        did we get one out of order so that Tab 11 is

24        Exhibit 10 and Tab 10 is Exhibit 11, or something

25        like that?  Because if that's the case, I think we



Page 133

```
 1      should clear up the record and make it kind of --
 2          MR. GHOSH:  So this was the only one that was
 3      left out.  And I believe, Jazzmin, is this tab -- is
 4      Exhibit 15?
 5          THE STENOGRAPHER:  This would be, I believe,
 6      14.  Let me go back and just triple check.
 7          THE EXHIBIT PRESENTER:  That's correct, yeah,
 8      14.
 9          MR. GHOSH:  Okay.  This will be 14.  Okay,
10      great.
11  BY MR. GHOSH:
12      Q.  Mr. Greenhouse, do you recognize this document?
13      A.  Yes.
14      Q.  Okay.  And can you briefly describe it?
15      A.  It's the monthly statement from Morgan Stanley of
16      the Greenhouse USV 2012 Joint Venture account.
17      Q.  Okay.  If we can just go to Page 3 of this
18      document.
19          Do you see where it says the total ending value
20      for this account is 1.293 million, approximately?
21      A.  Yes.
22      Q.  Has that 1.293 million been distributed to the
23      investors of this fund?
24      A.  Probably all of that.  But not the 18,926, that's
25      on the top line.
```



Page 134

1      Q.  Okay.

2      A.  So conceptually that was the Polychain proceeds.

3  Cash was transferred into that account and then it was

4  disbursed.

5      Q.  Understand.

6          So when you say "Polychain proceeds," can you --

7      A.  Did I say "Polychain"?  Coinbase.

8          Coinbase, excuse me.

9      Q.  Okay.  Okay.  So your cost basis in Coinbase, the

10  Greenhouse USV 2012 cost basis in Coinbase, the company,

11  was $18,926; is that correct?

12     A.  No, it's not.

13     Q.  Okay.  So what does the 18,000 figure there

14  represent?

15     A.  Again, remember, this is the bank -- this account

16  functions like a bank account, where when we have a

17  call -- we have requested money from each of the members

18  of our group, these would be my family members, and they

19  send me checks, I deposit them into this account.

20     Q.  Okay.

21     A.  But we have -- before -- before any of the

22  Coinbase money showed up or was transferred in, we had

23  $18,000 here in the kitty for the next capital call.

24     Q.  Okay.  Okay.  And were there any subsequent

25  capital calls for Greenhouse USV 2012?



Page 135

1    A.  I would have to look and see whether we did.  I

2    don't -- whether there was any from Union Square and

3    whether I had got any more money from my relatives.

4    Q.  Understood.

5        I'm just trying to understand --

6    A.  I think I did actually ask my -- I asked my

7    relatives for some more money.  I saw the kitty was

8    getting low, and I also knew they had all received some

9    money from the Coinbase sale.

10   Q.  I understand.

11       So the -- the Greenhouse USV 2012 Joint Venture

12   was established sometime in 2012; is that correct?

13   A.  Yes.

14   Q.  Okay.  And that is -- that entity invests in a

15   corresponding USV 2012 fund; is that correct?

16   A.  Yes.

17   Q.  How long does that fund have the right to make

18   capital calls to the -- the Greenhouse entity?

19   A.  You know, I don't know that there's a specific

20   time frame, but -- but they -- they can go on for quite

21   a few years.  You know, more than ten years.  I mean, it

22   is a practical matter.

23   Q.  Okay.  So -- so if Debtor was to put in any sum

24   of money, let's say $100,000 in the Greenhouse joint

25   venture, there's no guarantee that more funds wouldn't



Page 136

1   be needed from him or the Debtor's estate, you know,

2   next year or the year after; is that correct?

3          MR. SALDINGER:  Wait.

4   A.   If he --

5          MR. SALDINGER:  Object to the form; calls for

6   speculation.

7          Go ahead, if you understand.

8   A.   Let me just understand.  So when you say if -- if

9   the debtor were to put in money in the 2019 fund -- it

10  depends how much, you know -- what was the rest of the

11  question?

12  BY MR. GHOSH:

13  Q.   So let me just ask that question back.

14         So let's say if the debtor were to put in

15  $100,000 right now into the 2019 Greenhouse USV Joint

16  Venture, is it possible that he would have to make

17  another, you know, capital call contribution at some

18  point in the future for that joint venture?

19  A.   Well, if he put in all the money he owes now, the

20  answer is no.

21  Q.   Okay.  And by "all the money he owes," do you

22  have that amount available to you?

23  A.   I believe the number is about $99,100 or

24  something like that, 99,166.  I forget what that number

25  was, because we looked at it earlier.



Page 137

1    Q.  Okay.  Okay.

2         Understood.  So the -- the other funds left in

3    this account were essentially like -- that was the

4    proceeds from the sale from the Coinbase investment that

5    USV made that was distributed to you all; is that

6    correct?

7    A.  Yeah.  It -- although, just to be technically

8    clear, we got the stock which would -- when the company

9    went public, we sold the stock.

10   Q.  Understood.

11   A.  So we -- it was stock and not cash.  I just want

12   to be accurate about that.

13   Q.  Within the next three to six months, do you

14   anticipate that the Greenhouse USV 2019 Joint Venture

15   will require Debtor to make any additional capital call

16   contributions?

17   A.  Well, you know, additional -- I mean, you know,

18   he's already, you know, underwater, if you will.  So

19   he -- he owes money for, you know, the capital that

20   we've called.  And, you know, in -- so I'm not -- maybe

21   I've lost the thread here.

22   Q.  I can clear this up a little bit.

23        Does Debtor currently owe the USV -- the

24   Greenhouse USV 2019 Joint Venture $99,000?

25   A.  He -- well, yes.  Yeah.



Page 138

1    Q.  Okay.  Are you planning on filing a proof of

2  claim with the bankruptcy court?

3    A.  I don't know.

4    Q.  Do you have any immediate plans to file a proof

5  of claim with the bankruptcy court in this bankruptcy

6  matter?

7         MR. SALDINGER:  Objection; asked and answered.

8  BY MR. GHOSH:

9    Q.  Okay.  I will ask a slightly different -- have

10  you filed yet a proof of claim in this bankruptcy

11  matter?

12    A.  No.

13    Q.  Okay.  Under what conditions does the USV entity

14  make a capital call to the Greenhouse Joint Venture?

15         MR. SALDINGER:  Objection; foundation; calls

16    for speculation.

17  BY MR. GHOSH:

18    Q.  You can still answer.

19    A.  When they need capital to make investments, they

20  call capital.  That's my understanding.

21    Q.  Okay.  Do you know what amount your fund has to

22  drop -- or your account has to drop below for them to

23  issue a capital call?

24    A.  It doesn't work that way.

25    Q.  How does it work?



Page 139

1      A.  Okay.  So the amount -- so they -- they issue a
2  capital call to everybody, okay.  And so Greenhouse USV
3  2012 is one of the investors that receives a capital
4  call.  And that amount is the same -- is the same for
5  everybody.  It's a percentage of your committed capital,
6  right.
7          So they may say, Okay.  Your capital is X, and we
8  want 15 percent of that now.  They may come back at some
9  point in the future and say, We want another 15 percent,
10  or 5 percent, or whatever.  And so they -- so we're --
11  essentially, we're always current in terms -- and
12  everybody, I assume, is, in terms of what the capital
13  call requirement has been.
14      Q.  Okay.
15      A.  It's not like -- it's not like a -- you know,
16  it's not like a -- I don't know what, a -- under what --
17  something else where, you know, you have a margin call
18  or something.  It's not like that.
19      Q.  Okay.  And so the requirement that you laid out,
20  is there a document that governs those capital call
21  requirements by Union Square Ventures?
22          MR. SALDINGER:  Objection; foundation.
23      A.  Ask that again.
24  BY MR. GHOSH:
25      Q.  Is there a document that lays out the various



Page 140

1    requirements and guidelines you've described that

2    governs a capital call that USV may issue to you?

3            MR. SALDINGER:   Same objection.

4        A.   I'm not sure what you mean by "guidelines."   I

5    mean, they tell us we're going to be calling capital

6    periodically.   I think some of the agreements they may

7    actually set a -- I don't recall whether or not it's

8    more or less on a regular schedule or not.   My

9    experience has been it's somewhat irregular.

10       Q.   So when you say "agreements," are you referring

11   to the subscription agreements that you have with Union

12   Square Ventures?

13       A.   Yes.

14       Q.   You have not produced those agreements to

15   Polychain; is that right?

16       A.   That's right.   And I don't even know -- to be

17   honest, I don't even know if it's in those subscription

18   agreements, you know --

19       Q.   Understood.

20       A.   -- they're going to call capital periodically,

21   and that's how that works.

22       Q.   Okay.   Okay.   What steps have you taken to ensure

23   that the Greenhouse USV Joint Ventures don't face

24   liability from USV from failing to meet a capital call?

25       A.   None.



Page 141

1    Q.  Okay.  So you gave some pretty specific details

2    about how the capital call process works.  And you've

3    testified that while the subscription agreement may

4    contain some of that, you're not sure if they do.

5         How, then, do you know that information about how

6    Union Square Ventures can make a capital call upon you?

7    A.  More or less, experience.  I mean, there have

8    been a series of these funds, and this is how they've

9    always done it.  Usually when they introduce a new fund,

10   they say, We're going to be working on the same basis

11   that we've worked on the previous funds.  And that's

12   kind of how it works.

13   Q.  Okay.  That makes sense.

14        Have you ever had any communications with Debtor

15   regarding his investment in 1313 Ventures?

16   A.  I don't think so.

17   Q.  Are you aware of any other capital call

18   obligations that Debtor might have, aside from the ones

19   he owes to the Greenhouse USV Ventures?

20   A.  No.

21   Q.  Okay.  Do you currently have a -- there's an

22   outstanding balance for the various USV -- Greenhouse

23   USV Ventures?

24   A.  His outstanding balance?

25   Q.  Yeah.  That he owes to the Greenhouse joint



Page 142

1   venture entities?

2       A.   To my knowledge, the only -- the only fund -- the

3   only entity where he owes money is the 2019 fund.

4       Q.   Okay.   I want to get a little more granular on

5   that.

6            He currently owes zero dollars in capital call

7   obligations to the Greenhouse USV 2012 Joint Venture; is

8   that correct?

9       A.   That's correct.

10      Q.   He owes nothing for the Greenhouse USV 2014 Joint

11  Venture; is that correct?

12      A.   That, I believe, is correct.

13      Q.   He owes nothing in capital call obligations to

14  the USV 2014 Opportunity Joint Venture, correct?

15      A.   That's correct.

16      Q.   And he owes nothing, in terms of capital call

17  obligations, to the Greenhouse USV 2016 Joint Venture;

18  is that correct?

19      A.   That's correct.

20      Q.   The only Greenhouse USV joint venture he does owe

21  a sum to, and that sum is approximately $99,000, is the

22  Greenhouse USV 2019 Joint Venture; is that right?

23      A.   Yes.   That's -- that's what I believe.

24      Q.   What document could a third party look at and

25  review to understand how the capital call obligations



Page 143

```
 1    work?
 2            MR. SALDINGER:  Object to the form; calls for
 3       speculation.
 4    BY MR. GHOSH:
 5       Q.  You can answer.
 6       A.  How they work?
 7       Q.  Yeah.  So that process that you gave sort of a
 8    general outline of, of how Union Square Ventures issues
 9    a capital call to you.
10       A.  Right.
11       Q.  And given the parameters and the rules you have
12    to follow to make sure that you're meeting your
13    financial obligations under the subscription agreement,
14    other than the subscription agreements, are there any
15    ancillary or third-party documents that would allow a
16    third party to better understand that capital call
17    structure?
18       A.  Well, I --
19            MR. SALDINGER:  Same objections.
20            Hang on, Lee.  Please.
21            Same objections.  And also a lack of
22       foundation.
23            You can answer, if you know.
24       A.  The only thing I would suggest is if you look at
25    the capital statements, they show whether the capital
```



Page 144

1    has been called.  So you get kind of a sense of how that

2    works.  And, you know, what the dates are and how much

3    they called at each time.  So, you know, it's all --

4    it's all there.

5         So I don't know what else -- what else you need

6    to know, in terms of how it works.

7    BY MR. GHOSH:

8       Q.  Understood.  Understood.

9            MR. GHOSH:  Can we pull up Exhibit 10.  I'm

10    sorry, Exhibit 11.

11    BY MR. GHOSH:

12       Q.  So we've reviewed this once.  I want to make sure

13    I'm clear on what you've just described.  What we have

14    here is the initial commitment that's $200,000.

15         So am I correct in saying that for the USV 2012

16    Investors Fund, the capital call obligation that the

17    Greenhouse entity had was only $200,000?

18       A.  Yes.  Going in, we had a $200,000 commitment.

19    And -- and we met it.  You can see on the bottom,

20    200,000 was paid.  So the remaining commitment is zero.

21       Q.  Okay.  So -- and these commitments were made

22    pursuant to the subscription agreement; is that right?

23       A.  The -- the -- I'm sorry?  What was made?

24       Q.  So these payments, these commitments, this

25    $200,000, they were paid to USV pursuant to the terms of



Page 145

1    the subscription agreement; is that right?

2        A.   Yes.  But the subscription agreement I don't

3    believe lays out a specific schedule.  It just says, and

4    it's as capital -- you know, we, as the fund, will call

5    capital periodically.

6        Q.   Okay.

7        A.   So it doesn't give you dates and amounts.  It

8    just sort of says we have the right to call capital

9    periodically.

10       Q.   And so USV has the sole discretion to call -- can

11   they call the entire capital amount at whatever time

12   they choose?

13       A.   I don't know.  That's probably in the

14   nitty-gritty of the document.  I don't know.

15       Q.   The document you're referring, that's the

16   subscription agreements underlying these funds; is that

17   right?

18       A.   Right.

19       Q.   Okay.

20       A.   They never have, I will tell you that.

21       Q.   I just want to talk about the recordkeeping and

22   the document procedures for the Greenhouse USV entities.

23            You mentioned previously that these are -- these

24   are entities maintained informally.  Is that a fair

25   characterization?



Page 146

1    A.  I don't think they're informal.  I mean, we have

2    a formation document.  We have, you know, some

3    recordkeeping.  I get statements from financial -- from

4    Union Square, I get them from the bank and brokerage

5    house.  So it's not informal, you know, like -- like,

6    you know, just keeping it at -- I don't know.  I think

7    it's formal.

8    Q.  Got it.

9        And do you have a ledger of exactly who has

10   contributed how much to each fund?

11   A.  Yes.  I told you that before.

12   Q.  That's the spreadsheet that you referred to

13   before, right?

14   A.  Yeah.  Yeah.

15   Q.  Okay.  Understood.

16       MR. GHOSH:  Okay.  I'm going to take a

17   five-minute break.  We'll go off the record for five

18   minutes and try to convene back at 55.

19       Thank you.

20       THE VIDEOGRAPHER:  Time is 12:51 p.m.

21       We're going off the video record.

22       (Whereupon, a break was taken from 12:51 p.m.

23   to 12:59 p.m.)

24       THE VIDEOGRAPHER:  Time is now 12:59 p.m.

25       We're back on the video record.



Page 147

```
 1          MR. GHOSH:  Great.  As I stated at the
 2     beginning of the deposition, upon prior agreement
 3     with Mr. Saldinger, we're agreeing to adjourn the
 4     deposition around 1:00 p.m.
 5          We're not agreeing to close the deposition
 6     until we've had a chance to confer internally on some
 7     of the issues that came up, as well as some of the
 8     document requests that came up.
 9          I have a few additional questions before we can
10     adjourn.  I will try to get right around the
11     1 o'clock mark.
12 BY MR. GHOSH:
13     Q.  Mr. Greenhouse, are there any companies or
14 entities that Debtor has an ownership or control
15 interest, other than the ones that we've discussed, to
16 your knowledge?
17     A.  No.
18     Q.  Okay.  Does Debtor have any repeat investment
19 partners, other than you?
20     A.  I'm sorry, "repeat investors"?
21     Q.  Yeah.  Repeat investment partners.  So in the
22 same way that you've invested recently in the same
23 funds.
24     A.  I don't know.
25     Q.  Okay.  Other than the ticketing business that
```



Page 148

1    you've described, does Debtor participate in any sort of

2    speculating investments?

3        MR. SALDINGER:  Objection; foundation; form.

4    A.  I don't -- I don't know.

5    BY MR. GHOSH:

6    Q.  Okay.  Other than the Coinbase liquidation event

7    that occurred, are there any other liquidation events

8    that are scheduled in the future that you know of?

9    A.  I don't know of any.

10   Q.  Okay.  Are there any securities in the USV JV

11   entities that can be liquidated right now?

12   A.  None.

13   Q.  Okay.  Do you -- is there any way for you to get

14   information of whether any of them can be liquidated in

15   the next three to six months?

16   A.  No.  The funds don't disclose that.  They're very

17   clear on that.

18   Q.  If you had to find that information out, who

19   would you ask?

20   A.  I would have to go to somebody at the fund and

21   ask, probably.

22   Q.  Somebody at Union Square Ventures, like Mr. Fred

23   Wilson; is that correct?

24   A.  Yeah.  Yeah.  They're very clear.  Whenever they

25   communicate, they're very care ful about not disclosing



MAGNA
LEGAL SERVICES

Page 149

1    future events.

2        Q.  Understood.  Understood.

3            Just to be clear, the folks at Union Square

4    Ventures, they have not been made aware of any

5    bankruptcy issues or any of the bankruptcy proceedings?

6        A.  No.

7        Q.  Okay.  There have been no correspondence between

8    the folks at Union Square Ventures and Mr. Saldinger?

9        A.  No.

10       Q.  Okay.  Have you taken any steps to measure your

11   value of your ownership -- of Mr. Greenhouse -- in the

12   Debtor's ownership interest in the various joint venture

13   entities?

14       A.  No.

15       Q.  Are there any real properties, such as real

16   estate, that you jointly own with Debtor?

17       A.  No.

18       Q.  Does Debtor currently own, to your knowledge, any

19   real property?

20       A.  Not to my knowledge.

21       Q.  Does Debtor own any personal property of

22   significant value?  And by that I mean anything over

23   $100,000.

24       A.  Personal property?

25       Q.  Things like cars or boats.



Page 150

1          MR. SALDINGER:  Objection; foundation.

2     BY MR. GHOSH:

3          Q.  You can answer.

4          A.  No.

5          MR. GHOSH:  Okay.  Seeing that we're past the

6     one o'clock mark, we will adjourn the deposition for

7     today.

8          Thank you all taking the time.

9          And thank you, Mr. Greenhouse.

10          THE WITNESS:  Thank you.

11          THE VIDEOGRAPHER:  Time is now 1:03 p.m.

12          This is the end of today's deposition.

13          (Thereupon, the proceedings concluded at

14     1:03 p.m.)

15

16

17

18

19

20

21

22

23

24

25



Page 151

```
1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF ORANGE:

5

6       I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

7    of Florida, do hereby certify that LEE GREENHOUSE

8    personally appeared before me via videoconferencing

9    technology on June 2, 2021, and was duly sworn and

10   produced driver's license/I.D. as identification.

11

12

13                      Signed on June 7, 2021.

14

15                      _____

                        Jazzmin A. Musrati, RPR, CRR
16                      Notary Public - State of Florida
                        My Commission No. GG984252
17                      My Commission Expires:  May 4, 2024

18

19

20

21

22

23

24

25
```



Page 152

CERTIFICATE OF REPORTER

1

STATE OF FLORIDA:

2

COUNTY OF ORANGE:

3

4

5     I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

6  of Florida, certify that I was authorized to and did

7  stenographically report the deposition of LEE

8  GREENHOUSE; that a review of the transcript was

9  requested; and that the foregoing transcript, Pages 1

10  through 154, is a true and accurate record of my

11  stenographic notes.

12     I further certify that I am not a relative, employee,

13  or attorney, or counsel of any of the parties, nor am I

14  a relative or employee of any of the parties' attorneys

15  or counsel connected with the action, nor am I

16  financially interested in the action.

17

18              DATED:  June 7, 2021.

19

20

21         _____
           Jazzmin A. Musrati, RPR, CRR
22         Registered Professional Reporter
           Certified Realtime Reporter
23

24

25



# EXHIBIT B

## Richard A. Saldinger

| | |
|---|---|
| **From:** | Richard A. Saldinger |
| **Sent:** | Tuesday, May 25, 2021 3:39 PM |
| **To:** | James C. Moon |
| **Cc:** | Pratik Ghosh; Douglas Curran; Linda Leali; Robert P. Charbonneau; Schneiderman, Steven (USTP) |
| **Subject:** | RE: Power of Attorney |

There are no documents in my client's possession or control related to the POA that were prepared or generated prior to the execution of the POA.  Any communications between Lee Greenhouse and his counsel between February 3, 2021 and March 26, 2021 are protected by the attorney-client privilege.  There are also no documents in my client's possession or control related to the POA that were prepared or generated after March 26, 2021.



**Richard A. Saldinger** / Partner
rsaldinger@llflegal.com

**Latimer LeVay Fyock LLC**
55 W Monroe Street - Suite 1100
Chicago IL, 60603
http://www.llflegal.com

312.667.1359 (office - direct)
773.505.6566 (cell)
312.422.8001 (fax)

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Dissemination, distribution or copying of the communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone or reply e-mail (hchesney@llflegal.com) and delete the message and all attachments thereto. Thank you.

**From:** James C. Moon <jmoon@melandbudwick.com>
**Sent:** Tuesday, May 25, 2021 1:03 PM
**To:** Richard A. Saldinger <rsaldinger@llflegal.com>
**Cc:** Pratik Ghosh <Ghosh@braunhagey.com>; Douglas Curran <curran@braunhagey.com>; Linda Leali <lleali@lealilaw.com>; Robert P. Charbonneau <RPC@agentislaw.com>; Schneiderman, Steven (USTP) <Steven.D.Schneiderman@usdoj.gov>
**Subject:** RE: Power of Attorney

Thank you Richard.

Are there any communications related to the POA and termination thereof, for example, any communications related to who the POA was provided to, or what acts were done in reliance upon the authority of the POA? If there are, is any privilege being asserted with respect to such communications?

Relatedly, I assume the Debtor or his counsel have an executed copy, and I would ask that Bob provide us with same.

Warm regards,

Jim

**From:** Richard A. Saldinger <rsaldinger@llflegal.com>
**Sent:** Tuesday, May 25, 2021 1:51 PM
**To:** James C. Moon <jmoon@melandbudwick.com>
**Cc:** Pratik Ghosh <Ghosh@braunhagey.com>; Douglas Curran <curran@braunhagey.com>; Linda Leali <lleali@lealilaw.com>; Robert P. Charbonneau <RPC@agentislaw.com>
**Subject:** RE: Power of Attorney

**EXTERNAL EMAIL:**
Counsel,

In response to Jim's e-mail below, attached is a Word version of the referenced POA.  My client does not have an executed copy of the POA.  I am also attaching a related Termination of Attorney-Client Relationship letter.

Regards,

Rich Saldinger



**Richard A. Saldinger** / Partner
rsaldinger@llflegal.com

**Latimer LeVay Fyock LLC**
55 W Monroe Street - Suite 1100
Chicago IL, 60603
http://www.llflegal.com

312.667.1359 (office - direct)
773.505.6566 (cell)
312.422.8001 (fax)

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Dissemination, distribution or copying of the communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone or reply e-mail (hchesney@llflegal.com) and delete the message and all attachments thereto. Thank you.

**From:** James C. Moon <jmoon@melandbudwick.com>
**Sent:** Monday, May 24, 2021 12:37 PM
**To:** Richard A. Saldinger <rsaldinger@llflegal.com>
**Cc:** Pratik Ghosh <Ghosh@braunhagey.com>; Douglas Curran <curran@braunhagey.com>; Linda Leali <lleali@lealilaw.com>
**Subject:** Power of Attorney

Richard,

Can you please provide us with the Power of Attorney the Debtor gave to Lee Greenhouse prior to the bankruptcy case and any correspondence related to same? We can formally amend the 2004 Request to add, but I wanted to see if Lee will voluntarily provide first.

Please advise.

Regards,

Jim

JAMES MOON

*Pronouns: He/Him/His*



MELAND | BUDWICK

3200 Southeast Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131

305-358-6363

jmoon@melandbudwick.com
www.melandbudwick.com
Download  Vcard

> **Our firm name is now Meland Budwick, P.A., as a result of Peter D. Russin's recent appointment as a United States Bankruptcy Judge in the Southern District of Florida.**

# EXHIBIT C

## LATIMER LeVAY FYOCK LLC



**Latimer | LeVay | Fyock LLC**

55 West Monroe Street
Suite 1100
Chicago, Illinois 60603

phone 312.422.8000
facsimile 312.422.8001
www.llflegal.com

Richard A. Saldinger
Direct: 312-667-1359
rsaldinger@llflegal.com

May 12, 2021

<u>**Via Electronic Mail**</u>

James C. Moon
Meland Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131
jmoon@melandbudwick.com

Pratik Ghosh
Braunhagey & Borden LLP
7 Times Square, 27th Floor
New York, NY 10036-6424
ghosh@braunhagey.com

J. Noah Hagey
Andrew Levine
351 California Street, 10th Floor
San Francisco, California 9410
hagey@braunhagey.com
levine@braunhagey.com

RE:     *In re the Bankruptcy Estate of Harry Beck Greenhouse*
         *Rule 2004 Examination and Subpoena for Documents – Lee Greenhouse*

Dear Counsel:

As you know, I have been retained by Lee Greenhouse to represent him in connection with the above-referenced matter.  This letter shall serve to provide Mr. Greenhouse's written responses and objections to the documents requested by Polychain Partners, LLC in its *Notice of Rule 2004 Examination Duces Tecum*.

### OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

<u>Request No. 1</u> – Documents related to all real property jointly owned by You and Debtor.

Page -2-
James Moon, Esq.
Pratik Ghosh, Esq.
J. Noah Hagey, Esq.
Andrew Levine, Esq.
May 12, 2021

> Response – Mr. Greenhouse does not possess any documents responsive to this request.

Request No. 2 – Documents regarding any real property transferred to You by Debtor from January 1, 2020 to the present.

> Response – Mr. Greenhouse does not possess any documents responsive to this request.

Request No. 3 – Documents regarding any trust that Debtor has an interest in.

> Response – Mr. Greenhouse does not possess any documents responsive to this request.

Request No. 4 – All statements for all personal, business, or joint bank accounts owned between You and Debtor from January 1, 2018 to present.

> Response – Mr. Greenhouse does not possess any documents responsive to this request.

Request No. 5 – All statements for all investment, trading or retirement accounts jointly held [or jointly] owned [by] You and Debtor from January 1, 2018 to the present.

> Response – Mr. Greenhouse objects to this request as overbroad, vague and ambiguous as to the request for "all statements." Subject to and without waiving the foregoing objections, Mr. Greenhouse states that he will produce copies of the following documents for each of the five Joint Ventures in which both he and Debtor have an interest:

- Schedule K-1 statements for each of the Joint Ventures for 2018-2020, to the extent that such K-1 statements exist for each Joint Venture;
- Morgan Stanley Smith Barney monthly account statements for each of the Joint Ventures from January 2018 – April 2021, to the extent that such statements exist for each of the Joint Ventures;
- The most recent Capital Account Statements for each of the Joint Ventures reflecting the capital contributions and distributions made through the effective date of those statements for each of the Joint Ventures;
- Merrill Lynch brokerage statements for each of the Joint Ventures from 1/1/18 (to the extent that such brokerage statements exist for the Joint Venture);
- "Welcome Letters" for those recently opened Merrill Lynch brokerage accounts where no brokerage statements have been generated as of yet;
- Fully executed Joint Venture Agreements (to the extent that Mr. Greenhouse readily possesses such fully executed agreements); and

Page -3-
James Moon, Esq.
Pratik Ghosh, Esq.
J. Noah Hagey, Esq.
Andrew Levine, Esq.
May 12, 2021

- Original, unsigned Joint Venture Agreements to the extent that Mr. Greenhouse does not readily possess the fully executed copies of such agreements.

Request No. 6 – All documents from January 1, 2018 to present regarding any entities in which both You and Debtor have an interest.

Response - Mr. Greenhouse objects to this request as overbroad, vague, ambiguous and duplicative of other requests contained in the *Subpoena Duces Tecum*. Subject to and without waiving the foregoing objections, Mr. Greenhouse states that he will produce copies of the following documents for each of the five Joint Ventures in which both he and Debtor have an interest:

- Schedule K-1 statements for each of the Joint Ventures for 2018-2020, to the extent that such K-1 statements exist for each Joint Venture;
- Morgan Stanley Smith Barney monthly account statements for each of the Joint Ventures from January 2018 – April 2021, to the extent that such statements exist for each of the Joint Ventures;
- The most recent Capital Account Statements for each of the Joint Ventures reflecting the capital contributions and distributions made through the effective date of those statements for each of the Joint Ventures;
- Merrill Lynch brokerage statements for each of the Joint Ventures from 1/1/18 (to the extent that such brokerage statements exist for the Joint Venture);
- "Welcome Letters" for those recently opened Merrill Lynch brokerage accounts where no brokerage statements have been generated as of yet;
- Fully executed Joint Venture Agreements (to the extent that Mr. Greenhouse readily possesses such fully executed agreements); and
- Original, unsigned Joint Venture Agreements to the extent that Mr. Greenhouse does not readily possess the fully executed copies of such agreements.

Request No. 7 – All documents reflecting any transfer of any financial or other asset to You by Debtor from January 1, 2018 to present.

Response – Mr. Greenhouse does not possess any documents responsive to this request other than e-mails reflecting a single wire transfer from Debtor to Mr. Greenhouse in the amount of $24,547 made on or about December 18, 2018. Mr. Greenhouse will explain the nature and purpose of this transfer during his Rule 2004 examination.

Page -4-
James Moon, Esq.
Pratik Ghosh, Esq.
J. Noah Hagey, Esq.
Andrew Levine, Esq.
May 12, 2021

Request No. 8 – All communications regarding the $4,173,141.25 arbitration award arising from the January 8, 2021 JAMS arbitration against Polychain, including but not limited to Debtor's ability to pay the award.

    Response – Mr. Greenhouse does not possess any documents responsive to this request.

Request No. 9 – All communications regarding Polychain.

    Response – Mr. Greenhouse objects to this request as overbroad, unlimited in time and scope and because it seeks documents that are not relevant to the issues pending in the bankruptcy estate proceedings. Subject to and without waiving the foregoing objections, Mr. Greenhouse states that he reviewed all of his prior e-mail communications with Debtor from January 1, 2018 to the present searching for any communications regarding (i) Debtor's ability to satisfy any potential or actual judgment in favor of Polychain, (ii) any thoughts or efforts by Debtor to hide any of his assets or protect his assets from recovery by his creditors, including Polychain, (iii) the actual or potential consequences to Debtor of an arbitration award in favor of Polychain and/or (iv) Debtor's intent to file for bankruptcy in the event that an arbitration award in favor of Polychain was entered against Debtor. Mr. Greenhouse did not locate any communications with Debtor regarding any of the foregoing topics.

Request No. 10 – All communications between You and Debtor related to Debtor's Cryptocurrency assets and valuation thereof from January 1, 2016 to present.

    Response – Debtor objects to this request as overbroad in time and scope and because it seeks documents that are not relevant to the issues pending n the bankruptcy estate proceedings. Subject to and without waiving the foregoing objections, Mr. Greenhouse located two e-mail communications between he and Debtor which may be responsive to this request.

Request No. 11 – Documents regarding any limited liability company, limited partnership, partnership, general partnership or similar domestic or foreign corporate entity managed or controlled by You in which Debtor has any interest.

    Response – Debtor objects to this request as overbroad in time and scope and because it seeks documents that are not relevant to the issues pending in the bankruptcy estate proceedings. Subject to and without waiving the foregoing objections, Mr. Greenhouse states that he will produce copies of the following documents for each of the five Joint Ventures in which both he and Debtor have an interest:

        - Schedule K-1 statements for each of the Joint Ventures for 2018-2020, to the extent that such K-1 statements exist for each Joint Venture;

Page -5-
James Moon, Esq.
Pratik Ghosh, Esq.
J. Noah Hagey, Esq.
Andrew Levine, Esq.
May 12, 2021

- Morgan Stanley Smith Barney monthly account statements for each of the Joint Ventures from January 2018 – April 2021, to the extent that such statements exist for each of the Joint Ventures;
- The most recent Capital Account Statements for each of the Joint Ventures reflecting the capital contributions and distributions made through the effective date of those statements for each of the Joint Ventures;
- Merrill Lynch brokerage statements for each of the Joint Ventures from 1/1/18 (to the extent that such brokerage statements exist for the Joint Venture);
- "Welcome Letters" for those recently opened Merrill Lynch brokerage accounts where no brokerage statements have been generated as of yet;
- Fully executed Joint Venture Agreements (to the extent that Mr. Greenhouse readily possesses such fully executed agreements); and
- Original, unsigned Joint Venture Agreements to the extent that Mr. Greenhouse does not readily possess the fully executed copies of such agreements.

If you have any questions regarding any of the foregoing responses, I would be happy to address them at Mr. Greenhouse's Rule 2004 examination, which is currently scheduled for May 26, 2021 beginning at 12:00 p.m. (ET).

Very truly yours,

Richard A. Saldinger

RAS/alh

cc:    Mr. Lee Greenhouse

# **EXHIBIT D**

## Richard A. Saldinger

| | |
|---|---|
| **From:** | Richard A. Saldinger |
| **Sent:** | Monday, June 14, 2021 2:09 PM |
| **To:** | Pratik Ghosh |
| **Cc:** | Nicole Grimal Helmstetter; Robert P. Charbonneau |
| **Subject:** | In re the Bankruptcy Estate of Lee Greenhouse |
| **Attachments:** | LG distribution memos.pdf; USV cap calls and distr memos.pdf; Owners cap required.pdf; Ledgers.pdf; Emails with JV members re cap calls.pdf; Emails w USV re capital calls.pdf |

Pratik,

As a follow up to my June 9, 2021 letter, attached to this e-mail are the following documents:

- Distributions letters from Lee Greenhouse to the investors in the five Joint Ventures from January 1, 2018 to the present.  As you know, all of these monies have been previously distributed by Mr. Greenhouse to the investors, and there are no pending distributions;
- Redacted copies of correspondence from USV to my client from January 1, 2018 to the present for each of the five funds announcing distributions or requesting capital calls.  Again, there are no pending distributions or pending capital calls;
- A copy of the spreadsheet referenced in Mr. Greenhouse's prior deposition testimony;
- Redacted copies of ledgers reflecting contributions by and distributions to Harry Greenhouse from the five funds for the time period January 1, 2018 to the present;
- E-mail correspondence from my client to the investors in the Joint Ventures requesting certain capitals, to the extent there was any such written correspondence from January 1, 2018 to the present; and
- E-mail correspondence from USV to my client regarding capital calls for any of the five funds, to the extent there was any such written correspondence from January 1, 2018 to the preset.

My client has now gone above and beyond in response to the Subpoena *Duces Tecum* served by Polychain.  Many of the documents produced were not even requested in the Subpoena or were certainly not requested with the required specificity.  If you still wish to continue Mr. Greenhouse's deposition after reviewing these documents, let me know and we can have a discussion on that topic.  However, the documents attached hereto are self-explanatory and consistent with my client's prior deposition testimony.  I do not readily see what additional, relevant testimony would need to be elicited from Mr. Greenhouse.

Regards,

Richard Saldinger



**Richard A. Saldinger** / Partner
rsaldinger@llflegal.com

**Latimer LeVay Fyock LLC**
55 W Monroe Street - Suite 1100
Chicago IL, 60603
http://www.llflegal.com

312.667.1359 (office - direct)
773.505.6566 (cell)
312.422.8001 (fax)

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Dissemination, distribution or copying of the communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone or reply e-mail (hchesney@llflegal.com) and delete the message and all attachments thereto. Thank you.

# **EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

HARRY BECK GREENHOUSE,

Debtor.
_____/

Chapter 11
Subchapter V

Case No. 21-12844-BKC-AJC

## OBJECTIONS AND RESPONSES OF LEE GREENHOUSE TO SUBPOENA TO PRODUCE DOCUMENTS ISSUED BY POLYCHAIN PARNTERS LLC

Lee Greenhouse ("Lee"), by and through his undersigned attorneys, hereby objects and responds to the Subpoena To Produce Documents issued by Creditor, Polychain Partners LLC, and states follows:

### GENERAL OBJECTIONS

These General Objections are incorporated into each of the specific responses that follow. Notwithstanding those responses, Lee does not waive any of these General Objections.

1.    Lee objects to the Subpoena to the extent that it seeks to impose on Lee any obligations not required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Southern District of Florida.

2.    Lee objects to the Subpoena because there are no pending proceedings or pending objections that permit discovery in the form of this Subpoena. *See* Rules 9002 and 9016 of the Federal Rules of Bankruptcy Procedure.

3.    Lee objects to the Subpoena to the extent that it seeks documents and information that can be obtained from the Debtor, Harry Greenhouse.  Lee will no longer produce any documents that can be obtained from the Debtor, Harry Greenhouse.

4.      Lee objects to the Subpoena to the extent that it calls for Lee to take action other than: (1) a reasonable and thorough inquiry; and (2) a reasonable and thorough search for information maintained in Lee's possession, custody, or control.

5.      Lee objects to the Subpoena to the extent that it seeks documents, things, and information protected by the attorney-client privilege and/or work product immunity.

6.      An objection based on attorney-client privilege and/or work product immunity should not be construed as a representation that such documents, things, or information exist or existed. Such objection indicates only that the Subpoena is of such a scope as to embrace subject matter protected by the attorney-client privilege and/or work product immunity.

7.      Lee's Responses and Objections are based on Lee's good-faith interpretation of the individual Subpoena and are subject to correction for errors or omissions, if any. Nothing in these Responses and Objections should be construed as waiving rights or objections, which might otherwise be available to Lee.

8.      Lee reserves the right to redact from documents produced any matter that is not called for or with respect to which Lee has objected to the Request.

9.      Lee objects to the definitions of "You" and "Your" as vague, ambiguous, overbroad and not proportional to the needs of the pending Bankruptcy Case. Lee shall interpret "You" and "Your" as referring solely to Lee Greenhouse.

10.     Lee objects to the Subpoena to the extent that it seeks irrelevant information.

11.     Lee objects to the Subpoena to the extent that it seeks discovery disproportionate to the needs of the Bankruptcy Case, and in particular those for which the burden or expense of the proposed discovery outweighs its likely benefit.

12.    Lee objects to the Subpoena to the extent that it seeks information constituting, reflecting, or revealing confidential financial information, or personal information.

13.    Lee objects to the Subpoena to the extent that it requests "all documents" or "all information" to be produced as irrelevant and not proportional to the needs of the Bankruptcy Case.  For those requests in the Subpoena that Lee agrees to provide non-privileged, relevant, responsive documents, Lee will produce sufficient documents to show the subject matter of the request.

## SPECIFIC OBJECTIONS AND RESPONSES

1.    All communications between You and Buchanan regarding Debtor's bankruptcy proceeding, including but not limited to all communications regarding Your payment of a $100,000 retainer to Buchanan, currently held in trust.

**RESPONSE: In addition to the foregoing General Objections, Lee objects to this request as seeking documents that are neither relevant nor reasonably likely to lead to the discovery of admissible evidence in the Bankruptcy Case.  Subject to and without waiving the foregoing General Objections and Specific Objections, Lee states as follows:  None.**

2.    All documents regarding the $100,000 retainer – currently held in trust – that You paid to Buchanan.

**RESPONSE: In addition to the foregoing General Objections, Lee objects to this request as seeking documents that are neither relevant nor reasonably likely to lead to the discovery of admissible evidence in the Bankruptcy Case.  Subject to and without waiving the foregoing General Objections and Specific Objections, Lee will produce non-privileged documents responsive to this request.**

3.    All agreements between You and Buchanan, including but not limited to any engagement agreements or retainer agreements between You and Buchanan or between You and Debtor.

**RESPONSE: In addition to the foregoing General Objections, Lee objects to this request**

as seeking documents that are neither relevant nor reasonably likely to lead to the

discovery of admissible evidence in the Bankruptcy Case.  Subject to and without waiving

the foregoing General Objections and Specific Objections, Lee states as follows:  None.

4.      All documents and communications regarding any transfer, sale, proposed transfer or proposed sale in Greenhouse USV 2012 JV, Greenhouse USV 2014 JV, Greenhouse USV 2014 Opportunity, Greenhouse USV 2016 JV, or Greenhouse USV 2016 [sic] JV.[1]

RESPONSE: In addition to the foregoing General Objections, Lee objects to this request

as seeking documents that are neither relevant nor reasonably likely to lead to the

discovery of admissible evidence in the Bankruptcy Case.  Subject to and without waiving

the foregoing General Objections and Specific Objections, Lee states as follows:  None.

5.      All documents and communications regarding any transfer, sale, proposed transfer or proposed sale of interest in any entity in which You and Debtor hold a financial interest.

RESPONSE: In addition to the foregoing General Objections, Lee objects to this request

as seeking documents that are neither relevant nor reasonably likely to lead to the

discovery of admissible evidence in the Bankruptcy Case.  Subject to and without waiving

the foregoing General Objections and Specific Objections, Lee states as follows:  None.

6.      All documents and communications since June 14, 2021 regarding any distributions, updates, account statements received by You from Union Square Ventures in connection with investments held by Greenhouse USV 2012 JV, Greenhouse USV 2014 JV, Greenhouse USV 2014 Opportunity JV, Greenhouse USV 2016 JV, or Greenhouse USV 2016 [sic] JV.

RESPONSE: In addition to the foregoing General Objections, Lee objects to this request

as seeking documents that are neither relevant nor reasonably likely to lead to the

discovery of admissible evidence in the Bankruptcy Case.  Subject to and without waiving

---

[1] Lee assumes that Polychain intended to request documents relating to Greenhouse USV 2019 JV rather than duplicating its request for documents relating to Greenhouse USV 2016 JV.  Lee's response will be based on this assumption.

the foregoing General Objections and Specific Objections, Lee will produce non-privileged documents responsive to this request.

Dated: November 5, 2021

**LEE GREENHOUSE**

_/s/ Richard A. Saldinger_

Richard A. Saldinger
Latimer LeVay Fyock LLC
55 W. Monroe Street, Ste. 1100
Chicago, IL 60603
Phone: (312) 667-1359
rsaldinger@llflegal.com
jambrogi@llflegal.com

_Counsel for Respondent, Lee Greenhouse_

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served on November 5, 2021 upon the following:

James C. Moon
Meland Budwick, P.A.
200 S. Biscayne Blvd., Suite 3200
Miami, Florida 33131
jmoon@melandbudwick.com
Counsel for Polychain Partners LLC

Linda Marie Leali
2525 Ponce De Leon Blvd., Suite 300
Coral Gambles, Florida 33134
lleali@lealilaw.com
Subchapter V Trustee

Steven D. Schneiderman
Office of the US Trustee
51 SW 1 Ave #1204
Miami, Florida 33130
steven.d.schneiderman@usdoj.gov
United States Trustee

Nicole Grimal Helmstetter
Buchanan Ingersoll & Rooney PC
One Biscayne Tower
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
nicole.helmstetter@bipc.com
Counsel for Debtor in Possession

/s/ Richard A. Saldinger
Richard A. Saldinger, Esq.

# **EXHIBIT F**

# LATIMER LeVAY FYOCK LLC



**Latimer | LeVay | Fyock LLC**

55 West Monroe Street
Suite 1100
Chicago, Illinois 60603

phone 312.422.8000
facsimile 312.422.8001
www.llflegal.com

**Richard A. Saldinger**
Direct:  312-667-1359
rsaldinger@llflegal.com

June 9, 2021

**Via Electronic Mail**
Pratik Ghosh
Braunhagey & Borden LLP
7 Times Square, 27th Floor
New York, NY 10036-6424
ghosh@braunhagey.com

RE:   *In re the Bankruptcy Estate of Harry Beck Greenhouse*
      *Rule 2004 Examination and Subpoena for Documents – Lee Greenhouse*

Dear Counsel:

This letter will respond to the misplaced accusations, baseless allegations and additional document requests set forth in your June 4, 2021 letter.

The majority of your letter accuses Mr. Greenhouse of failing to respond properly and completely to the document requests contained in Polychain's *Rule 2004 Examination Duces Tecum* (the "Subpoena"). Your accusations have no merit. In response to the Subpoena, you were sent numerous responsive documents plus a very clear letter (dated May 12, 2021) setting forth my client's objections and written responses to the requests. This letter followed our telephone conference in which we reached an agreement on the scope of the requests, which you acknowledged on our call were overbroad in many respects. Notably, although you received my May 12 letter well in advance of my client's June 2nd deposition, you never raised any issues with or objections to my May 12 letter and the documents produced by my client. If you believed that the document production was insufficient or incomplete in any manner, you could have and should have raised those issues before the deposition, and we could have attempted to resolve those issues. You chose not to do so. At bottom, my client's document production was complete, thorough and responsive to the Subpoena. The remainder of this letter will respond to your more specific allegations/requests in the order that they were set forth in your letter.

Page -2
Pratik Ghosh, Esq.
June 9, 2021


**Response to Section A of your June 4 Letter**

      Response to Bullet Point No. 1 – My client's document collection efforts were done with my counsel and with the guidance *you* provided on our conference call and in your May 6, 2021 e-mail. My client's document production was not limited at all by his relationship with the Debtor. Your express and implied accusations that my client is hiding something to protect the Debtor are false and baseless.

      Response to Bullet Point No. 2 - My client did not search the hard drive to his computer because to do so was unnecessary. Gmail, which he uses for e-mail, is a cloud-based service. He literally reviewed every e-mail between himself and Debtor from January 1, 2018 to the present. He went online to locate and produce all of the account statements and other financial information requested. There was nothing to search for on the hard drive of his computer.

      Response to Bullet Point No. 3 – You are correct that my client did not search his e-mail accounts using search terms. However, to be *more* thorough and transparent, he reviewed *every, single e-mail* between himself and the Debtor, as outlined in my May 12 letter. From our conference call regarding the Subpoena, my client and I understood the subject matter that Polychain is seeking and he reviewed all of those e-mails seeking any such content. It does not exist. The fact that there are no responsive documents is not an indication that my client did not perform a thorough search.

      Response to Bullet Point No. 4 – *See* response to Bullet Point No. 3. In addition, it would be patently unreasonable and unduly burdensome for my client to review all of his e-mails with individuals other than Debtor. Searching for what? For what time period? The Subpoena provides no guidance in this regard and you did not provide any guidance on this newly raised topic either during our conference call or in your May 6, 2021 e-mail.

      Response to Bullet Point No. 5 – Your allegations are false and misleading. *See* response to Bullet Point No. 3 and my May 12 letter.

      Response to Bullet Point No. 6 – *See* response to Bullet Point No. 3. Again, Gmail is a cloud-based platform, and the only such e-mail platform utilized by my client. My client also reviewed every text message between himself and Debtor for the period you requested. Text messaging is also cloud-based.

      Response to Bullet Point No. 7 – My client does not possess any "prior electronic devices," so there was nothing for him to search in this regard.

      Response to Bullet Point No. 8 – *See* responses to Bullet Point Nos. 3 and 4.

Page -3
Pratik Ghosh, Esq.
June 9, 2021

**Response to Section B of your June 4 Letter**

Again, please recognize that my client's objections and responses to the Subpoena were thoroughly outlined in my May 12 letter. You did not raise any objection to that letter or his production prior to the deposition. Yet, you now attack that response and demand that he produce additional documents not previously requested and that appear to have no relevance to Polychain's claims against Debtor. Please see the responses below to your latest demands.

Response to Bullet Point No. 1 – My client will produce the spreadsheet referenced by my client during his deposition. Please note that my client only started maintaining that spreadsheet beginning with the 2016 fund. Although not requested or elicited during his deposition testimony, my client will also provide redacted copies of ledgers reflecting contributions by and distributions to Harry Greenhouse from the five funds for the time period January 1, 2018 to the present, to the extent that contributions or distributions were made by or to Debtor during that time frame.

Response to Bullet Point No. 2 – The only "agreement" that exists between Union Square and the Greenhouse USV Joint Ventures is the subscription agreement referenced by my client during his deposition testimony. This document was not expressly requested in the Subpoena. Moreover, and in any event, this is a confidential agreement that my client is not authorized by USV to produce to Polychain. If you wish to obtain a copy, you will need to do so through a subpoena to USV.

Response to Bullet Point No. 3 – Again, correspondence regarding capital calls made to Debtor were not expressly requested in the Subpoena, and my client clearly testified as to what is due and owing at this time by Debtor. In a continued effort by my client to cooperate with complete transparency, my client will provide the limited e-mail correspondence he had with Debtor and the other investors regarding capital calls from January 1, 2018 to the present. There were no communications via text messaging regarding capital calls.

Response to Bullet Point No. 4 – The Subpoena did not request communications between USV and the Greenhouse USV Joint Ventures nor do I see how such communications are relevant to Polychain's claims against Debtor. However, in a continued effort by my client to cooperate with complete transparency, my client will produce copies of any correspondence from USV (redacting confidential information, as necessary) reflecting distributions or capital calls from January 1, 2018 to the present for any of the five funds.

Response to Bullet Point No. 5 – The Subpoena did not request documents concerning the holdings of any of the USV funds nor do I see how such documents are relevant to Polychain's claims against Debtor. Still further, such information is proprietary and confidential to USV. If you want to continue to pursue the production of such documentation, you will need to do so through a subpoena to USV.

In addition, as to your commentary that your May 6, 2021 e-mail requested any of the foregoing documents, I respectfully disagree. We reviewed your e-mail and produced the

Page -4
Pratik Ghosh, Esq.
June 9, 2021

responsive documents in my client's possession. Please recognize that not all of the documents requested by you exist. I also direct you again to your failure to respond to or object to anything in my May 12 letter.

**Response to Section C of your June 4 Letter**

While I understand why you might be frustrated by my and Debtor's counsel's objections to some of your questions regarding the Power of Attorney ("POA"), those frustrations do not mean that the objections were improper. You repeatedly phrased your questions in a manner that, if answered by my client, would necessarily reveal attorney-client privileged communications. Further, my client answered all of your questions regarding what he did, or did not do, as Debtor's Power of Attorney during the limited time period when he had the authority to act in that capacity.

Further, Debtor's counsel and I previously confirmed that there are no "documents and communications ... concerning the February 3, 2021 POA." The retention agreement itself is a privileged document, and there are no other documents evidencing or relating to the POA which have not been produced.

**The Continuance of Mr. Greenhouse's Deposition**

After you review the additional documents, let me know if you have additional, relevant questions that would necessitate the continuance of Mr. Greenhouse's deposition. However, and in any and all events, I do not want to continue Mr. Greenhouse's deposition unless or until these outstanding document production issues are resolved. I will produce the additional documents reference herein by the close of business on Monday, June 14, 2021, if not earlier.

Let me know if you would like to have a conversation to discuss any of these issues.

Very truly yours,

Richard A. Saldinger

RAS/alh

cc:    Mr. Lee Greenhouse

# **<u>EXHIBIT G</u>**

## Richard A. Saldinger

| | |
|---|---|
| **From:** | Richard A. Saldinger |
| **Sent:** | Tuesday, December 14, 2021 11:00 AM |
| **To:** | Pratik Ghosh |
| **Cc:** | Andrew Levine; James C. Moon; Helmstetter, Nicole G. |
| **Subject:** | RE: In re: Harry B. Greenhouse (Bankr. S.D. Fla. Case No. 21-12844-AJC) |
| **Attachments:** | H_Greenhouse-090906_image.pdf; H_Greenhouse-84280_image.pdf |

Pratik,

Thanks for your e-mail.  See my responses in ALL CAPS below.

Thanks.

Rich

**Richard A. Saldinger** / Partner
rsaldinger@llflegal.com

**Latimer LeVay Fyock LLC**
55 W Monroe Street - Suite 1100
Chicago IL, 60603
http://www.llflegal.com

312.667.1359 (office - direct)
773.505.6566 (cell)
312.422.8001 (fax)

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Dissemination, distribution or copying of the communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone or reply e-mail (hchesney@llflegal.com) and delete the message and all attachments thereto. Thank you.

**From:** Pratik Ghosh <Ghosh@braunhagey.com>
**Sent:** Friday, December 10, 2021 7:39 PM
**To:** Richard A. Saldinger <rsaldinger@llflegal.com>
**Cc:** Andrew Levine <levine@braunhagey.com>; James C. Moon <jmoon@melandbudwick.com>
**Subject:** RE: In re: Harry B. Greenhouse (Bankr. S.D. Fla. Case No. 21-12844-AJC)

Rich,

I write to follow up on our December 8, 2021 meet and confer regarding Polychain's discovery requests to your client.

While we appreciate that your client wishes to avoid spending additional time and resources responding to Polychain's requests, he is in possession, custody, and control of documents and information necessary to evaluate the Debtor's proposed plan.  We would like to avoid motion practice, but given your client's role—he manages several special purpose vehicles in which Debtor has interests worth millions of dollars, communicates regularly with Debtor about those and other investments, and had power of attorney over Debtor's finances for a time—we cannot accept as complete your client's inadequate search and production of materials responsive to Polychain's October 21, 2021 Subpoena.  **AS OUTLINED IN MY PRIOR CORRESPONDENCE, MY CLIENT'S SEARCH WAS THOROUGH AND NOT INADEQUATE.**

Below I memorialize there of the key issues we discussed:

- First, you stated that you would consider producing unredacted versions of the Q3 2021 capital account statements for the Greenhouse USV Joint Ventures. As stated, we are amenable to these being produced on an Attorneys Eyes Only basis under the Protective Order governing this case. Please let us know as soon as possible if you will agree to produce unredacted copies of these capital account statements. **WE PREVIOUSLY UNREDACTED COPIES OF THE CAPITAL ACCOUNT STATEMENTS. IF YOU ARE REFERENCING CERTAIN INFORMATION REDACTED FROM UNION SQUARE'S DISTRIBUTION MEMOS, I AGAIN SUGGEST THAT YOU SEEK SUCH INFORMATION DIRECTLY FROM UNION SQUARE. I DO NOT BELIEVE THAT THE PROTECTIVE ORDER DIRECTLY ADDRESSES THIS SITUATION AND MY CLIENT IS NOT COMFORTABLE DISCLOSING THIS CONFIDENTIAL INFORMATION. MOREOVER, AND IN ANY EVENT, THIS IS UNION SQUARE'S INFORMATION. IF UNION SQUARE WANTS TO PROVIDE SUCH CONFIDENTIAL INFORMATIN, THEY CAN DO SO INFORMALLY OR IN RESPONSE TO A SUBPOENA.**

- Second, you asked that we provide exemplar communications from your client which were produced by Debtor but not by your client. I have attached two such examples. As these documents show, your client is in possession of responsive documents which he had an independent obligation to produce. I expressed some concern that your document production was based off a document search your client performed himself through a manual e-mail search. Given the procedural deficiencies and the exemplar documents showing responsive documents in your client's possession, custody, or control, we reiterate our request that you provide a search term proposal to sufficiently capture all documents and communications responsive to Polychain's subpoena. **I REVIEWED THE "EXAMPLES" YOU PROVIDED OF COMMUNICATIONS THAT YOU ALLEGE MY CLIENT FAILED TO PRODUCE IN RESPONSE TO POLYCHAIN'S SUBPOENA. BOTH OF THOSE EXAMPLES ARE ALSO ATTACHED TO THIS E-MAIL. HOWEVER, NEITHER OF THE TWO E-MAILS WAS RESPONSIVE TO THE SUBPOENA. THE JUNE 2017 E-MAIL RELATES TO ONE OF LEE GREENHOUSE'S INVESTMENTS. THE JUNE 2018 E-MAILS RELATES TO AN INVESTMENT PROPOSED TO LEE GREENHOUSE, BUT MR. GREENHOUSE CHOSE NOT TO INVEST IN THAT FUND. BOTH OF THE E-MAILS ALSO APPEAR TO BE COMPLETELY IRRELEVANT AND, IN ANY EVENT, THEY WERE PRODUCED BY THE DEBTOR.**

- Third, although I indicated that it may be possible for us to avoid reopening your client's deposition if a complete and sufficient document production is made, thus far that has not occurred. During Mr. Lee Greenhouse's deposition, we agreed to adjourn early as an accommodation to you, but we held the deposition open given the outstanding discovery issues. Please provide your client's availability for the continued deposition for the weeks of January 17 and January 24. **MY CLIENT HAS MADE A COMPLETE DOCUMENT PRODUCTION AND RECENTLY SUPPLEMENTED THAT DOCUMENT PRODUCTION, EVEN THOUGH THERE IS NO PENDING PROPOSED PLAN OF REORGANIZATION NOR (TO THE BEST OF MY KNOWLEDGE) HAS POLYCHAIN FILED ANY PENDING OBJECTIONS. AT THIS TIME, I DO NOT BELIEVE THERE ARE ANY OUTSTANDING DISCOVERY ISSUES NOR HAVE YOU EXPLAINED ANY NECESSITY TO DEPOSE MY CLIENT FURTHER.**

Best,
Pratik

**Pratik K. Raj Ghosh**
B R A U N H A G E Y  &  B O R D E N  LLP
Direct: (415) 715-4302

**From:** Richard A. Saldinger <rsaldinger@llflegal.com>
**Sent:** Thursday, December 2, 2021 10:15 AM
**To:** Pratik Ghosh <Ghosh@braunhagey.com>; James C. Moon <jmoon@melandbudwick.com>; Andrew Levine <levine@braunhagey.com>
**Subject:** FW: In re: Harry B. Greenhouse (Bankr. S.D. Fla. Case No. 21-12844-AJC)

**\*\*\* EXTERNAL MESSAGE \*\*\***

Re-sending because I sent it the first time to the wrong "Andrew."  My apologies.

Rich

**Richard A. Saldinger** / Partner
rsaldinger@llflegal.com
**Latimer LeVay Fyock LLC**
55 W Monroe Street - Suite 1100
Chicago IL, 60603
http://www.llflegal.com

312.667.1359 (office - direct)
773.505.6566 (cell)
312.422.8001 (fax)

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Dissemination, distribution or copying of the communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone or reply e-mail (hchesney@llflegal.com) and delete the message and all attachments thereto. Thank you.

**From:** Richard A. Saldinger
**Sent:** Thursday, December 2, 2021 8:47 AM
**To:** Pratik Ghosh <Ghosh@braunhagey.com>; 'Andrew D. Eichner (aeichner@bergerschatz.com)'
<aeichner@bergerschatz.com>; James C. Moon <jmoon@melandbudwick.com>
**Subject:** FW: In re: Harry B. Greenhouse (Bankr. S.D. Fla. Case No. 21-12844-AJC)

Counsel,

In response to the attached correspondence, let me know when you are free to participate in a conference call.

I am generally available tomorrow afternoon between 1:30 and 5:00 CST.

Thank you.

Regards,

Richard Saldinger

**Richard A. Saldinger** / Partner
rsaldinger@llflegal.com
**Latimer LeVay Fyock LLC**
55 W Monroe Street - Suite 1100
Chicago IL, 60603
http://www.llflegal.com

312.667.1359 (office - direct)
773.505.6566 (cell)
312.422.8001 (fax)

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Dissemination, distribution or copying of the communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone or reply e-mail (hchesney@llflegal.com) and delete the message and all attachments thereto. Thank you.

**From:** Vy Le <le@braunhagey.com>
**Sent:** Tuesday, November 23, 2021 10:55 PM
**To:** Richard A. Saldinger <rsaldinger@llflegal.com>
**Cc:** Pratik Ghosh <Ghosh@braunhagey.com>; Andrew Levine <levine@braunhagey.com>; Douglas Curran <Curran@braunhagey.com>; James C. Moon <jmoon@melandbudwick.com>; lleali@lealilaw.com; Steven.D.Schneiderman@usdoj.gov
**Subject:** In re: Harry B. Greenhouse (Bankr. S.D. Fla. Case No. 21-12844-AJC)

Counsel,

Attached, please find correspondence on behalf of Mr. Pratik K. Ghosh.

Best Regards,

Vy Le
Litigation Legal Assistant
**BRAUNHAGEY & BORDEN** LLP
Direct:  (415) 504-1187

**San Francisco (Main Office)**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel. & Fax: (415) 599-0210

**New York**
7 Times Square
27th Floor
New York, NY 10036-6524
Tel. & Fax: (646) 829-9403

This message is intended only for the confidential use of the intended recipient(s) and may contain protected information that is subject to attorney-client, work product, joint defense and/or other legal privileges.  If you are not the intended recipient, please contact me immediately at the phone number listed above and permanently delete the original message and any copies thereof from your email system.  Thank you.

FOR ADVISORS EYES ONLY

**From:** Lee Greenhouse <lee@greenhousegrows.com>
**Sent:** Wednesday, June 21, 2017 11:27 AM EDT
**To:** Mr. Harry Greenhouse <harrygreenhouse@gmail.com>
**Subject:** Fwd: Changes to Meta Stable Edge terms
**Attachment(s):** "lee details-objection.pdf","lee grandfather.pdf","Redline- Meta Stable Edge PPM LPA Sub (Capital FINAL 01-28-15) to (06-12-17).pdf"

What are your thoughts on this?


Lee Greenhouse
Greenhouse Associates, Inc.
(773) 404-0780
www.greenhousegrows.com

---------- Forwarded message ----------
**From: Josh Selms** <josh@metastablecapital.com>
Date: Tue, Jun 20, 2017 at 8:44 PM
Subject: Changes to Meta Stable Edge terms
To: Lee Greenhouse <lee@greenhousegrows.com>
Cc: MG STOVER - ECHOSIGN <investorservices@mgstover.com>, "metastable@mgstover.com" <metastable@mgstover.com>


Hi Lee,

As you probably know, Meta Stable Edge has performed great this year (up over 5x net in 2017 so far!).

I'm now full time, and Naval has jumped in to help us raise. We've added some amazing LPs recently (including Union Square Ventures, A16Z and Founders Fund).

This email is to convey a few changes to the partnership agreement, especially these two:

- We have additional expenses since that the fund has grown, and Naval and I are committing time to the fund. As such, we're removing the $150K annual cap on management fee. In other words, your 1.5% management fee will no longer be capped. We're raising the management fee for Edge to 2.5% for new investors, but you'll be grandfathered in at 1.5%.
- At the request of various LPs, we've tightened the withdraw rules to allow for quarterly (vs. monthly) withdrawals, plus a 15% fund-level gate per quarter.

We have also launched a new fund called Meta Stable Balanced. Balanced makes no assumptions about investor holdings in other coins, it's designed to be stand-alone (i.e., unlike Edge, it holds a significant bitcoin position). The fee structure for Balanced is 2/20, but as an existing LP of Edge, we're offering you a reduced 1/10 fee for any investment you commit to Balanced by July 31, 2017 (to be averaged in over the next 12 months).

See attachments:

- details-objection letter: fuller details of changes, along with a "notification of objection". If you disagree with these changes, please sign the "notification of objection" and send to the fund administrators (CCed above).
- grandfather letter: to officially lock in your 1.5% management fee (vs. the new 2.5% default), please sign and send to the fund administrators (CCed above).
- redline: redline of all changes to the legal language.

Thank you for being part of our fund!

Take care,

Josh

H_Greenhouse-090906

**From:** Lee Greenhouse <lee@greenhousegrows.com>
**Sent:** Wednesday, June 27, 2018 12:26 AM EDT
**To:** Ezra Galston <ezra.galston@gmail.com>; Mr. Harry Greenhouse <harrygreenhouse@gmail.com>
**Subject:** Re: Checking in

Hi Ezra,

Thanks for sharing the materials with me (I will keep them to myself), and congratulations on your progress.  I'm going out of the country tomorrow for about two weeks, so we can talk when I get back, but meanwhile I'm looking forward to diving into your materials.

All the best,
Lee

Lee Greenhouse
Greenhouse Associates, Inc.
(773) 404-0780
www.greenhousegrows.com

On Tue, Jun 26, 2018 at 10:54 PM, Ezra Galston<ezra.galston@gmail.com> wrote:
Hi Lee -

So nice to hear from you. Would be great to get together soon. I believe Harry has shared my deck and Q1 update letter but I've reattached them here. I have not yet finished the Q2 letter.

A nice update since the last time we spoke: Grubhub's CEO Matt Maloney committed to my fund as one of my largest investors and heading up my advisory board. This was a personal dream of mine and I think his presence helps create additional credibility around my mission to own the consumer internet landscape outside SF/NY. We actually had our monthly check-in call yesterday and I've attached the slides I covered with him. I'd appreciate you not sharing those slides with anyone else - you & Harry will actually be the only two people to have seen it :) Of the companies in those slides, Dibit is the only one I'm currently pursuing aggressively.

The fund has made two investments representing $1.75m in capital outlays.

1. Cameo.com - $1m
2. Unchained Capital - $750k

It is early days for both businesses, but I remain bullish on their progress. There is additional context in the pipeline slides.

Other notable investors coming into the July close besides Matt include Michael Bloomberg's VC arm Bloomberg Beta, Dan Levitan who co-founded Maveron alongside Howard Schultz, Ryan Enterprises (Pat Ryan's family office), Hunt Companies (one of the largest family offices in TX), and many more diverse and interesting folks.

Please let me know if there are further questions I can answer. If you're curious to reference check me, in addition to Harry (!) both Scott Meadow & Alan Warms know me well.

Have a nice evening,
Ezra

On Tue, Jun 26, 2018 at 9:45 PM, Lee Greenhouse<lee@greenhousegrows.com> wrote:
Hi Ezra,

We haven't talked a quite a while and Harry mentioned that he's investing in your fund.  I would be interested in an update with anything that would be easy for you to send along.  I hope that all is well with you.

Best wishes,
Lee

Lee Greenhouse
Greenhouse Associates, Inc.
(773) 404-0780
www.greenhousegrows.com

--
--

FOR ADVISORS EYES ONLY

Ezra Galston
Ezra.vc | @EzraMoGee

H_Greenhouse-84281